**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| LAURA POITRAS,<br><br>                              Plaintiff,<br><br>          v.<br><br>DEPARTMENT OF HOMELAND SECURITY, DEPARTMENT OF JUSTICE, and OFFICE OF THE DIRECTOR OF NATIONAL INTELLIGENCE,<br><br>                              Defendants. | Civil Action No. 15-cv-01091-KBJ |

## PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT

Plaintiff Laura Poitras ("Plaintiff") hereby cross-moves for summary judgment with respect to Defendant Department of Justice ("DOJ") component Federal Bureau of Investigation's ("FBI") and Defendant Department of Homeland Security ("DHS") component U.S. Customs and Border Protection's ("CPB") withholding of agency records responsive to Plaintiff's Freedom of Information Act ("FOIA") request. Plaintiff respectfully refers the Court to the accompanying memorandum of points and authorities in support of this cross-motion.

Dated: August 24, 2016

Respectfully Submitted,

*/s/ David L. Sobel*
DAVID L. SOBEL
D.C. Bar No. 360418
Electronic Frontier Foundation
5335 Wisconsin Avenue, N.W.
Suite 640
Washington, DC  20015
(202) 246-6180

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

LAURA POITRAS,

                         Plaintiff,

         v.                                        Civil Action No. 15-cv-01091-KBJ

DEPARTMENT OF HOMELAND
SECURITY, DEPARTMENT OF
JUSTICE, and OFFICE OF THE DIRECTOR
OF NATIONAL INTELLIGENCE,

                         Defendants.

<u>**MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT AND IN SUPPORT OF PLAINTIFF'S CROSS-MOTION FOR SUMMARY
JUDGMENT**</u>

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................. 1

STATEMENT OF FACTS .................................................................................................... 2

   I.   Plaintiff Was Routinely Stopped, Detained, and Questioned During
      International Travel Between 2006 and 2012. ................................................. 2

   II.  Plaintiff's FOIA Requests ................................................................................. 7

   III. Procedural History .............................................................................................. 8

ARGUMENT ........................................................................................................................ 9

   I.   FOIA Establishes a Presumption of Disclosure, and the Government Bears the
      Burden of Proving Withheld Information is Clearly Exempt. ........................... 9

   II.  FBI Has Improperly Withheld Records Under Exemption 5 .......................... 11

   III. FBI Has Improperly Withheld Records Under Exemption 7 .......................... 14

   IV. FBI and CBP Have Failed to Segregate and Release Non-Exempt Information ............. 18

   VI. CBP Has Failed to Conduct a Sufficient Search for Records. ....................... 20

CONCLUSION .................................................................................................................... 23

# TABLE OF AUTHORITIES

## Cases

*Ancient Coin Collectors Guild v. Dep't of State*,
   641 F.3d 504 (D.C. Cir. 2011) .................................................................................... 22

*Birch v. USPS*,
   803 F.2d 1206 (D.C. Cir. 1986) ................................................................................... 10

*Black v. Sheraton Corp. of America*,
   371 F. Supp. 97 (D.D.C. 1974) .................................................................................... 15

*Campbell v. Dep't of Justice*,
   164 F.3d 20 (D.C. Cir. 1998) ....................................................................................... 21

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986) ..................................................................................................... 10

*Center for Auto Safety v. Environmental Protection Agency*,
   731 F.2d 16 (D.C. Cir. 1984) ....................................................................................... 19

*Citizens for Responsibility & Ethics v. Dep't of Homeland Sec.*,
   648 F. Supp. 2d 152 (D.D.C. 2009) ............................................................................. 14

*Coastal States Gas Corp. v. Dep't of Energy*,
   617 F.2d 854 (D.C. Cir. 1980) ..................................................................................... 13

*Concepcion v. U.S. Customs & Border Prot.*,
   767 F. Supp. 2d 141 (D.D.C. 2011) ....................................................................... 21, 23

*Dep't of Air Force v. Rose*,
   425 U.S. 352 (1976) ....................................................................................................... 9

*Dep't of Interior v. Klamath Water Assn.*,
   532 U.S. 1 (2001) ........................................................................................................... 9

*Dep't of Justice v. Reporters Comm.*,
   489 U.S. 749 (1989) ....................................................................................................... 9

*Dep't of Justice v. Tax Analysts*,
   492 U.S. 136 (1989) ....................................................................................................... 9

*Duenas Iturralde v. Comptroller of the Currency*,
   315 F.3d 311 (D.C. Cir. 2003) ................................................................................ 20, 21

*Electronic Frontier Foundation v. Dep't of Justice*,
   141 F. Supp. 3d 51 (D.D.C. 2015) ("*EFF I*"), *appeal dismissed* No. 15-5346, 2016 WL
   3041648 (D.C. Cir. Apr. 27, 2016) .............................................................................. 10

*Electronic Frontier Foundation v. Dep't of Justice,*
826 F. Supp. 2d 157 (D.D.C. 2011) ("*EFF II*")................................................. 12, 13

*Environmental Protection Agency v. Mink,*
410 U.S. 73 (1973)................................................................................................ 12

*Founding Church of Scientology of Washington, D.C., Inc. v. Nat'l Sec. Agency,*
610 F.2d 824 (D.C. Cir. 1979)............................................................................. 20

*Friends of Blackwater v. Dep't of the Interior,*
391 F. Supp. 2d 115 (D.D.C. 2005)..................................................................... 22

*Harrison v. Exec. Office of U.S. Attorneys,*
377 F. Supp. 2d 141 (D.D.C. 2005)..................................................................... 10

*Johnson v. Exec. Office for U.S. Attorneys,*
310 F.3d 771 (D.C. Cir. 2002)............................................................................. 19

*Jordan v. Dep't of Justice,*
591 F.2d 753 (D.C. Cir. 1978)............................................................................. 11

*Judicial Watch v. Dep't of Homeland Sec.,*
857 F. Supp. 2d 129 (D.D.C. 2012)..................................................................... 22

*Judicial Watch v. Dep't of Justice,*
365 F.3d 1108 (D.C. Cir. 2004)........................................................................... 14

*Judicial Watch, Inc. v. Dep't of Homeland Security,*
841 F. Supp. 2d 142 (D.D.C. 2012)................................................................ 19, 20

*\*Judicial Watch, Inc. v. U.S. Postal Serv.,*
297 F. Supp. 2d 252 (D.D.C. 2004)........................................................... 11, 12, 13

*Kamman v. Internal Revenue Service,*
56 F.3d 46 (9th Cir. 1995) .................................................................................. 10

*King v. Dep't of Justice,*
830 F.2d 210 (D.C. Cir. 1987)........................................................................ 11, 15

*Lamont v. Dep't of Justice,*
475 F. Supp. 761 (S.D.N.Y. 1979) .................................................................. 15, 18

*Mead Data Cent., Inc. v. Dep't of Air Force,*
566 F.2d 242 (D.C. Cir. 1977).......................................................................... 10, 19

*Nat'l Labor Relations Bd. v. Robbins Tire & Rubber Co.,*
437 U.S. 214 (1978)............................................................................................... 9

*Nat'l Labor Relations Bd. v. Sears, Roebuck & Co.*,
   421 U.S. 132 (1975) ............................................................................................ 12

*Nation Magazine v. U.S. Customs Serv.*,
   71 F.3d 885 (D.C. Cir. 1995) ........................................................................... 20, 23

*Oglesby v. Dep't of Army*,
   79 F.3d 1172 (D.C. Cir. 1996) ............................................................................. 19

*Oglesby v. Dep't of Army*,
   920 F.2d 57 (D.C. Cir. 1990) ........................................................................... 20, 22

*People for the Ethical Treatment of Animals, Inc. v. Bureau of Indian Affairs*,
   800 F. Supp. 2d 173 (D.D.C. 2011) ...................................................................... 21

*Petroleum Info. Corp. v. Dep't of Interior*,
   976 F.2d 1429 (D.C. Cir. 1992) ....................................................................... 12, 14

*\*Pratt v. Webster*,
   673 F.2d 408 (D.C. Cir. 1982) ................................................................. 15, 16, 17, 18

*Quarles v. Dep't of Navy*,
   893 F.2d 390 (D.C. Cir. 1990) ......................................................................... 12, 14

*Quinon v. Federal Bureau of Investigation*,
   86 F.3d 1222 (D.C. Cir. 1996) ......................................................................... 10, 17

*Shapiro v. Dep't of Justice*,
   37 F. Supp. 3d 7 (D.D.C. 2014) ......................................................................... 16, 17

*Stolt-Nielsen Transp. Grp. Ltd. v. United States*,
   534 F.3d 728 (D.C. Cir. 2008) ............................................................................. 19

*Trans-Pac. Policing Agreement v. U.S. Customs Serv.*,
   177 F.3d 1022 (D.C. Cir. 1999) ........................................................................... 19

*Valencia-Lucena v. U.S. Coast Guard*,
   180 F.3d 321 (D.C. Cir. 1999) ......................................................................... 20, 21

*Vaughn v. Rosen*,
   523 F.2d 1136 (D.C. Cir. 1975) ("*Vaughn II*") ..................................................... 11

*Vaughn v. Rosen*, 484 F.2d 820 (D.C. Cir. 1973) ("*Vaughn I*") .................................... 10

*Vymetalik v. Federal Bureau of Investigation*,
   785 F.2d 1090 (D.C. Cir. 1986) ............................................................................ 16

*Weisberg v. Dep't of Justice*,
   705 F.3d 1344 (D.C. Cir. 1983) ............................................................................ 10

*Weisberg v. Dep't of Justice,*
  745 F.2d 1476 (D.C. Cir. 1984) .......................................................................... 21

*Weissman v. CIA,*
  565 F.2d 692 (D.C. Cir. 1977) ............................................................................ 15

## Statutes

18 U.S.C. § 2331 ........................................................................................................ 16

18 U.S.C. § 2385 .................................................................................................. 16, 17

28 U.S.C. § 533 .......................................................................................................... 16

28 U.S.C. § 534 .......................................................................................................... 16

5 U.S.C. § 552 ..................................................................................................... 1, 6, 8

5 U.S.C. § 552(a)(4)(B) ............................................................................................. 10

5 U.S.C. § 552(b) ................................................................................................... 9, 18

5 U.S.C. § 552(b)(7) .................................................................................................. 14

## Other Authorities

Glenn Greenwald, *U.S. filmmaker repeatedly detained at border,*
  Salon.com (Apr. 8, 2012) ................................................................................. 3, 18

Mike Fleming, Jr., *Documentary Directors Protest Homeland Security Treatment of*
  *Helmer Laura Poitras* (Apr. 9, 2012) ................................................................... 3

TSA, Screening Management Standard Operating Procedures (May 28, 2008) ........... 4

Wikipedia, No Fly List ................................................................................................. 5

Wikipedia, Secondary Security Screening Selection ................................................... 4

## Rules

Fed. R. Civ. P. 56(a) .................................................................................................... 9

*Authorities on which we chiefly rely are marked with asterisks.

**INTRODUCTION**

This case arises out of Plaintiff Laura Poitras' ("Plaintiff") experience being stopped, detained, and/or questioned at the U.S. border for every international flight she took entering the country between July 2006 and April 2012. Plaintiff, a U.S. citizen and award-winning documentary filmmaker, journalist, and artist who has covered the U.S. military occupation of Iraq and Guantanamo Bay Prison, frequently travels internationally for her work. During the six-year period, she was subject to airport detentions at the U.S. border on almost 40 occasions and multiple times while in transit overseas. She was also subjected to heightened security screenings, also known as "Secondary Security Screening," at airport security checkpoints during domestic flights and international flights originating in the United States on roughly 50 occasions. This treatment ended in June of 2012, following the publication of an article on *Salon.com* about her experiences and the submission of a petition by documentary filmmakers protesting her treatment. Plaintiff, who has no criminal record and was never provided with any rationale for her treatment, sought information concerning the government's actions through the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552.

This FOIA lawsuit challenges the Defendants' withholding of records it possesses concerning Poitras and her repeated border stops and detentions. Of the 271 currently disputed pages, the Federal Bureau of Investigation ("FBI"), Defendant Department of Justice's ("DOJ") component, withholds 19 pages in full, while the remaining 252 pages are heavily redacted. FBI asserts FOIA Exemption 5 (deliberative process privilege; 4 redacted pages) and Exemption 7 (records compiled for law enforcement; 252 redacted pages[1] and the 19 withheld pages). FBI has failed to prove it may withhold the disputed information under Exemptions 5 and 7 and has failed to segregate and release non-exempt information, such as non-exempt facts. Meanwhile, CPB has failed to conduct a sufficient search of its records.

---

[1] The 4 pages containing Exemption 5 redactions also include Exemption 7 redactions.

Plaintiff challenges the FBI's withholdings under Exemptions 7(A), 7(D), and 7(E). Plaintiff does not contest the withholdings of U.S. Customs and Border Protection ("CPB"), component of Defendant Department of Homeland Security ("DHS"), (although, as described below, Plaintiff does challenge the sufficiency of CBP's search), the Transportation Security Administration ("TSA"), and Defendant Office of the Director of National Intelligence ("ODNI"), or FBI's withholding solely under Exemptions 1, 3, 6 and 7(C). Finally Plaintiff does not contest Immigration and Customs Enforcement's ("ICE"), U.S. Citizenship and Immigration Services' ("USCIS"), or DHS's failure to produce any response records.

The Court should grant Plaintiff's motion for summary judgment, order FBI to disclose all of the disputed information, and order CBP to conduct a more thorough search of its records and disclose the additional responsive records it finds.

## STATEMENT OF FACTS

I.      **Plaintiff Was Routinely Stopped, Detained, and Questioned During International Travel Between 2006 and 2012.**

Plaintiff has been documenting post-9/11 America for the past decade. Her work has received many awards. Most recently, Plaintiff received the 2015 Academy Award for Documentary Feature, along with various other awards, for her film *CITIZENFOUR*, a documentary about whistleblower and former NSA contractor Edward Snowden. Her other works include *My Country, My Country* (2006), an Oscar-nominated documentary film about the U.S. military occupation of Iraq; and *The Oath* (2010), a documentary film about Guantanamo Bay Prison military commissions nominated for two Emmy awards. Her reporting on the National Security Agency ("NSA") received the George Polk Award for national security journalism and shared in the 2014 Pulitzer Prize for Public Service. Plaintiff frequently travels internationally for her work, particularly to the Middle East and Europe. Declaration of Laura Poitras ("Poitras Decl."), ¶¶ 1–2 .

Plaintiff was first detained on July 12, 2006, while she was traveling from Jerusalem to Newark International Airport ("Newark") after attending the Jerusalem Film Festival, where her

film *My Country, My Country* was screened. Plaintiff was initially detained and questioned at Ben Gurion International Airport by Israeli airport security for about a half hour prior to her departure. Then, upon her arrival at Newark, she was met by CBP agents at the gate, where the agents had set up a "hard stand" to check the passport of each passenger getting off the plane. Plaintiff was thereafter escorted to a holding room, where she was detained and questioned for roughly two hours, and where her bags were searched, before being allowed to enter the United States. Poitras Decl. ¶¶ 4, 7.

For the next six years, Plaintiff was detained and questioned, and her bags were searched, at the U.S. border every time she entered the country, and occasionally while outside the United States in the course of international travel. She was also detained and questioned once in the United States before a flight to Dubai. Between July 2006 and June 2012, Plaintiff was detained, questioned, and searched—sometimes for hours at a time—almost 40 times at the U.S border and multiple times while in transit overseas. Poitras Decl. ¶¶ 5–6.

During these detentions, border agents routinely made photocopies of her travel documents, and on approximately ten occasions, border agents also made photocopies of Plaintiff's reporter's notebooks and/or the contents of her pockets and wallet, including notes, receipts, business cards, and/or credit cards. Poitras Decl. ¶ 52.

Plaintiff's detentions ended in June 2012, following the publication of an article by journalist Glenn Greenwald on *Salon.com* about Plaintiff's experiences. Poitras Decl. ¶ 8.[2] The *Salon* article also prompted a group of documentary filmmakers to send DHS a petition protesting Plaintiff's treatment. Poitras Decl. ¶ 8.[3]

---

[2] *See also* Glenn Greenwald, *U.S. filmmaker repeatedly detained at border,* Salon.com (Apr. 8, 2012), available at https://www.salon.com/2012/04/08/u_s_filmmaker_repeatedly_detained_at _border/ (last visited July 25, 2015).

[3] *See also* Mike Fleming, Jr., *Documentary Directors Protest Homeland Security Treatment of Helmer Laura Poitras* (Apr. 9, 2012), https://deadline.com/2012/04/documentary-directors-protest-homeland-security-treatment-of-helmer-laura-poitras-254291/ (last visited July 25, 2016).

During this same period, for both domestic flights and international flights *leaving* the United States, Plaintiff routinely could not receive her boarding pass until after an airline agent personally called DHS from the check-in counter. Plaintiff's boarding passes were thereafter marked "SSSS"—indicating her status as Secondary Security Screening Selectee[4]—and she was thereafter subjected to increased security screening at TSA security checkpoints. In the case of domestic travel, her selection for Secondary Security Screening initially lasted only for a few months, until October 2006, but routine Secondary Security Screenings during domestic travel resumed again a few years later. Her subjection to heightened screenings during purely domestic travel did not fully cease until June 2012, the same point at which her international detentions stopped. Poitras Decl. ¶¶ 9–10.

Beginning in mid-2011, when Plaintiff began work on a documentary about Julian Assange and WikiLeaks, U.S. authorities started to question Plaintiff in Europe before she was able to obtain her boarding pass to return to the United States, in addition to detaining, questioning, and searching her upon her arrival in the United States. For example, on April 5, 2012, while traveling from London to Newark after filming with Julian Assange, Plaintiff was questioned by U.S. authorities in London before being issued a boarding pass and also detained, questioned, and searched upon her arrival in the United States. During the course of her detention at Newark, several security officers repeatedly threatened to handcuff Plaintiff for attempting to take notes, claiming her pen could be used as a weapon. Poitras Decl. ¶ 11.

Including both her domestic travel and international travel, Plaintiff was subject was subject to Secondary Security Screening on roughly 50 occasions. Poitras Decl. ¶ 12.

---

[4] *See* TSA, Screening Management Standard Operating Procedures, p. 4-13 (May 28, 2008), available at https://cryptome.org/2013/01/tsa-screening-mgmt-sop.pdf (last visited Aug. 24, 2016) (confirming that "SSSS" indicates a "selectee marking" for a heightened screening process); *see also* Wikipedia, Secondary Security Screening Selection, https://en.wikipedia.org/wiki/Secondary_Security_Screening_Selection#cite_note-TSA-1 (last visited Aug. 24, 2016) (depicting a boarding pass of a passenger selected for Secondary Security Screening).

The following non-inclusive list provides a few additional examples of Plaintiff's experiences being detained and questioned between 2006 and 2012:

- On August 22, 2006, while traveling from Sarajevo to JFK after attending the Sarajevo Film Festival, Plaintiff was detained at the Vienna International Airport by Austrian airport security. She was transported to a holding area, where her bags were searched and x-rayed. An Austrian security agent told her that she had been assigned a "Threat Score" of 400 out of 400 points by U.S. authorities. Plaintiff was eventually allowed to board a plane to the United States. Upon her arrival at JFK, CBP agents again met her at the gate, escorted her to a holding room, searched her bags a second time, and questioned her for roughly 2 hours before she was allowed to enter the United States. Poitras Decl. ¶ 14.

- On November 26, 2006, upon her arrival at Newark after a flight from Paris, Plaintiff was met by CBP agents and detained and questioned for 30 minutes while her bags were searched. Poitras Decl. ¶ 15.

- On December 17, 2006, upon her arrival at JFK after a flight from Dubai, where she had attended the Dubai Film Festival, Plaintiff was met by border agents and detained and questioned before being allowed entry into the United States. The CBP agents asked Plaintiff when she had last been to Atlanta, Georgia and told her that she had a criminal record, despite that she had no such record. Poitras Decl. ¶ 16.

- On March 19, 2007, upon her arrival at Washington Dulles International Airport after a flight from London, where she had after attended a conference on Guantanamo Bay Prison, Plaintiff was detained and questioned, and her bags were searched. Poitras Decl. ¶ 17.

- On March 31, 2007, while traveling from Canada to LaGuardia Airport after conducting a documentary workshop, Plaintiff was detained, questioned, and searched _before_ being allowed to board the plane. Poitras Decl. ¶ 18.

- On May 26, 2007, while traveling from Yemen via Jordan to JFK after filming families of Guantanamo prisoners, CBP agents met Plaintiff at the gate upon her arrival in New York. She was detained and questioned, and all of her journalist notebooks, receipts, business cards, and credit cards were photocopied. Poitras Decl. ¶ 19.

- On June 12, 2007, while traveling from Jordan to JFK after leading a filmmaking workshop in Amman, Plaintiff was detained, questioned, and searched after her flight, and all of her credit cards and receipts were photocopied. Poitras Decl. ¶ 20.

- On February 10, 2010, while traveling from JFK to Berlin, Germany to attend the Berlin Film Festival, Plaintiff was told by airport security agents at JFK that she was on the No

Fly List, a list maintained by FBI's Terrorist Screening Center.[5] After Plaintiff's former lawyer call the U.S. Department of State, Plaintiff was eventually permitted to board her flight. While departing Berlin several days later, on February 16, 2010, Plaintiff was again told by airline representatives that she was on the No Fly List, though she was eventually again allowed to board her flight. Upon her arrival at JFK, she was detained and questioned for over one hour and her bags were searched. Poitras Decl. ¶ 33.

- On August 1, 2010, upon arriving at JFK after a flight from Yemen via Dubai, CBP agents confiscated Plaintiff's digital devices. She was detained and questioned, as usual, by CBP agents. During the course of her detention, her laptop, video camera, media containing footage, and cellphone were taken and held for 41 days. Poitras Decl. ¶ 35.

- On August 13, 2011, upon her arrival at Newark after a flight from Berlin, Plaintiff was detained and questioned for almost one hour and her bags were searched. Poitras Decl. ¶ 42.

- On August 29, 2011, upon her arrival at JFK after a flight from Berlin, Plaintiff was detained and questioned for more than an hour and a half and her bags were searched. Poitras Decl. ¶ 43.

- On September 10, 2011, upon her arrival at Newark after a flight from London, Plaintiff was detained and questioned for over one hour and her bags were searched. Poitras Decl. ¶ 44.

- On June 1, 2012, upon her arrival at Newark after a flight from London, Plaintiff was again detained, questioned, and searched. Poitras Decl. ¶ 51.

These examples represent only a few of the almost 40 instances in which Plaintiff was detained, questioned, and searched during the course of international travel between July 2006 and June 2012. *See* Poitras Decl. ¶¶ 4, 5–6, 13–51.

In the fall of 2012, Plaintiff moved to Berlin, Germany, as a direct result of her detentions at the U.S. border. She did not move back to the United States until the spring of 2015, almost three years after the detentions ceased. Poitras Decl. ¶ 53.

Plaintiff believes that she has been targeted for adverse treatment due to the subject matter of her documentary films and journalism, which have presented a critical perspective on U.S. policies and practices adopted post-9/11. Poitras Decl. ¶ 56.

---

[5] *See* Wikipedia, No Fly List, https://en.wikipedia.org/wiki/No_Fly_List (last visited Aug. 24, 2016).

## II.    Plaintiff's FOIA Requests

On January 24, 2014, counsel, on behalf of Plaintiff, submitted separate requests, by letter, to FBI, CBP, TSA, DHS, USCIS, ICE, and ODNI pursuant to 5 U.S.C. § 552 for "all agency records concerning, naming, or relating to Ms. Poitras." Over the next few months, ODNI, DHS, USCIS, TSA, and FBI acknowledged Plaintiff's request, while neither CBP nor ICE responded to Plaintiff's requests. *See generally* Compl., Dkt. 1, ¶¶ 27–30, 37, 40, 49, 52, 58, 67.

On February 25, 2014, ODNI denied Plaintiff's FOIA request; Plaintiff appealed the denial on March 21, 2014, and never received a response from ODNI regarding her appeal. Compl. ¶¶ 68–69 .

DHS, USCIS, and TSA each asked Plaintiff to provide additional information to assist the agency. Plaintiff provided information concerning the specific difficulties she encountered while traveling on international flights between July 2006 and May 2007, as well her difficulties while traveling on domestic flights between June or July 2006 and October 2006, to DHS on March 5, 2014, and to USCIS and TSA on March 19, 2014. On March 26, 2014, DHS advised that it had referred Plaintiff's request to the FOIA offices of its components CBP and TSA; Plaintiff received no further response. Meanwhile, neither USCIS nor TSA acknowledged the receipt of additional information; both agencies instead responded by sending Plaintiff letters almost identical to the form letters they had sent to acknowledge receipt of Plaintiff's FOIA request and again inviting Plaintiff to provide additional information to assist the agency. On May 6, 2014, Plaintiff appealed USCIS's determination that it had no records responsive to her request, and on July 7, 2014, USCIS denied Plaintiff's administrative appeal. Compl. ¶¶ 30–32, 40–44, 52–54.

FBI sent Plaintiff no further response after acknowledging Plaintiff's request via a form letter dated February 19, 2014. Over a year later, however, Plaintiff received a letter dated May 21, 2015 from Susan B. Gerson, Assistant Director of the DOJ's Executive Office for U.S. Attorneys ("EOUSA"), indicating that FBI had referred Plaintiff's request to EOUSA and that

EOUSA was denying Plaintiff's request. Ms. Gerson's letter indicated that her office had located only six pages relevant to Plaintiff's request but that it was withholding in full all six pages pursuant to Federal Rule of Criminal Procedure 6(e). On May 29, 2015, Plaintiff appealed the denial of her request to FBI. Compl. ¶¶ 59–60.

## III.    Procedural History

On July 13, 2015, Plaintiff filed this lawsuit under 5 U.S.C. § 552. *See* Compl. Defendants filed their answer on August 19, 2015, after which the government's counsel and Plaintiff's counsel conferred regarding a schedule for the various agencies to review, process, and produce responsive records. *See* Dkt. 7. FBI ultimately made five interim productions: (i) on Oct. 14, 2015, FBI released 62 of 145 reviewed pages, withholding 83 pages in full (including 4 pages withheld as duplicative); (ii) on Nov. 10, 2015, FBI released 8 of 8 reviewed pages; (iii) on Dec. 14, 2015, FBI released 10 of 10 reviewed pages; (iv) on Feb. 16, 2016, FBI released 120 of 124 reviewed pages, withholding 4 pages in full; and (v) on Mar. 4, 2016, FBI released 57 of 57 reviewed pages. *See* Public Declaration of David M. Hardy, Dkt. 14-1 ("Hardy Decl."), ¶¶ 12–16. The vast majority of the pages released are heavily redacted. FBI referred 35 of the withheld pages to the U.S. Army Criminal Investigation Command ("USACIDC"); on Oct. 2, 2015, USACIDC released 24 partially redacted pages and withheld 11 pages in full (including 3 pages as duplicative). *See* Hardy Decl. ¶ 96. FBI referred 7 of the withheld pages to the Army's FOIA Office and 4 of the withheld pages to EOUSA; neither agency has produced any records to Plaintiff, even in part. *See* Hardy Decl. ¶¶ 97–98. FBI also referred 25 of the withheld pages pages to DHS, which referred the pages to CBP for a direct response to Plaintiff; CBP, however, has not produced these records to Plaintiff.[6] *See* Hardy Decl. ¶ 106 & n. 44.

CBP made two interim productions: (i) on Nov. 12, 2015, CBP released 712 pages; and (ii) on Feb. 17, 2016, CBP released 223 pages and withheld in full 3,180 pages. *See* Declaration

---

[6] The Hardy Declaration states that these 25 pages were labeled Poitras-289–294, 296–304, 306–309, 311–344. *See* Hardy Decl. ¶ 106, n. 44. Plaintiff did not receive any documents from FBI, DHS, or CBP with these Bates numbers.

of Sabrina Burroughs, Dkt. 14-3 ("Burroughs Decl."), ¶¶ 18, 26, 31, 38. The vast majority of the pages released are partially redacted.

TSA made a single production on Nov. 12, 2015 of 21 pages.[7] *See* Declaration of Regina Ann McCoy, Dkt. 14-4, ¶¶ 17, 27.

On June 6, 2016, Defendants filed their motion for summary judgment. *See* Dkt. No. 13.

## ARGUMENT

### I. FOIA Establishes a Presumption of Disclosure, and the Government Bears the Burden of Proving Withheld Information is Clearly Exempt.

FOIA safeguards the American public's right to know "what their government is up to." *Dep't of Justice v. Reporters Comm.*, 489 U.S. 749, 773 (1989) (citation and internal quotations omitted). The central purpose of the statute is "to ensure an informed citizenry, vital to the functioning of a democratic society, needed to check against corruption and to hold the governors accountable to the governed." *Nat'l Labor Relations Bd. v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 242 (1978).

FOIA requires disclosure of all requested records unless they fall within one of nine narrow exemptions. *See* 5 U.S.C. § 552(b). "'[T]hese limited exemptions do not obscure the basic policy that disclosure, not secrecy, is the dominant objective of the Act[.]'" *Dep't of Interior v. Klamath Water Assn.*, 532 U.S. 1, 7–8 (2001) (citation omitted, brackets in original); *see also Dep't of Air Force v. Rose*, 425 U.S. 352, 361 (1976) (the purpose of FOIA is "'to pierce the veil of administrative secrecy and to open agency action to the light of public scrutiny'") (citation omitted). The exemptions "have been consistently given a narrow compass." *Dep't of Justice v. Tax Analysts*, 492 U.S. 136, 151 (1989). Where exemptions apply, FOIA requires disclosure of "[a]ny reasonably segregable portion." 5 U.S.C. § 552(b).

Disputes involving the propriety of agency withholdings are commonly resolved through summary judgment in FOIA cases. *See Harrison v. Exec. Office of U.S. Attorneys*, 377 F. Supp.

---

[7] Neither ICE, ODNI, DHS, nor CIS produced any responsive records.

2d 141, 145 (D.D.C. 2005). The moving party must show "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A moving party with the burden of proof on an issue (here the agency) must show that no reasonable trier of fact could find against them; but a moving party without the burden of proof (here the requester) need only show an absence of evidence on the other side. *Id.* at 323. The underlying facts are viewed "in the light most favorable to the [FOIA] requester." *Electronic Frontier Foundation v. Dep't of Justice*, 141 F. Supp. 3d 51, 55 (D.D.C. 2015) ("*EFF I*"), *appeal dismissed* No. 15-5346, 2016 WL 3041648 (D.C. Cir. Apr. 27, 2016) (brackets word in original) (quoting *Weisberg v. Dep't of Justice*, 705 F.3d 1344, 1350 (D.C. Cir. 1983)).

The agency bears the burden of proving that records have been properly withheld, and courts review *de novo* the agency's withholdings. 5 U.S.C. § 552(a)(4)(B); *Reporters Comm.*, 489 U.S. at 755. Indeed, the agency must prove the withheld information is "clearly exempt." *Birch v. USPS*, 803 F.2d 1206, 1209 (D.C. Cir. 1986). The agency "must provide a relatively detailed justification, specifically identifying the reasons why a particular exemption is relevant and correlating those claims with the particular part of a withheld document to which they apply." *Mead Data Cent., Inc. v. Dep't of Air Force*, 566 F.2d 242, 251 (D.C. Cir. 1977); *see also Quinon v. Federal Bureau of Investigation*, 86 F.3d 1222, 1227 (D.C. Cir. 1996) (government may not "merely recit[e] statutory standards"); *Kamman v. Internal Revenue Service*, 56 F.3d 46, 48 (9th Cir. 1995) (the government "'may not rely upon conclusory and generalized allegations of exemptions'") (citation omitted). These requirements typically are satisfied through an agency's submission of an affidavit or declaration describing the basis for its withholdings and providing justifications for redactions, accompanied by a "*Vaughn*" index listing responsive records and indicating the precise redactions made to the records. *Vaughn v. Rosen*, 484 F.2d 820, 826–28 (D.C. Cir. 1973) ("*Vaughn I*"). "To accept an inadequately supported exemption claim 'would constitute an abandonment of the trial court's obligation

- 10 -

under the FOIA to conduct a *de novo* review.'" *King v. Dep't of Justice*, 830 F.2d 210, 219 (D.C. Cir. 1987) (quoting *Allen v. Central Intelligence Agency*, 636 F.2d 1287, 1293 (D.C. Cir. 1980)).

As discussed below, FBI's proffered evidence supporting its withholdings under Exemption 5 (deliberative process privilege) and Exemption 7 (law enforcement exemption) falls short of this standard. The government's declaration lacks the kind of "detailed justification" that courts interpreting FOIA consistently have required.

## II.     FBI Has Improperly Withheld Records Under Exemption 5.

FBI invokes Exemption 5 for redactions on four pages: Poitras-158, Poitras-159, Poitras-163, and Poitras-164.[8] *See* Exhibit A (filed herewith). To invoke Exemption 5's deliberative process privilege, "an agency must show that an allegedly exempt document is both 'predecisional' and 'deliberative.'" *Judicial Watch, Inc. v. U.S. Postal Serv.*, 297 F. Supp. 2d 252, 259 (D.D.C. 2004) (citations omitted). A "predecisional" document is one that is "antecedent to the adoption of agency policy." *Jordan v. Dep't of Justice*, 591 F.2d 753, 774 (D.C. Cir. 1978) (en banc). To demonstrate that a claimed exemption is "predecisional," an agency must either "pinpoint an agency decision or policy to which the document contributed, . . . or identify a decisionmaking process to which a document contributed." *Judicial Watch*, 297 F. Supp. 2d at 259 (citations and internal quotations omitted). Meanwhile, a "deliberative" document is one that is "a direct part of the deliberative process in that it makes recommendations or expresses opinions on legal or policy matters." *Vaughn v. Rosen*, 523 F.2d 1136, 1143–44 (D.C. Cir. 1975) ("*Vaughn II*"). "Merely factual material is not exempt; the document must 'bear on the formulation or exercise of agency policy-oriented *judgment*.'" *Judicial Watch*, 297 F. Supp. 2d at 259 (citing *Petroleum Info. Corp. v. Dep't of Interior*, 976

---

[8] While both the Hardy Declaration and the Government's memorandum of points and authorities claim the deliberative process exemption for Poitras-164, *see* Hardy Decl. ¶ 62; Def. Mot. at 23, there is no indication on the page itself that any redactions were made pursuant to Exemption 5. *See* Exhibit A. In the interest of preserving her objection to any deliberative process exemptions made on Poitras-164, Plaintiff assumes the privilege assertions contained within the Hardy Declaration and Government's brief are accurate.

F.2d 1429, 1435 (D.C. Cir. 1992) (emphasis in original)). Thus, deliberative documents are those "reflecting advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated." *Nat'l Labor Relations Bd. v. Sears, Roebuck & Co.*, 421 U.S. 132, 150 (1975) (internal quotations and citations omitted).

The "first step" in determining whether a document is properly withheld as deliberative under Exemption 5 "is to examine the context in which the materials are used." *Petroleum Info. Corp. v. Dep't of Interior*, 976 F.2d 1429, 1434 (D.C. Cir. 1992) (internal citations and quotations omitted). "Since the applicability of the deliberative process privilege depends on the content of each document and the role it plays in the decisionmaking process, an agency's affidavit must correlate facts in or about each withheld document with the elements of the privilege." *Judicial Watch*, 297 F. Supp. 2d at 259–60. "Without a *sufficiently specific* affidavit or *Vaughn* Index, a court cannot decide, one way or the other, a deliberative process privilege claim." *Id.* at 260 (citations omitted) (emphasis added). To satisfy its burden, an agency must identify "the particular deliberative process involved," the "role that the withheld document played in that deliberative process," and information concerning the "identities, positions, and job duties of the authors and recipients of the withheld documents" for the documents withheld. *Electronic Frontier Foundation v. Dep't of Justice*, 826 F. Supp. 2d 157, 169, 170 (D.D.C. 2011) ("*EFF II*").

"[M]emoranda consisting only of compiled factual material or purely factual material contained in deliberative memoranda and severable from its context" may *not* be withheld under the deliberative process privilege. *Environmental Protection Agency v. Mink*, 410 U.S. 73, 88–89 (1973), *superseded by statute on other grounds*. While the rationale behind the deliberative process privilege encourages candor in deliberative discussions, the requirement that facts must be disclosed is intended to enhance the integrity of agency deliberations. *See Quarles v. Dep't of Navy*, 893 F.2d 390, 392 (D.C. Cir. 1990) (noting that "the prospect of disclosure is less likely to make an advisor omit or fudge raw facts").

Here, FBI has failed to provide the heightened level of contextual specificity necessary to withhold responsive records under the deliberative process privilege. Indeed, FBI has failed to identify a specific agency decision to which the redacted paragraphs are predecisional or a decision-making process to which the redacted paragraphs contributed. *See Judicial Watch*, 297 F. Supp. 2d at 259. The Hardy Declaration states vaguely that the information in question was an "intra-agency analysis" in which the New York Field Office "is discussing the results of database checks conducted to aid in the investigation at issue" and "analyzing, delivering, sorting ideas and providing recommendations of things to consider for this particular investigation" *See* Hardy Decl. ¶ 62. Not only is this impermissibly vague, but it fails to provide the required context into the specific agency decision or decision-making process of which the redacted paragraphs were allegedly a part, nor does it satisfy FBI's burden of identifying for the Court the "the particular deliberative process involved," the "role that the withheld [paragraphs] played in that deliberative process," and information concerning the "identities, positions, and job duties of the authors and recipients of the withheld [paragraphs]." *See EFF II*, 826 F. Supp. 2d at 169, 170. Moreover, to support the assertion that the redactions on pages Poitras-158, Poitras-159, Poitras-163, and Poitras-164 fall within the deliberative process privilege, FBI relies solely on the word "recommendations" within the phrase "Analytical Recommendations" on Poitras-158. *See* Hardy Decl. ¶ 62; Def. Mot. at 23. Even if the appearance of the word "recommendations" was enough to satisfy FBI's Exemption 5 burden for the redacted paragraphs on pages Poitras-158 and Poitras-159 immediately preceding the reference (it is not), it would not be sufficient for the redacted paragraphs on pages Poitras-163 and Poitras-164, which do not fall within the same section of the document. *See* Exhibit A.

Furthermore, "even if the document is predecisional at the time it is prepared, it can lose that status if it is adopted, formally or informally, as the agency position on an issue or is used by the agency in its dealings with the public." *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 866 (D.C. Cir. 1980). Here, because FBI has failed to identify a specific decision to

which the redacted paragraphs preceded and contributed, the records must be treated as the final agency positions and, thus, may not be withheld under the deliberative process privilege.

Finally, for each of FBI's redactions pursuant to the deliberative process privilege, the agency simply has redacted complete paragraphs and fails to segregate out any purely factual material contained in those paragraphs. With multiple consecutive paragraphs redacted in their entirety on the pages at issue, even assuming that these redacted paragraphs included some agency judgments, it is a near-certainty that FBI has withheld some purely factual material on which any such judgments were made. It is well established that the deliberative process privilege generally does not shield purely factual information from disclosure. *See, e.g., Judicial Watch v. Dep't of Justice*, 365 F.3d 1108, 1113 (D.C. Cir. 2004); *Petroleum Info. Corp.*, 976 F.2d at 1434. Indeed, the purposes underlying the deliberative process privilege are not served by permitting agencies to shield factual information from disclosure to the public. *See Quarles*, 893 F.2d at 392. Here, all factual material contained within the agencie's block redactions is not properly withheld under Exemption 5. *See Citizens for Responsibility & Ethics v. Dep't of Homeland Sec*., 648 F. Supp. 2d 152, 159 (D.D.C. 2009).

The Hardy Declaration fails to justify the agency's broad claims under the deliberative process exemption and the FBI should thus be ordered to disclose the paragraphs redacted under Exemption 5.

### III.    FBI Has Improperly Withheld Records Under Exemption 7.

Plaintiff challenges the FBI's Exemption 7(A), 7(D), and 7(E) withholdings because the agency has fundamentally failed to make the required threshold showing that the records or information were complied for law enforcement purposes. Because the FBI has failed to meet the threshold, the Court need not reach the applicability of the specific criteria set forth in 7(A), 7(D), and 7(E).[9]

---

[9] In the Hardy Declaration, the FBI notes that it referred 35 pages of responsive records to United States Army Criminal Investigation Command ("USACIC"). *See* Hardy Decl. ¶ 96. Mr. Hardy references the Declaration of Jon Z. Ali (attached to the Hardy Decl. as Exhibit K, Dkt. 14-1, at

Exemption 7 applies to "records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information" would have one of the undesirable effects enumerated by the exemption. 5 U.S.C. § 552(b)(7). To justify a withholding under the exemption, an agency must therefore "demonstrate, as a threshold matter, that the information it seeks to shield has been 'compiled for law enforcement purposes[.]'" *King v. Dep't of Justice*, 830 F.2d 210, 229 (D.C. Cir. 1987) (internal quotations omitted). The D.C. Circuit has laid out a two-part test for determining whether a law-enforcement agency invoking Exemption 7 has made even the threshold showing: the agency must (1) "identify a particular individual or a particular incident as the object of its investigation" and specify "the connection between that individual or incident and a possible security risk or violation of federal law"; and (2) demonstrate that this relationship is "based on information sufficient to support at least a 'colorable claim' of the connection's rationality." *Pratt v. Webster*, 673 F.2d 408, 420–421 (D.C. Cir. 1982).

As such, the appropriate inquiry is whether the records indicate that the agency was gathering information with the *good faith* belief that the subject may violate or has violated federal law, or was merely monitoring the subject for purposes unrelated to enforcement of federal law. *See Weissman v. CIA*, 565 F.2d 692, 694–95 (D.C. Cir. 1977) (concluding that the CIA's "intermittent but extensive investigation over a five-year period of an American citizen living at home, without his knowledge" was not for "law-enforcement purposes"); *see also Black v. Sheraton Corp. of America*, 371 F. Supp. 97, 102 (D.D.C. 1974) (denying application of Exemption 7 since FBI investigation was not related to law enforcement proceeding but was conducted simply for intelligence purposes); *Lamont v. Dep't of Justice*, 475 F. Supp. 761, 774–76 (S.D.N.Y. 1979) (finding no connection between seventeen years of generalized monitoring of plaintiff due to his association with various educational and political

---

pp. 101–05). However, the Declaration of Mr. Ali does not even attempt to satisfy the threshold that the withheld records were compiled for law enforcement purposes.

organizations that enforcement authorities suspected were Communist fronts and "good-faith enforcement of the Smith Act"). In order to meet the Exemption 7 threshold, "an agency must establish that its investigatory activities are realistically based on a legitimate concern that federal laws have been or may be violated or that national security may be breached." *Pratt*, 673 F.2d at 421. "[R]ecords compiled 'in connection with investigations that focus directly on *specific alleged illegal acts* which could result in civil or criminal sanctions' are records compiled for law enforcement purposes[.]" *Shapiro v. Dep't of Justice*, 37 F. Supp. 3d 7, 29 (D.D.C. 2014) (citation omitted; emphasis added).

The focus of the two-part test is "on how and under what circumstances the requested files were compiled, and whether the files sought relate to anything that can fairly be characterized as an enforcement proceeding.'" *Shapiro*, 37 F. Supp. 3d at 28–29 (citation omitted). Thus, "FBI records are not law enforcement records simply by virtue of the function that the FBI serves." *Vymetalik v. Federal Bureau of Investigation*, 785 F.2d 1090, 1095 (D.C. Cir. 1986) (citing *Pratt*, 673 F.2d at 415 n.14). Indeed, while Congress intended that "law enforcement purpose" be broadly construed, "it was not meant to include investigatory activities wholly unrelated to law enforcement agencies' legislated functions of preventing risks to the national security and violations of the criminal laws and of apprehending those who do violate the laws." *Pratt*, 673 F.2d at 420–21.

In *Shapiro*, 37 F. Supp. 3d at 29, this Court assessed whether another FBI declaration, also authored by Mr. Hardy, satisfied Exemption 7's threshold requirement. In that case, Mr. Hardy stated that responsive records "concern[ed] documents compiled as a result of assistance FBI rendered to various state and local law enforcement agencies which were investigating potential criminal activity by protestors [sic] involved with the 'Occupy' movement in Houston"; that FBI maintained the records pursuant to FBI's "general investigative authority per 28 U.S.C. §§ 533 and 534," and its "lead role in investigating terrorism and in the collection of terrorism threat information"; and that "FBI, acting in concert with state and local law enforcement agencies, compiled these records while assessing the protests for potential terrorist threats,

including domestic terrorism in violation of 18 U.S.C. § 2331, and other criminal activity, such as advocating the overthrow of the government in violation of 18 U.S.C. § 2385." *Id.* (internal citations omitted). The Court rejected the Bureau's claim, finding that "Mr. Hardy's averments are too generalized for purposes of Exemption 7." *Id.* The Court faulted Mr. Hardy for failing to "supply specific facts as to the basis for FBI's belief that the Occupy protestors might have been engaged in terroristic or other criminal activity" and noted that "[n]either the word 'terrorism' nor the phrase 'advocating the overthrow of the government' are talismanic, especially where FBI purports to be investigating individuals who ostensibly are engaged in protected First Amendment activity." *Id.; cf. Quinon v. Federal Bureau of Investigation,* 86 F.3d 1222, 1229 (D.C. Cir. 1996) (rejecting FBI's invocation of Exemption 7 where the affidavits proffered in support of FBI's motion for summary judgment "simply allude to 'certain events,' which [FBI] fail[s] to describe or characterize").

Here, just as in *Shapiro*, the Hardy Declaration fails *Pratt's* two-part test for the Exemption 7 law enforcement threshold. In support of the Exemption 7 withholdings on each of the 252 redacted pages and 19 withheld pages at issue, the FBI states merely that the withheld information "was compiled as part of a criminal investigation into Plaintiff's 'potential involvement with anti-coalition forces during her time in Iraq as an independent media representative.'" Def. Mot. at 24 (citing Hardy Decl. ¶ 64). The reference to this vague and highly generalized "criminal investigation" is not sufficient to satisfy the government's burden. Just as in *Shapiro*, Mr. Hardy failed to supply specific facts as to the basis of the FBI's belief that Plaintiff might have been somehow involved in terroristic or other criminal activity. *Shapiro*, 37 F. Supp. 3d at 29. In fact, Mr. Hardy's declaration in this case provides *even less* factual detail than the insufficient declaration in *Shapiro.* Namely, his declaration in *Shapiro* alleged the violation of particular statutes but was still found inadequate. *See id.*

Here, Mr. Hardy fails even to cite any particular statute(s) that Plaintiff allegedly violated. Thus, the FBI fails to provide any detail regarding any alleged connection between Plaintiff or any particular incident and a possible security risk or violation of federal law.

- 17 -

Furthermore, the Hardy Declaration fails to provide enough specificity such that the Court could say that the FBI has established a "colorable claim of rationality" between the object of its investigation and its asserted law enforcement duties. *Pratt*, 673 F.2d at 420.

The FBI's averments in this case thus do not support a finding that the FBI had good-faith belief that Plaintiff violated any federal law or posed a legitimate security risk. To the contrary, it appears that Plaintiff was monitored and harassed for purposes unrelated to enforcement of federal law—*i.e.*, as a result of her decision to dedicate her journalism and documentary film career to covering politically controversial topics, which often entails presenting a critical view of U.S. foreign and domestic policy. Plaintiff's belief that her extensive harassment at the U.S. border (and elsewhere) was politically motivated is further buttressed by the fact that it ceased after Glenn Greenwald brought her harassment to the public's attention in his June 2012 *Salon.com* article.

This case is thus akin to *Lamont*, which involved a FOIA request by an individual who had been subject to years of surveillance after being placed on a "Security Index," an FBI surveillance program to monitor the activities of persons considered "inimical to the country's internal security," as a result of his association with educational and political organizations law enforcement authorities suspected to be Communist. *Lamont*, 475 F. Supp. at 765–66. The *Lamont* court found there to be "no connection" between the seventeen years of generalized monitoring of the plaintiff and "good-faith enforcement of the Smith Act." *Id.* at 775. Here, just as in *Lamont*, there is no connection between the six years of Plaintiff's airport detentions and heightened security screening and good-faith enforcement of any federal law, and the FBI has entirely failed to support any such connection.

The Hardy Declaration fails to demonstrate that the information the Bureau seeks to shield has been compiled for legitimate "law enforcement purposes," and the FBI should thus be ordered to disclose the information withheld under Exemptions 7(A), (D) and (E).

## IV.    FBI and CBP Have Failed to Segregate and Release Non-Exempt Information.

Even when a responsive record contains exempt information, the FOIA explicitly

requires that "[a]ny reasonably segregable potion of [the] record shall be provided to any person requesting such record after deletion of the portions which are exempt[.]" 5 U.S.C. § 552(b); *see Oglesby v. Dep't of Army*, 79 F.3d 1172, 1176 (D.C. Cir. 1996) ("If a document contains exempt information, the agency must still release 'any reasonably segregable portion' after deletion of the nondisclosable portions."). The segregability requirement "applies to all documents and all exemptions in the FOIA." *Center for Auto Safety v. Environmental Protection Agency*, 731 F.2d 16, 21 (D.C. Cir. 1984). As with all aspects of FOIA litigation, the burden is on the government to "provide a 'detailed justification' for its non-segregability." *Johnson v. Exec. Office for U.S. Attorneys*, 310 F.3d 771, 776 (D.C. Cir. 2002) (citation omitted). This includes "a statement of [the government's] reasons," and a "descri[ption of] what proportion of the information in a document is non-exempt and how that material is dispersed throughout the document." *Mead Data Cent.,* 566 F.2d at 261. Simply claiming that a segregability review has been conducted is insufficient. *Oglesby*, 79 F.3d at 1180. Furthermore, district courts have an "affirmative duty to consider the segregability issue *sua sponte*." *Trans-Pac. Policing Agreement v. U.S. Customs Serv.*, 177 F.3d 1022, 1028 (D.C. Cir. 1999).

FBI and CBP have provided nothing more than "empty invocation[s] of the segregability standard" that the Court must reject. *See Judicial Watch, Inc. v. Dep't of Homeland Security*, 841 F. Supp. 2d 142, 161 (D.D.C. 2012); *see also Stolt-Nielsen Transp. Grp. Ltd. v. United States*, 534 F.3d 728, 734 (D.C. Cir. 2008) (holding that a "conclusory" declaration that the agency paralegal had "reviewed each page line-by-line to assure himself that he was withholding from disclosure only information exempt pursuant to the Act" was "not sufficient support for a court to conclude that the self-serving conclusion is the correct one"). The government's motion essentially reiterates the language that the *Judicial Watch* court rejected, stating that "CBP has conducted a line-by-line review of the records determined to be response and determine that all reasonable segregable portions of the responsive records have been released to Plaintiff" and that FBI has determined that the information withheld was either exempt itself or "so intertwines with non-exempt information" that segregation was not possible (even for the withheld pages it

referred to other agencies, some of which were in fact partially released by USACIDC). *See Judicial Watch*, 841 F. Supp. 2d at 161*; Def. Mot. at 33–34 (citing Burroughs Decl. ¶ 52; Hardy Decl. ¶ 110.). Meanwhile, USACIDC, which withheld 11 pages in full (pages referred from FBI to the agency), states merely that "[e]very effort was made to provide Plaintiffs with all material in the public domain and with reasonable segregable portions of releasable material." *See* Declaration of Jon Z. Ali (Exhibit K to Hardy Decl.) ¶ 4; *see also* Hardy Decl. ¶ 96. These statements are conclusions, not the detailed explanations FOIA requires. The FBI, CBP, and USACIDC have together withheld over 3,200 pages of responsive records in their entirety, in addition to large blocks of redacted text on the majority of the released pages, thus concealing entire sentences, paragraphs, and pages from public disclosure. It is a near certainty that the agencies have withheld more information than is otherwise justifiable. In any event, despite their assertions that they have complied with FOIA's segregability requirement, the agencies have not satisfied their burden and are not entitled to summary judgment.

## V.   CBP Has Failed to Conduct a Sufficient Search for Records.

Where, as here, the requester challenges the adequacy of the agency's search for responsive records, in order to prevail on summary judgment, "the agency must demonstrate beyond material doubt that its search was reasonably calculated to uncover all relevant documents." *Nation Magazine v. U.S. Customs Serv.*, 71 F.3d 885, 890 (D.C. Cir. 1995) (internal quotations and citations omitted). An agency must demonstrate that it searched for documents in good faith, using methods that are reasonably expected to produce the requested information. *Valencia-Lucena v. U.S. Coast Guard*, 180 F.3d 321, 326 (D.C. Cir. 1999) (citing *Oglesby v. Dep't of Arm*y, 920 F.2d 57, 68 (D.C. Cir. 1990)).

In response to the agency's showing, a "plaintiff may . . . provide 'countervailing evidence' as to the adequacy of the agency's search." *Duenas Iturralde v. Comptroller of the Currency*, 315 F.3d 311, 314 (D.C. Cir. 2003) (quoting *Founding Church of Scientology of Washington, D.C., Inc. v. Nat'l Sec. Agency*, 610 F.2d 824, 836 (D.C. Cir. 1979)). If the plaintiff provides "sufficient evidence to raise 'substantial doubt' concerning the adequacy of [the

agency's] search," particularly when there is a "'well defined request[] and positive indications of overlooked materials,' summary judgment is inappropriate." *Id.* at 314 (quoting *Valencia-Lucena*, 180 F.3d at 326); *see also Concepcion v. U.S. Customs & Border Prot.*, 767 F. Supp. 2d 141, 145-146 (D.D.C. 2011).

Here, Defendant DHS is not entitled to summary judgment because its component, CBP, has failed to demonstrate that it conducted an adequate search for responsive records. "The court applies a 'reasonableness' test to determine the 'adequacy' of a search methodology," and if "the record leaves substantial doubt as to the sufficiency of the search, summary judgment for the agency is not proper." *Campbell v. Dep't of Justice*, 164 F.3d 20, 27 (D.C. Cir. 1998) (citations and internal quotation marks omitted). In this case, CBP's search is suspect for two distinct reasons: (1) the Burroughs Declaration does not contain the requisite specificity with respect to the search; and (2) there are "positive indications of overlooked material."  *See Duenas Iturralde*, 315 F.3d at 314.

First, there are "positive indications of overlooked materials." *Duenas Iturralde*, 315 F.3d at 314; *see also Valencia-Lucena*, 180 F.3d at 326; *Concepcion*, 767 F. Supp. 2d at 145–46. Most significantly, it is undisputed that on about ten occasions, CBP agents searched and copied Plaintiff's reporter notebooks and/or the contents of her pockets and wallet, including handwritten notes, credit cards, receipts, and business cards. Poitras Decl. ¶ 52. In light of the fact that the produced documents fail to include any such photocopies, the agency's unsubstantiated assertion that it conducted an adequate search cannot withstand judicial scrutiny. As the D.C. Circuit has long emphasized, the adequacy of an agency's search "is judged by a standard of reasonableness and depends, not surprisingly, upon the facts of each case." *Weisberg v. Dep't of Justice*, 745 F.2d 1476, 1485 (D.C. Cir. 1984) (citation omitted). In conducting the requisite analysis, "the underlying facts and the inferences to be drawn from them are construed in the light most favorable to the FOIA requester." *People for the Ethical Treatment of Animals, Inc. v. Bureau of Indian Affairs*, 800 F. Supp. 2d 173, 177 (D.D.C. 2011) (citation and internal quotation marks omitted).

- 21 -

Furthermore, CBP provides minimal detail about the electronic searches conducted, stating only that CBP personnel "performed searches on relevant databases within those systems using Plaintiff's name and date of birth" and failing to provide the specific search terms utilized. *See* Burroughs Decl. ¶ 5. CBP further fails to provide any detail regarding the search criteria and methods employed for the paper and electronic searches conducted at CBP's New York field office, stating merely that "CBP searched paper files and performed an electronic search on email records using Plaintiff's name and *other relevant search terms*." *Id.* (emphasis added). Recognizing that such vague representations do not aid the court in conducting a *de novo* review of an agency's search efforts, the D.C. Circuit has long required agency declarations to identify the specific "search terms" employed by agency personnel conducting search for responsive records. *See Oglesby*, 920 F.2d at 68 ("A reasonably detailed affidavit, setting forth the search terms and the type of search performed, and averring that all files likely to contain responsive materials (if such records exist) were searched, is necessary to afford a FOIA requester an opportunity to challenge the adequacy of the search and to allow the district court to determine if the search was adequate in order to grant summary judgment.") (emphasis added); *see also Ancient Coin Collectors Guild v. Dep't of State*, 641 F.3d 504, 514 (D.C. Cir. 2011); *Valencia-Lucena*, 180 F.3d at 326; *Nation Magazine*, 71 F.3d at 890.

This Court has found agency representations similar to those at issue here deficient. In *Judicial Watch v. Dep't of Homeland Sec.*, 857 F. Supp. 2d 129, 140 (D.D.C. 2012), the agency declaration "omit[ted] necessary details regarding the searches of several component offices," including "the search terms used by [several] offices" and "how the search was conducted." The Court held that "[u]nder the law of this Circuit, the omission of such information from the agency declarations precludes the entry of summary judgment in the [agency's] favor." *Id.* (footnote and citations omitted); *see also Friends of Blackwater v. Dep't of the Interior,* 391 F. Supp. 2d 115, 119–121 (D.D.C. 2005) ("Without evidence in the agency's affidavit of the

- 22 -

specific search terms used to carry out the search, . . . the Court finds that the agency's search . . . was inadequate.").

The lack of search terms and a description of "how the search was conducted" makes it impossible for Plaintiff or the Court to assess the adequacy of CBP's efforts. CBP's failure to describe its search efforts with the requisite specificity strongly suggests that the agency's search did not "us[e] methods that are reasonably expected to produce the requested information," *Concepcion*, 767 F. Supp. 2d at 145, and was not "reasonably calculated to uncover all relevant documents." *Nation Magazine*, 71 F.3d at 890. Indeed, it appears from the Burroughs Declaration that common sense methods—such as searching for Plaintiff's passport number, phone numbers, variations of Plaintiff's name, and common name misspellings—were not employed by the CBP personnel that performed searches on the TECS and ATS databases. And the record's meager description of the agency's search efforts makes it impossible to determine whether such common sense search methods were employed on the records contained within CBP's New York field office.

Under the facts of this case, the Court should find that CBP's search was not "reasonably calculated to uncover all relevant documents" and was thus inadequate. Summary judgment for the agency is thus inappropriate. *See Nation Magazine*, 71 F.3d at 890.

## CONCLUSION

For the foregoing reasons, the Court should deny the government's motion for summary judgment and grant Plaintiff's cross-motion for summary judgment.

Dated: August 24, 2016                    Respectfully Submitted,

                                             */s/ David L. Sobel*
                                            DAVID L. SOBEL
                                            D.C. Bar No. 360418
                                            Electronic Frontier Foundation
                                            5335 Wisconsin Avenue, N.W.
                                            Suite 640
                                            Washington, DC 20015
                                            (202) 246-6180

NATHAN D. CARDOZO
D.C. Bar No. 1018696
JENNIFER LYNCH
(*Admitted in California*)
JAMIE WILLIAMS
(*Admitted in California*)
Electronic Frontier Foundation
815 Eddy Street
San Francisco, CA 94109
(415) 436-9333

*Counsel for Plaintiff*
*Laura Poitras*

NATHAN D. CARDOZO
D.C. Bar No. 1018696
JENNIFER LYNCH
(*Admitted in California*)
JAMIE WILLIAMS
(*Admitted in California*)
Electronic Frontier Foundation
815 Eddy Street
San Francisco, CA 94109
(415) 436-9333

*Counsel for Plaintiff*
*Laura Poitras*