## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

LAURA POITRAS,

                            Plaintiff,

    v.

DEPARTMENT OF HOMELAND
SECURITY, DEPARTMENT OF
JUSTICE, and OFFICE OF THE DIRECTOR
OF NATIONAL INTELLIGENCE,

                           Defendants.

Civil Action No. 15-cv-01091-KBJ

## PLAINTIFF'S SECOND CROSS-MOTION FOR SUMMARY JUDGMENT

Plaintiff Laura Poitras hereby cross-moves for summary judgment with respect to

Defendant Department of Justice component Federal Bureau of Investigation's and Defendant

Department of Homeland Security component U.S. Customs and Border Protection's

withholding of agency records responsive to Plaintiff's Freedom of Information Act  request.

Plaintiff respectfully refers the Court to the accompanying memorandum of points and

authorities in support of this cross-motion.


Dated: August 21, 2017

Respectfully Submitted,

*/s/ David L. Sobel*
DAVID L. SOBEL
D.C. Bar No. 360418
Electronic Frontier Foundation
5335 Wisconsin Avenue, N.W.
Suite 640
Washington, DC  20015
(202) 246-6180

NATHAN D. CARDOZO
D.C. Bar No. 1018696

JAMIE WILLIAMS
(Admitted in California)
Electronic Frontier Foundation
815 Eddy Street
San Francisco, CA 94109
(415) 436-9333

*Counsel for Plaintiff*
*Laura Poitras*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

LAURA POITRAS,

                    Plaintiff,

    v.

DEPARTMENT OF HOMELAND
SECURITY, DEPARTMENT OF
JUSTICE, and OFFICE OF THE DIRECTOR
OF NATIONAL INTELLIGENCE,

                   Defendants.

Civil Action No. 15-cv-01091-KBJ

**MEMORANDUM IN OPPOSITION TO DEFENDANTS' SECOND MOTION FOR
SUMMARY JUDGMENT AND IN SUPPORT OF PLAINTIFF'S SECOND CROSS-
MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

STATEMENT OF FACTS .................................................................................................... 2

   I.   Plaintiff Was Routinely Stopped, Detained, and Questioned During International
      Travel Between 2006 and 2012. ................................................................................. 2

   II.  Plaintiff's FOIA Requests to the FBI and CBP ......................................................... 7

   III. Procedural History ..................................................................................................... 8

ARGUMENT ........................................................................................................................ 9

   I.   FOIA Establishes a Presumption of Disclosure, and the Government Bears
      the Burden of Proving Withheld Information Is Clearly Exempt. .............................. 9

   II.  The FBI Has Improperly Withheld Records Under Exemption 7. .............................. 11

   III. The FBI Has Improperly Withheld Records Under Exemption 5. ............................. 18

   IV. The FBI Has Failed to Release Documents that Address the Apparent Decision
       to Close the Investigation into Plaintiff. ................................................................... 21

   V.  The FBI and CBP Have Failed to Segregate and Release Non-Exempt Information. ...... 23

   VI. CBP Has Failed to Conduct a Sufficient Search for Records. .................................... 25

CONCLUSION ..................................................................................................................... 29

# TABLE OF AUTHORITIES

## Cases

*Ancient Coin Collectors Guild v. Dep't of State,*
  641 F.3d 504 (D.C. Cir. 2011) .......................................................................... 28

*Birch v. USPS,*
  803 F.2d 1206 (D.C. Cir. 1986) ........................................................................ 10

*\*Black v. Sheraton Corp. of America,*
  371 F. Supp. 97 (D.D.C. 1974) .................................................................... 12, 14

*Blank Rome LLP v. Dep't of Air Force,*
  No. 15-CV-1200-RCL, 2016 WL 5108016 (D.D.C. Sept. 20, 2016) ..................... 23

*Campbell v. Dep't of Justice,*
  164 F.3d 20 (D.C. Cir. 1998) ............................................................................ 25

*Celotex Corp. v. Catrett,*
  477 U.S. 317 (1986) ......................................................................................... 10

*Center for Auto Safety v. Environmental Protection Agency,*
  731 F.2d 16 (D.C. Cir. 1984) ............................................................................ 23

*Citizens for Responsibility & Ethics v. Dep't of Homeland Sec.,*
  648 F. Supp. 2d 152 (D.D.C. 2009) .............................................................. 21, 22

*Coastal States Gas Corp. v. Dep't of Energy,*
  617 F.2d 854 (D.C. Cir. 1980) ..................................................................... 20, 22

*Concepcion v. U.S. Customs & Border Prot.,*
  767 F. Supp. 2d 141 (D.D.C. 2011) .......................................................... 25, 26, 28

*Dep't of Air Force v. Rose,*
  425 U.S. 352 (1976) ........................................................................................... 9

*Dep't of Interior v. Klamath Water Assn.,*
  532 U.S. 1 (2001) ............................................................................................... 9

*Dep't of Justice v. Reporters Comm.,*
  489 U.S. 749 (1989) ........................................................................................ 9, 10

*Dep't of Justice v. Tax Analysts,*
  492 U.S. 136 (1989) ........................................................................................... 9

*Duenas Iturralde v. Comptroller of the Currency,*
   315 F.3d 311 (D.C. Cir. 2003) ..................................................................... 25, 26

*Electronic Frontier Foundation v. Dep't of Justice,*
   141 F. Supp. 3d 51 (D.D.C. 2015) ..................................................................... 10

*Electronic Frontier Foundation v. Dep't of Justice,*
   826 F. Supp. 2d 157 (D.D.C. 2011) ............................................................. 19, 20

*Environmental Protection Agency v. Mink,*
   410 U.S. 73 (1973) .......................................................................................... 19

*Friends of Blackwater v. Dep't of the Interior,*
   391 F. Supp. 2d 115 (D.D.C. 2005) ................................................................... 28

*Harrison v. Exec. Office of U.S. Attorneys,*
   377 F. Supp. 2d 141 (D.D.C. 2005) ................................................................... 10

*Johnson v. Exec. Office for U.S. Attorneys,*
   310 F.3d 771 (D.C. Cir. 2002) .......................................................................... 23

*Jordan v. Dep't of Justice,*
   591 F.2d 753 (D.C. Cir. 1978) .......................................................................... 18

*Judicial Watch v. Dep't of Justice,*
   365 F.3d 1108 (D.C. Cir. 2004) ......................................................................... 21

*Judicial Watch, Inc. v. Dep't of Homeland Security,*
   841 F. Supp. 2d 142 (D.D.C. 2012) ......................................................... 23, 24, 28

*Judicial Watch, Inc. v. U.S. Postal Serv.,*
   297 F. Supp. 2d 252 (D.D.C. 2004) ......................................................... 18, 19, 20

*Kamman v. Internal Revenue Service,*
   56 F.3d 46 (9th Cir. 1995) ................................................................................ 10

*King v. Dep't of Justice,*
   830 F.2d 210 (D.C. Cir. 1987) ...................................................................... 10, 11

*Lamont v. Dep't of Justice,*
   475 F. Supp. 761 (S.D.N.Y. 1979) ............................................................... 12, 18

*Linn v. Dep't of Justice,*
   No. 36-1, 1995 WL 631847 (D.D.C. 1995) ......................................................... 22

*Looks Filmproduktionen GMBH v. Central Intelligence Agency*,
    2016 U.S. Dist. LEXIS 102963 (D.D.C. Aug. 5, 2016) ........................................................ 22

*Mead Data Cent., Inc. v. Dep't of Air Force*,
    566 F.2d 242 (D.C. Cir. 1977) ............................................................................... 10, 23, 24

*Nat'l Labor Relations Bd. v. Sears, Roebuck & Co.*,
    421 U.S. 132 (1975) ............................................................................................... 19, 22

*Nat'l Labor Relations Board v. Robbins Tire & Rubber Co.*,
    437 U.S. 214 (1978) ...................................................................................................... 9

*Nation Magazine v. U.S. Customs Serv.*,
    71 F.3d 885 (D.C. Cir. 1995) ....................................................................................... 25, 28

*Oglesby v. Dep't of Army*,
    79 F.3d 1172 (D.C. Cir. 1996) ..................................................................................... 23, 27

*People for the Ethical Treatment of Animals, Inc. v. Bureau of Indian Affairs*,
    800 F. Supp. 2d 173 (D.D.C. 2011) ................................................................................... 26

*Petroleum Info. Corp. v. Dep't of Interior*,
    976 F.2d 1429 (D.C. Cir. 1992) .................................................................................... 19, 21

*\*Pratt v. Webster*,
    673 F.2d 408 (D.C. Cir. 1982) ........................................................................... 11, 12, 13, 17

*Quarles v. Dep't of Navy*,
    893 F.2d 390 (D.C. Cir. 1990) ..................................................................................... 20, 21

*Quinon v. Federal Bureau of Investigation*,
    86 F.3d 1222 (D.C. Cir. 1996) ..................................................................................... 10, 13

*Senate of the Com. of Puerto Rico on Behalf of Judiciary Committee v. Dep't of Justice*,
    823 F.2d 547 (D.C. Cir. 1987) ........................................................................................ 22

*\*Shapiro v. Dep't of Justice*,
    37 F. Supp. 3d 7 (D.D.C. 2014) ............................................................................... 12, 13, 16

*Stolt-Nielsen Transp. Grp. Ltd. v. United States*,
    534 F.3d 728 (D.C. Cir. 2008) ........................................................................................ 24

*Trans-Pac. Policing Agreement v. U.S. Customs Serv.*,
    177 F.3d 1022 (D.C. Cir. 1999) ...................................................................................... 23

*United States v. Ciambrone,*
    750 F.2d 1416 (9th Cir. 1984) ................................................................. 16

*Valencia-Lucena v. U.S. Coast Guard,*
    180 F.3d 321 (D.C. Cir. 1999) ................................................. 25, 26, 28

*Vaughn v. Rosen,*
    523 F.2d 1136 (D.C. Cir. 1975) ............................................................. 19

*Vymetalik v. Federal Bureau of Investigation,*
    785 F.2d 1090 (D.C. Cir. 1986) ............................................................. 12

*Weisberg v. Dep't of Justice,*
    745 F.2d 1476 (D.C. Cir. 1984) ............................................................. 26

*Weissman v. Central Intelligence Agency,*
    565 F.2d 692 (D.C. Cir. 1977) ....................................................... 12, 15

## Statutes

18 U.S.C. § 4 ...................................................................................................... 16

5 U.S.C. § 552 ............................................................................................. *passim*

## Rules

Fed. R. Civ. P. 56(a) ........................................................................................ 10

## Federal Regulations

73 Fed. Reg. 45325 (Aug. 4, 2008).................................................................. 16

## Executive Orders

Executive Order 12333 ............................................................................... 15, 16

## Other Authorities

George Packer, "The Holder of Secret," *New Yorker* (Oct. 20, 2014), available at
    http://www.newyorker.com/magazine/2014/10/20/holder-secrets ............................................. 1

Glenn Greenwald, "U.S. filmmaker repeatedly detained at border," *Salon.com* (Apr. 8, 2012), https://www.salon.com/2012/04/08/u_s_filmmaker_repeatedly_
    detained_at_border/. ............................................................................................................ 4

Mike Fleming, Jr., "Documentary Directors Protest Homeland Security Treatment of Helmer Laura Poitras," *Deadline Hollywood* (Apr. 9, 2012), https://deadline.com/2012/04/doc
    umentary-directors-protest-homeland-security-treatment-of-helmer-laura-poitras-254291/ ..... 4

TSA, Screening Management Standard Operating Procedures (May 28, 2008), available at
https://cryptome.org/2013/01/tsa-screening-mgmt-sop.pdf........................................................ 4

Wikipedia, No Fly List, https://en.wikipedia.org/wiki/No_Fly_List............................................ 6

Wikipedia, Secondary Security Screening Selection, https://en.wikipedia.org/wiki/
Secondary_Security_Screening_Selection#cite_note-TSA-1 .................................................... 4

## INTRODUCTION

This case arises out of a U.S. citizen's desire to understand why she was stopped, detained, and questioned at the U.S. border by her own government for every international flight she took entering her own country for *six years*.

Plaintiff Laura Poitras ("Plaintiff") is an award-winning documentary filmmaker, journalist, and artist. She covers controversial subjects, like the U.S. military occupation of Iraq, mass spying, and Guantanamo Bay. She has no criminal record. Yet, she was stopped at the U.S. border on almost 40 occasions and multiple times while in transit overseas between 2006 and 2012, and she was subject to heightened security screenings at airport security checkpoints on roughly 50 occasions. She was never provided with any rationale for why. Plaintiff sought information concerning these border detentions through the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552.

Plaintiff seeks to understand why these detentions suddenly ended roughly two months after her border detentions made national news. She also seeks to understand why they began in the first place. The government's proffered explanation is its suspicion that she was possibly involved with anti-coalition forces—a suspicion based entirely on her presence on the roof of the subject of her documentary film's home[1] during an ambush of U.S. forces and one individual's unsupported "belief" that she knew about the ambush in advance and chose not to report it. But documents produced in the course of this litigation show that the U.S. Army Criminal Investigation Command ("USACIC") investigated her potential involvement and concluded— *before her very first detention*—that there was no "credible evidence" that Plaintiff committed any criminal offense. *See* Exhibit A (filed herewith).

This FOIA lawsuit challenges the Defendants' withholding of records it possesses concerning Plaintiff and her repeated border stops and detentions. Of the 271 currently disputed

---

[1] *See* George Packer, "The Holder of Secret," *New Yorker* (Oct. 20, 2014), https://www.newyorker.com/magazine/2014/10/20/holder-secrets (discussing Plaintiff's filming of Dr. Riyadh al-Adhadh for her documentary, "My Country, My Country").

pages, the Federal Bureau of Investigation ("FBI"), component of Defendant Department of Justice ("DOJ"), withholds 19 pages in full, while the remaining 252 pages are heavily redacted. The FBI asserts FOIA Exemption 5 (deliberative process privilege; 3 redacted pages) and Exemption 7 (records compiled for law enforcement; 252 redacted pages[2] and 19 withheld pages).

Plaintiff challenges the FBI's withholdings under Exemptions 5, 7(A), 7(D), and 7(E). The FBI has failed to prove it may withhold the disputed information under Exemptions 5 and 7, and it has failed to segregate and release non-exempt information, such as non-exempt facts.

Plaintiff also challenges the sufficiency of the search by U.S. Customs and Border Protection ("CPB"), component of Defendant Department of Homeland Security ("DHS"). CBP has failed to conduct a sufficient search of its records.

The Court should grant Plaintiff's cross-motion for summary judgment, order the FBI to disclose all of the disputed information, and order CBP to conduct a more thorough search of its records and disclose the additional responsive records it finds.

### STATEMENT OF FACTS

**I.     Plaintiff Was Routinely Stopped, Detained, and Questioned During International Travel Between 2006 and 2012.**

Plaintiff has been documenting post-9/11 America for the past decade. Her work has received many awards—including the 2015 Academy Award for Documentary Feature, along with various other awards, for her film *CITIZENFOUR*, a documentary about whistleblower and former NSA contractor Edward Snowden. Her other works include *My Country, My Country* (2006), an Oscar-nominated documentary film about the U.S. military occupation of Iraq; and *The Oath* (2010), an Emmy-nominated documentary film about Guantanamo Bay Prison military commissions. Her latest documentary film, *Risk* (2017), is about Julian Assange and WikiLeaks. Her reporting on the National Security Agency ("NSA") received the George Polk Award for

---

[2] The three pages containing Exemption 5 redactions also include Exemption 7 redactions.

national security journalism and shared in the 2014 Pulitzer Prize for Public Service. Plaintiff frequently travels internationally for her work, particularly to the Middle East and Europe. Declaration of Laura Poitras ("First Poitras Decl."), ECF No. 17-2, ¶¶ 1–2; Second Declaration of Laura Poitras ("Second Poitras Decl.") (filed herewith), ¶¶ 1–2.

Plaintiff was first detained on July 12, 2006, while she was traveling from Jerusalem to Newark International Airport ("Newark") after attending the Jerusalem Film Festival, where her film *My Country, My Country* was screened. Plaintiff was initially detained and questioned at Ben Gurion International Airport by Israeli airport security for about 30 minutes prior to her departure. Then, upon her arrival at Newark, she was met by CBP agents at the gate, where the agents had set up a "hard stand" to check the passport of each passenger getting off the plane. Plaintiff was thereafter escorted to a holding room, where she was detained and questioned for roughly two hours, and where her bags were searched, before being allowed to enter the United States. First Poitras Decl. ¶ 4.

This initial detention came *after* USACIC concluded—after investigating the very same allegations that the government proffers here as its rationale for Plaintiff's border detentions— that there was no "credible information . . . to believe [Plaintiff] committed a criminal offense." USACIC informed the FBI of this conclusion in an April 6, 2006 letter to the Bureau, noting that this could "change if [Plaintiff] were to be interviewed and admitted she had knowledge of the ambush and refused to notify US Forces in order to further her documentary and media interest." *See* Exhibit A (filed herewith); Second Poitras Decl. ¶ 6.

The FBI never contacted Plaintiff for an interview. Second Poitras Decl. ¶ 7.

Yet, the FBI maintained an open investigation of Plaintiff and, for the next six years, she was detained and questioned, and her bags were searched, at the U.S. border every time she entered the country, and occasionally while outside the United States in the course of international travel. She was also detained and questioned once in the United States before a flight to Dubai. Between July 2006 and June 2012, Plaintiff was detained, questioned, and

searched—sometimes for hours at a time—almost 40 times at the U.S border and multiple times while in transit overseas. First Poitras Decl. ¶¶ 5–6.

During these detentions, border agents routinely made photocopies of her travel documents. On nine occasions, border agents also made photocopies of Plaintiff's reporter's notebooks and/or the contents of her pockets and wallet, including notes, receipts, business cards, and/or credit cards. First Poitras Decl. ¶ 52.

Plaintiff's detentions ended in June 2012, following the publication of an article by journalist Glenn Greenwald on *Salon.com* about Plaintiff's border detentions. First Poitras Decl. ¶ 8.[3] The *Salon* article also prompted a group of documentary filmmakers to send DHS a petition protesting Plaintiff's treatment. First Poitras Decl. ¶ 8.[4]

During this same period, for both domestic flights and international flights *leaving* the United States, Plaintiff routinely could not receive her boarding pass until after an airline agent personally called DHS from the check-in counter. Plaintiff's boarding passes were thereafter marked "SSSS"—indicating her status as Secondary Security Screening Selectee[5]—and she was thereafter subjected to increased security screening at TSA security checkpoints. In the case of domestic travel, her selection for Secondary Security Screening initially lasted only for a few months, until October 2006, but routine Secondary Security Screenings during domestic travel resumed again a few years later. Her subjection to heightened screenings during purely domestic

---

[3] *See also* Glenn Greenwald, "U.S. filmmaker repeatedly detained at border," *Salon.com* (Apr. 8, 2012), https://www.salon.com/2012/04/08/u_s_filmmaker_repeatedly_detained_at_border/.

[4] *See also* Mike Fleming, Jr., "Documentary Directors Protest Homeland Security Treatment of Helmer Laura Poitras," *Deadline Hollywood* (Apr. 9, 2012), https://deadline.com/2012/04/documentary-directors-protest-homeland-security-treatment-of-helmer-laura-poitras-254291/.

[5] *See* TSA, Screening Management Standard Operating Procedures, p. 4-13 (May 28, 2008), available at https://cryptome.org/2013/01/tsa-screening-mgmt-sop.pdf (confirming that "SSSS" indicates a "selectee marking" for a heightened screening process); *see also* Wikipedia, Secondary Security Screening Selection, https://en.wikipedia.org/wiki/Secondary_Security_Screening_Selection#cite_note-TSA-1 (last updated Jul. 17, 2017) (depicting a boarding pass of a passenger selected for Secondary Security Screening).

travel did not fully cease until June 2012, the same point at which her international detentions stopped. First Poitras Decl. ¶¶ 9–10.

Beginning in mid-2011, when Plaintiff began work on a documentary about Julian Assange and WikiLeaks, U.S. authorities started to question Plaintiff in Europe before she was able to obtain her boarding pass to return to the United States, in addition to detaining, questioning, and searching her upon her arrival in the United States. For example, on April 5, 2012, while traveling from London to Newark after filming with Julian Assange, Plaintiff was questioned by U.S. authorities in London before being issued a boarding pass and also detained, questioned, and searched upon her arrival in the United States. During the course of her detention at Newark, several security officers repeatedly threatened to handcuff Plaintiff for attempting to take notes, claiming her pen could be used as a weapon. First Poitras Decl. ¶ 11.

Including both her domestic travel and international travel, Plaintiff was subject to Secondary Security Screening on roughly 50 occasions. First Poitras Decl. ¶ 12.

The following non-inclusive list provides a few additional examples of Plaintiff's experiences being detained and questioned between 2006 and 2012:

- On August 22, 2006, while traveling from Sarajevo to John F. Kennedy International Airport ("JFK") after attending the Sarajevo Film Festival, Plaintiff was detained at the Vienna International Airport by Austrian airport security. She was transported to a holding area, where her bags were searched and x-rayed. An Austrian security agent told her that she had been assigned a "Threat Score" of 400 out of 400 points by U.S. authorities. Plaintiff was eventually allowed to board a plane to the United States. Upon her arrival at JFK, CBP agents again met her at the gate, escorted her to a holding room, searched her bags a second time, and questioned her for roughly 2 hours before she was allowed to enter the United States. First Poitras Decl. ¶ 14.

- On November 26, 2006, upon her arrival at Newark after a flight from Paris, Plaintiff was met by CBP agents and detained and questioned for 30 minutes while her bags were searched. First Poitras Decl. ¶ 15.

- On December 17, 2006, upon her arrival at JFK after a flight from Dubai, where she had attended the Dubai Film Festival, Plaintiff was met by border agents and detained and questioned before being allowed entry into the United States. The CBP agents asked Plaintiff when she had last been to Atlanta, Georgia and told her that she had a criminal record, despite that she had no such record. First Poitras Decl. ¶ 16.

- On March 19, 2007, upon her arrival at Washington Dulles International Airport after a flight from London, where she had attended a conference on Guantanamo Bay Prison, Plaintiff was detained and questioned, and her bags were searched. First Poitras Decl. ¶ 17.

- On March 31, 2007, while traveling from Canada to LaGuardia Airport after conducting a documentary workshop, Plaintiff was detained, questioned, and searched *before* being allowed to board the plane. First Poitras Decl. ¶ 18.

- On May 26, 2007, while traveling from Yemen via Jordan to JFK after filming families of Guantanamo prisoners, CBP agents met Plaintiff at the gate upon her arrival in New York. She was detained and questioned, and all of her journalist notebooks, receipts, business cards, and credit cards were photocopied. First Poitras Decl. ¶ 19.

- On June 12, 2007, while traveling from Jordan to JFK after leading a filmmaking workshop in Amman, Plaintiff was detained, questioned, and searched after her flight, and all of her credit cards and receipts were photocopied. First Poitras Decl. ¶ 20.

- On February 10, 2010, while traveling from JFK to Berlin, Germany to attend the Berlin Film Festival, Plaintiff was told by airport security agents at JFK that she was on the No Fly List, a list maintained by the FBI's Terrorist Screening Center.[6] After Plaintiff's former lawyer called the U.S. Department of State, Plaintiff was eventually permitted to board her flight. While departing Berlin several days later, on February 16, 2010, Plaintiff was again told by airline representatives that she was on the No Fly List, though she was eventually again allowed to board her flight. Upon her arrival at JFK, she was detained and questioned for over one hour and her bags were searched. First Poitras Decl. ¶ 33.

- On August 1, 2010, upon arriving at JFK after a flight from Yemen via Dubai, CBP agents confiscated Plaintiff's digital devices. She was detained and questioned, as usual, by CBP agents. During the course of her detention, her laptop, video camera, media containing footage, and cellphone were taken and held for 41 days. First Poitras Decl. ¶ 35.

- On August 13, 2011, upon her arrival at Newark after a flight from Berlin, Plaintiff was detained and questioned for almost one hour and her bags were searched. First Poitras Decl. ¶ 42.

- On August 29, 2011, upon her arrival at JFK after a flight from Berlin, Plaintiff was detained and questioned for more than an hour and a half and her bags were searched. First Poitras Decl. ¶ 43.

---

[6] *See* Wikipedia, No Fly List, https://en.wikipedia.org/wiki/No_Fly_List (last updated Aug. 10, 2017).

- On September 10, 2011, upon her arrival at Newark after a flight from London, Plaintiff was detained and questioned for over one hour and her bags were searched. First Poitras Decl. ¶ 44.

- On June 1, 2012, upon her arrival at Newark after a flight from London, Plaintiff was again detained, questioned, and searched. First Poitras Decl. ¶ 51.

These examples represent only a few of the almost 40 instances in which Plaintiff was detained, questioned, and searched during the course of international travel between July 2006 and June 2012. *See* First Poitras Decl. ¶¶ 4, 5–6, 13–51.

In the fall of 2012, Plaintiff moved to Berlin, Germany, as a direct result of her detentions at the U.S. border. She did not move back to the United States until the spring of 2015, almost three years after the detentions ceased. First Poitras Decl. ¶ 53.

Plaintiff believes that she has been targeted for adverse treatment due to the subject matter of her documentary films and journalism, which have presented a critical perspective on U.S. policies and practices adopted post-9/11. First Poitras Decl. ¶ 56.

## II.   Plaintiff's FOIA Requests to the FBI and CBP

On January 24, 2014, counsel, on behalf of Plaintiff, submitted separate requests, by letter, to the FBI and CBP pursuant to 5 U.S.C. § 552 for "all agency records concerning, naming, or relating to Ms. Poitras." *See* Compl., ECF No. 1, ¶¶ 27–28.

CBP never responded to Plaintiff's request. Compl. ¶ 37.

The FBI acknowledged Plaintiff's request via a form letter dated February 19, 2014. Over a year later, Plaintiff received a letter dated May 21, 2015, from Susan B. Gerson, Assistant Director of the DOJ's Executive Office for U.S. Attorneys ("EOUSA"), indicating that the FBI had referred Plaintiff's request to EOUSA and that EOUSA was denying Plaintiff's request. Ms. Gerson's letter indicated that her office had located only six pages relevant to Plaintiff's request but that it was withholding in full all six pages pursuant to Federal Rule of Criminal Procedure 6(e). Plaintiff appealed the denial of her FBI request on May 29, 2015. Compl. ¶¶ 59–60.

### III.   Procedural History

On July 13, 2015, Plaintiff filed this lawsuit under 5 U.S.C. § 552. *See* Compl. Defendants filed their answer on August 19, 2015, after which the government's counsel and Plaintiff's counsel conferred regarding a schedule for the various agencies to review, process, and produce responsive records. *See* ECF No. 7. The FBI ultimately made five interim productions: (i) on Oct. 14, 2015, the FBI released 62 of 145 reviewed pages, withholding 19 pages in full (including 4 pages withheld as duplicative); (ii) on Nov. 10, 2015, the FBI released 8 of 8 reviewed pages; (iii) on Dec. 14, 2015, the FBI released 10 of 10 reviewed pages; (iv) on Feb. 16, 2016, the FBI released 120 of 124 reviewed pages, withholding 4 pages in full; and (v) on Mar. 4, 2016, the FBI released 57 of 57 reviewed pages. *See* Public Declaration of David M. Hardy, ECF No. 14-1 ("First Hardy Decl."), ¶¶ 12–16. The vast majority of the pages released are heavily redacted. The FBI referred 35 of the withheld pages to USACIC, and on Oct. 2, 2015, USACIC released 24 partially redacted pages and withheld 11 pages in full (including 3 pages as duplicative). *See* First Hardy Decl. ¶ 96. The FBI referred 7 of the withheld pages to the Army's FOIA Office and 4 of the withheld pages to EOUSA; neither agency has produced any records to Plaintiff, even in part. *See* First Hardy Decl. ¶¶ 97–98.

The FBI also referred 25 of the withheld pages to DHS, which referred the pages to CBP for a direct response to Plaintiff. CBP has not produced these records to Plaintiff.[7] *See* First Hardy Decl. ¶ 106 & n. 44.

CBP made two interim productions: (i) on Nov. 12, 2015, CBP released 712 pages; and (ii) on Feb. 17, 2016, CBP released 223 pages and withheld in full 3,182 pages (including an unspecified number as duplicative). The vast majority of the pages released are partially redacted. *See* Declaration of Sabrina Burroughs, ECF No. 14-3 ("Burroughs Decl."), ¶¶ 18, 26, 31, 38.

---

[7] The First Hardy Declaration states that these 25 pages were labeled Poitras-289–294, 296–304, 306–309, 311–344. *See* First Hardy Decl. ¶ 106, n. 44. Plaintiff did not receive any documents from the FBI, DHS, or CBP with these Bates numbers.

On March 31, 2017, after cross-motions for summary judgment, this Court held that the FBI had failed to "explain the reasons that the particular exemption [are] being asserted with respect to any document" and ordered the FBI to produce a *Vaughn* Index and/or supplemental declaration with respect to the Bureau's full or partial withholdings under FOIA Exemptions 5, 7(A), 7(D), and 7(E). This Court also granted summary judgment as to uncontested elements of this case. *See* ECF No. 22. Defendants filed their second motion for summary judgment, including a *Vaughn* Index, on July 24, 2017. *See* ECF No. 13.

## ARGUMENT

### I.     FOIA Establishes a Presumption of Disclosure, and the Government Bears the Burden of Proving Withheld Information Is Clearly Exempt.

FOIA safeguards the American public's right to know "what their government is up to." *Dep't of Justice v. Reporters Comm.*, 489 U.S. 749, 773 (1989) (citation and internal quotations omitted). The central purpose of the statute is "to ensure an informed citizenry, vital to the functioning of a democratic society, needed to check against corruption and to hold the governors accountable to the governed." *Nat'l Labor Relations Board v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 242 (1978).

FOIA requires disclosure of all requested records unless they fall within one of nine narrow exemptions. *See* 5 U.S.C. § 552(b). "'[T]hese limited exemptions do not obscure the basic policy that disclosure, not secrecy, is the dominant objective of the Act[.]'" *Dep't of Interior v. Klamath Water Assn.*, 532 U.S. 1, 7–8 (2001) (citation omitted, brackets in original); *see also Dep't of Air Force v. Rose*, 425 U.S. 352, 361 (1976) (the purpose of FOIA is "'to pierce the veil of administrative secrecy and to open agency action to the light of public scrutiny'") (citation omitted). The exemptions "have been consistently given a narrow compass." *Dep't of Justice v. Tax Analysts*, 492 U.S. 136, 151 (1989). Where exemptions apply, FOIA requires disclosure of "[a]ny reasonably segregable portion." 5 U.S.C. § 552(b).

Disputes involving the propriety of agency withholdings are commonly resolved through summary judgment in FOIA cases. *See Harrison v. Exec. Office of U.S. Attorneys*, 377 F. Supp.

2d 141, 145 (D.D.C. 2005). The moving party must show "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A moving party with the burden of proof on an issue (here the agency) must show that no reasonable trier of fact could find against them; but a moving party without the burden of proof (here the requester) need only show an absence of evidence on the other side. *Id.* at 323. The underlying facts are viewed "in the light most favorable to the [FOIA] requester." *Electronic Frontier Foundation v. Dep't of Justice*, 141 F. Supp. 3d 51, 55 (D.D.C. 2015) ("*EFF I*"), *appeal dismissed* No. 15-5346, 2016 WL 3041648 (D.C. Cir. Apr. 27, 2016) (brackets word in original) (quoting *Weisberg v. Dep't of Justice*, 705 F.3d 1344, 1350 (D.C. Cir. 1983)).

The agency bears the burden of proving that records have been properly withheld, and courts review *de novo* the agency's withholdings. 5 U.S.C. § 552(a)(4)(B); *Reporters Comm.*, 489 U.S. at 755. Indeed, the agency must prove the withheld information is "clearly exempt." *Birch v. USPS*, 803 F.2d 1206, 1209 (D.C. Cir. 1986). The agency "must provide a relatively detailed justification, specifically identifying the reasons why a particular exemption is relevant and correlating those claims with the particular part of a withheld document to which they apply." *Mead Data Cent., Inc. v. Dep't of Air Force*, 566 F.2d 242, 251 (D.C. Cir. 1977); *see also Quinon v. Federal Bureau of Investigation*, 86 F.3d 1222, 1227 (D.C. Cir. 1996) (government may not "merely recit[e] statutory standards"); *Kamman v. Internal Revenue Service*, 56 F.3d 46, 48 (9th Cir. 1995) (the government "'may not rely upon conclusory and generalized allegations of exemptions'") (citation omitted). "To accept an inadequately supported exemption claim 'would constitute an abandonment of the trial court's obligation under the FOIA to conduct a *de novo* review.'" *King v. Dep't of Justice*, 830 F.2d 210, 219 (D.C. Cir. 1987) (quoting *Allen v. Central Intelligence Agency*, 636 F.2d 1287, 1293 (D.C. Cir. 1980)).

As discussed below, the FBI's proffered evidence supporting its withholdings under Exemption 5 (deliberative process privilege) and Exemption 7 (law enforcement exemption) falls

short of this standard. The government's declarations and recently filed *Vaughn* Index lack the kind of "detailed justification" that courts interpreting FOIA consistently have required.

## II.     The FBI Has Improperly Withheld Records Under Exemption 7.

Plaintiff challenges the FBI's Exemption 7(A), 7(D), and 7(E) withholdings because the agency has fundamentally failed to make the required threshold showing that the records or information were complied for law enforcement purposes. Because the FBI has failed to meet the threshold, the Court need not reach the applicability of the specific criteria set forth in 7(A), 7(D), and 7(E).[8]

Exemption 7 applies to "records or information *compiled for law enforcement purposes*, but only to the extent that the production of such law enforcement records or information" would have one of the undesirable effects enumerated by the exemption. 5 U.S.C. § 552(b)(7) (emphasis added). To justify a withholding under the exemption, an agency must therefore "demonstrate, as a threshold matter, that the information it seeks to shield has been 'compiled for law enforcement purposes[.]'" *King v. Dep't of Justice*, 830 F.2d 210, 229 (D.C. Cir. 1987) (internal quotations omitted). The D.C. Circuit has laid out a two-part test for determining whether a law-enforcement agency invoking Exemption 7 has satisfied the threshold showing: the agency must (1) "identify a particular individual or a particular incident as the object of its investigation" and specify "the connection between that individual or incident and a possible security risk or violation of federal law"; and (2) demonstrate that this relationship is "based on information sufficient to support at least a 'colorable claim' of the connection's rationality." *Pratt v. Webster*, 673 F.2d 408, 420–421 (D.C. Cir. 1982).

Pursuant to this test, "an agency must establish that its investigatory activities are realistically based on a legitimate concern that federal laws have been or may be violated or that

_____

[8] In the First Hardy Declaration, the FBI notes that it referred 35 pages of responsive records to USACIC. *See* First Hardy Decl. ¶ 96. Mr. Hardy references the Declaration of Jon Z. Ali ("Ali Decl.") (attached to the First Hardy Declaration as Exhibit K, ECF No. 14-1, at pp. 101–05). The Declaration of Mr. Ali made no attempt to satisfy the threshold requirement of demonstrating that the withheld records were compiled for law enforcement purposes.

national security may be breached." *Pratt*, 673 F.2d at 421. The appropriate inquiry is whether the records indicate that the agency was gathering information with the *good faith* belief that the subject had violated or may violate federal law, or whether they indicate that the agency was merely monitoring the subject for purposes unrelated to enforcement of federal law. *See Weissman v. Central Intelligence Agency*, 565 F.2d 692, 694–95 (D.C. Cir. 1977) (the CIA's "intermittent but extensive investigation over a five-year period of an American citizen living at home, without his knowledge" was not for "law-enforcement purposes").

Thus, records "compiled 'in connection with investigations that focus directly on specific alleged illegal acts which could result in civil or criminal sanctions' are records compiled for law enforcement purposes[.]" *Shapiro v. Dep't of Justice*, 37 F. Supp. 3d 7, 29 (D.D.C. 2014) (citation omitted; emphasis added). Records compiled in connection with intelligence investigations undertaken by the FBI *are not*. See *Black v. Sheraton Corp. of America*, 371 F. Supp. 97, 102 (D.D.C. 1974) (denying application of Exemption 7 since the FBI investigation was not related to law enforcement proceeding but was conducted simply for intelligence purposes); *Lamont v. Dep't of Justice*, 475 F. Supp. 761, 774–76 (S.D.N.Y. 1979) (no connection between 17 years of generalized monitoring of plaintiff due to his association with various educational and political organizations, which enforcement authorities suspected were Communist fronts, and "good-faith enforcement of the Smith Act").

The focus of the two-part test is "on how and under what circumstances the requested files were compiled, and whether the files sought relate to anything that can fairly be characterized as an enforcement proceeding.'" *Shapiro*, 37 F. Supp. 3d at 28–29 (citation omitted). "FBI records are not law enforcement records simply by virtue of the function that the FBI serves." *Vymetalik v. Federal Bureau of Investigation*, 785 F.2d 1090, 1095 (D.C. Cir. 1986) (citing *Pratt*, 673 F.2d at 415 n.14). Indeed, while Congress intended that "law enforcement purpose" be broadly construed, "it was not meant to include investigatory activities wholly unrelated to law enforcement agencies' legislated functions of preventing risks to the national

security and violations of the criminal laws and of apprehending those who do violate the laws." *Pratt*, 673 F.2d at 420–21.

In *Shapiro*, 37 F. Supp. 3d at 29, this Court assessed whether another FBI declaration, also authored by David M. Hardy, satisfied Exemption 7's threshold requirement. In that case, Mr. Hardy stated (i) that responsive records "concern[ed] documents compiled as a result of assistance FBI rendered to various state and local law enforcement agencies which were investigating potential criminal activity by protestors [sic] involved with the 'Occupy' movement in Houston"; (ii) that the FBI maintained the records pursuant to the FBI's "general investigative authority per 28 U.S.C. §§ 533 and 534" and its "lead role in investigating terrorism and in the collection of terrorism threat information"; and (iii) that the "FBI, acting in concert with state and local law enforcement agencies, compiled these records while assessing the protests for potential terrorist threats, including domestic terrorism in violation of 18 U.S.C. § 2331, and other criminal activity, such as advocating the overthrow of the government in violation of 18 U.S.C. § 2385." *Id.* (internal citations omitted). The Court rejected the Bureau's claim, finding that "Mr. Hardy's averments [were] too generalized for purposes of Exemption 7." *Id.* The Court faulted Mr. Hardy for failing to "supply specific facts as to the basis for FBI's belief that the Occupy protestors might have been engaged in terroristic or other criminal activity" and noted that "[n]either the word 'terrorism' nor the phrase 'advocating the overthrow of the government' are talismanic, especially where FBI purports to be investigating individuals who ostensibly are engaged in protected First Amendment activity." *Id.; cf. Quinon v. Federal Bureau of Investigation,* 86 F.3d 1222, 1229 (D.C. Cir. 1996) (rejecting the FBI's invocation of Exemption 7 where the affidavits proffered in support of the Bureau's motion for summary judgment "simply allude to 'certain events,' which [the FBI] fail[s] to describe or characterize").

Here, as in *Shapiro*, the FBI's three Hardy declarations and recently submitted *Vaughn* Index fail *Pratt's* two-part test for the Exemption 7 law enforcement threshold—they do not demonstrate a rational connection between Plaintiff and any security risk or violation of federal law.

- 13 -

In support of the Exemption 7 withholdings on each of the 252 redacted pages and 19 withheld pages at issue, the First Hardy Declaration states merely that the withheld information "was compiled as part of a criminal investigation into Plaintiff's 'possible involvement with anti-coalition forces during her time in Iraq as an independent media representative.'" Def. 2nd Mot., ECF No. 24-1, at 10 (quoting First Hardy Decl. ¶ 64). The FBI also states that the investigation "was undertaken at the request of the U.S. military" in 2006 after it provided the Bureau with "information about Plaintiff's involvement in an ambush on U.S. forces[.]" Def. 2nd Mot. at 10 (quoting First Hardy Decl. ¶ 31). The First Hardy Declaration specifically states that this information included "the possibility that she had prior knowledge of the ambush and purposely chose not to report it" and that, "[a]s a result [of receiving this new information], the U.S. military requested an investigation of Poitras because of her possible involvement with anti-coalition forces during her time in Iraq[.]"  First Hardy Decl. ¶ 31. The Second Hardy Declaration largely repeats the statements made in Mr. Hardy's initial declaration. *See* Second Declaration of David M. Hardy, ECF No. 20-1 ("Second Hardy Decl."), ¶ 9. The Third Hardy Declaration and the FBI's recently submitted *Vaughn* Index focus entirely on the specific exemptions claimed and provide no information related to whether the FBI satisfied the Exemption 7 law enforcement threshold. *See* Third Declaration of David M. Hardy, ECF No. 24-3, ¶¶ 7–9; FBI *Vaughn* Index, ECF No. 24-2.

The FBI's assertions fail to meet the agency's Exemption 7 burden for two reasons:

First, USACIC's 2016 letter to the FBI providing the Bureau with the referenced "information" shows that the Bureau's investigation of Plaintiff was conducted for intelligence gathering purposes—not law enforcement purposes—and that Exemption 7 therefore does not apply to the disputed records. *See Black*, 371 F. Supp. at 102. As noted, the letter reports that USACIC had conducted a full investigation into an anonymous source's "belief" that Plaintiff had prior knowledge of the ambush and purposely chose not to report it, and that the agency had concluded that "credible information *does not presently exist* to believe [Plaintiff] committed a criminal offense[.]" (emphasis added). The letter noted that this could change if Plaintiff were

interviewed and admitted to a criminal offense. The letter did not, despite Mr. Hardy's characterization of it, *request* that the FBI open an investigation. The letter noted merely that USACIC was providing the information to the FBI "for any action you deem appropriate" and requested only that the FBI notify USACIC if it decided—on it's own—to initiate an investigation of Plaintiff. *See* Exhibit A.

The documents produced in this case reveal that the FBI *did* decide to initiate an investigation into Plaintiff. But with no "credible" evidence found by USACIC, and thus no reason to believe that Plaintiff had committed any crime, the FBI's investigation can only be characterized as one undertaken for intelligence gathering purposes. The intelligence gathering nature of the FBI's investigation into Plaintiff is confirmed by the fact that the FBI never followed through on the only step that USACIC had identified as having the potential to reveal evidence that Plaintiff committed a crime—*i.e.*, interviewing Plaintiff. Significantly, the FBI never once in the course of its at least 6-year investigation into Plaintiff contacted her for an interview. *See* Second Poitras Decl. at ¶ 7. *Cf. Weissman*, 565 F.2d at 694–95 (five-year-long "intermittent but extensive investigation" of an American citizen "*without his knowledge*" was not for law-enforcement purposes) (emphasis added).

The Second Hardy Declaration unequivocally confirms that the FBI's investigation of Plaintiff was conducted for intelligence gathering purposes. The declaration notes that the investigation of Plaintiff was conducted pursuant to the Attorney General Guidelines for FBI National Security Intelligence Collection ("AGG/NSIG")—the only new information the second declaration provided. Mr. Hardy explained, "[t]he scope of authorized activities under AGG/NSIG Part II 'is not limited to criminal investigations, but rather encompasses gathering information for broader analytic and intelligence purposes authorized by [Executive Order] 12333." Second Hardy Decl. ¶ 9.

The FBI seems to assume that the intelligence collection guidelines impact the scope of what constitutes "law enforcement purposes" under FOIA. They do not. Executive Order 12333, first signed by President Reagan in 1981 and amended several times since then, lays out the

powers and responsibilities of the United States' *intelligence* activities.[9] *See* 73 Fed. Reg. 45325 (Aug. 4, 2008). The FBI's authority under Executive Order 12333 to engage in intelligence collection beyond the context of criminal investigations does not relieve it of its burden to establish that any records it seeks to withhold under FOIA Exemption 7 were complied for *law enforcement* purposes. 5 U.S.C. § 552(b)(7) (applying to "records or information compiled for law enforcement purposes"). Thus, while the Second Hardy Declaration may provide enough specificity for this Court to find that the FBI's investigation of Plaintiff was for *intelligence purposes*, that does not satisfy the agency's burden under Exemption 7's *law enforcement* threshold requirement.

Second, the Hardy declarations' vague and highly generalized references to the FBI's "criminal investigation" are not sufficient to satisfy the government's burden. Mr. Hardy failed to supply specific facts as to the basis of the FBI's belief that Plaintiff might have been somehow involved in criminal activity. *See Shapiro*, 37 F. Supp. 3d at 29. His declaration in this case provides *even less* factual detail than the declaration deemed insufficient in *Shapiro*, which unlike here included alleged violations of particular statutes. *See id.* Here, Mr. Hardy fails to cite any particular statute(s) that Plaintiff allegedly violated. He fails even to cite any particular statute(s) that could have provided a mere basis for "potential prosecution."[10]

The FBI's failure to cite a single criminal statute Plaintiff might have violated— combined with Mr. Hardy's acknowledgement that the FBI's authority under the intelligence collection guidelines is "not limited to criminal investigations"—buttresses the conclusion that the investigation of Plaintiff was initiated for "broader analytic and intelligence purposes." *See* Second Hardy Decl. ¶ 9. Such purposes fall squarely outside the FBI's law enforcement duties.

---

[9] The FBI does not claim that any of the withheld records at issue are being withheld pursuant to Exemption 1, which might have excused a failure to disclose records of an intelligence operation.

[10] Failing to report a felony may, in some circumstances, be a crime (*see, e.g.*, Misprision of Felony, 18 U.S.C. § 4) but only if the defendant "took an affirmative step to conceal the crime." *United States v. Ciambrone*, 750 F.2d 1416, 1417 (9th Cir. 1984). No such affirmative step to conceal is alleged, or even hinted at, in the Second Hardy Declaration.

Even putting aside Mr. Hardy's failure to cite to a specific statute that Plaintiff allegedly violated, he also fails to cite any specific facts supporting the FBI's hypothesis that Plaintiff somehow knew in advance of the ambush. Mr. Hardy refers to Plaintiff "watch[ing] and film[ing] the ambush from on top of a nearby building[.]" Second Hardy Decl. at ¶ 9. That Plaintiff, a documentary filmmaker and journalist, was seen with a camera on the roof of the home of the subject of her documentary film—who she was staying with during her trip to Baghdad[11]—is not a fact that in any way rationalizes the FBI's proposition that Plaintiff knew about the ambush in advance. The theory that Plaintiff somehow knew about the attack in advance is supported only by one individual's "belief"— one which USACIC had independently and previously investigated and found no evidence to support. Mr. Hardy fails to establish how the actions of a journalist working on a documentary about the military occupation of Iraq and allegedly filming a confrontation from the roof of the home in which she was staying constitutes a federal crime.

Without even the suggestion of a clear allegation that Plaintiff affirmatively concealed a specific crime, or a citation to any criminal statute underlying the investigation whatsoever, Mr. Hardy's unsupported assertions that the investigation into Plaintiff was for "law enforcement" purposes fail. His declarations do not satisfy the FBI's burden of establishing a "colorable claim" of the rationality of any connection between Plaintiff and a violation of federal law or potential security risk. *See Pratt* 673 F.2d at 420–21. If anything, the Bureau had been informed by USACIS that there was no "credible" evidence to support such a claim.

It appears that Plaintiff was monitored and harassed for purposes unrelated to enforcement of federal law—*i.e.*, as a result of her decision to dedicate her journalism and documentary film career to covering politically controversial topics, which often entails

---

[11] *See* Second Hardy Declaration, Exhibit B (noting that Plaintiff's "media project entailed her living with a local Iraqi family and documenting the upcoming Iraqi elections from the perspective of Iraqis. The Iraqi family she was living with was later identified as one of the local Iraqi leaders [Dr. Riyadh al-Adhadh].").

presenting a critical view of U.S. foreign and domestic policy. Plaintiff's belief that her extensive harassment at the U.S. border—and elsewhere—was politically motivated is supported by the fact that this harassment of Plaintiff ceased only after Greenwald brought it to the public's attention in his April 2012 *Salon* article.

This case is thus akin to *Lamont*, which involved a FOIA request by an individual who had been subject to years of surveillance after being placed on a "Security Index," an FBI surveillance program to monitor the activities of persons considered "inimical to the country's internal security," as a result of his association with educational and political organizations that law enforcement authorities suspected to be Communist. *Lamont*, 475 F. Supp. at 765–66. The court found there to be "no connection" between the 17 years of generalized monitoring of the plaintiff and "good-faith enforcement of the Smith Act." *Id.* at 775. Here, just as in *Lamont*, there is no connection between the FBI's investigation of Plaintiff and good-faith enforcement of any federal law.

The FBI has failed to demonstrate that the information it seeks to shield has been compiled for legitimate "law enforcement purposes," and the Bureau should be ordered to disclose the information withheld under Exemptions 7(A), (D) and (E).

## III.    The FBI Has Improperly Withheld Records Under Exemption 5.

The FBI invokes Exemption 5 for redactions on three pages: Poitras-158, Poitras-159, and Poitras-163. *See* ECF No. 17-1. To invoke Exemption 5's deliberative process privilege, "an agency must show that an allegedly exempt document is both 'predecisional' and 'deliberative.'" *Judicial Watch, Inc. v. U.S. Postal Serv.*, 297 F. Supp. 2d 252, 259 (D.D.C. 2004) (citations omitted). A "predecisional" document is one that is "antecedent to the adoption of agency policy." *Jordan v. Dep't of Justice*, 591 F.2d 753, 774 (D.C. Cir. 1978) (en banc). To demonstrate that a claimed exemption is "predecisional," an agency must either "pinpoint an agency decision or policy to which the document contributed, . . . or identify a decisionmaking process to which a document contributed." *Judicial Watch*, 297 F. Supp. 2d at 259 (citations and internal quotations omitted). Meanwhile, a "deliberative" document is one that is "a direct part of

the deliberative process in that it makes recommendations or expresses opinions on legal or policy matters." *Vaughn v. Rosen*, 523 F.2d 1136, 1143–44 (D.C. Cir. 1975). "Merely factual material is not exempt; the document must 'bear on the formulation or exercise of agency policy-oriented *judgment*.'" *Judicial Watch*, 297 F. Supp. 2d at 259 (citing *Petroleum Info. Corp. v. Dep't of Interior*, 976 F.2d 1429, 1435 (D.C. Cir. 1992) (emphasis in original)). Thus, deliberative documents are those "reflecting advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated." *Nat'l Labor Relations Bd. v. Sears, Roebuck & Co.*, 421 U.S. 132, 150 (1975) (internal quotations and citations omitted).

The "first step" in determining whether a document is properly withheld as deliberative under Exemption 5 "is to examine the context in which the materials are used." *Petroleum Info. Corp. v. Dep't of Interior*, 976 F.2d 1429, 1434 (D.C. Cir. 1992) (internal citations and quotations omitted). "Since the applicability of the deliberative process privilege depends on the content of each document and the role it plays in the decisionmaking process, an agency's affidavit must correlate facts in or about each withheld document with the elements of the privilege." *Judicial Watch*, 297 F. Supp. 2d at 259–60. "Without a *sufficiently specific* affidavit or *Vaughn* Index, a court cannot decide, one way or the other, a deliberative process privilege claim." *Id*. at 260 (citations omitted) (emphasis added). To satisfy its burden, an agency must identify "the particular deliberative process involved," the "role that the withheld document played in that deliberative process," and information concerning the "identities, positions, and job duties of the authors and recipients of the withheld documents" for the documents withheld. *Electronic Frontier Foundation v. Dep't of Justice*, 826 F. Supp. 2d 157, 169, 170 (D.D.C. 2011) ("*EFF II*").

"[M]emoranda consisting only of compiled factual material or purely factual material contained in deliberative memoranda and severable from its context" may not be withheld under the deliberative process privilege. *Environmental Protection Agency v. Mink*, 410 U.S. 73, 88–89 (1973), *superseded by statute on other grounds*. While the rationale behind the deliberative

process privilege encourages candor in deliberative discussions, the requirement that facts must be disclosed is intended to enhance the integrity of agency deliberations. *See Quarles v. Dep't of Navy*, 893 F.2d 390, 392 (D.C. Cir. 1990) ("the prospect of disclosure is less likely to make an advisor omit or fudge raw facts").

Here, the FBI has failed to provide the heightened level of contextual specificity necessary to withhold responsive records under the deliberative process privilege. Indeed, the FBI has failed to identify a *specific* agency decision to which the redacted paragraphs are predecisional or a decision-making process to which the redacted paragraphs contributed. *See Judicial Watch*, 297 F. Supp. 2d at 259. The First Hardy Declaration vaguely states that the information in question was an "intra-agency analysis" in which the New York Field Office "is discussing the results of database checks conducted to aid in the investigation at issue" and "analyzing, delivering, sorting ideas and providing recommendations of things to consider for this particular investigation" *See* First Hardy Decl. ¶ 62. Not only is this impermissibly vague, but it fails to identify with *sufficient specificity* "the particular deliberative process involved" or the "role that the withheld [paragraphs] played in that deliberative process[.]" *EFF II*, 826 F. Supp. 2d at 169; *Judicial Watch*, 297 F. Supp. 2d at 260 (citations omitted) ("Without a *sufficiently specific* affidavit or Vaughn Index, a court cannot decide, one way or the other, a deliberative process privilege claim.") (emphasis added). Neither Mr. Hardy's second declaration (ECF No. 20-1), nor the recently submitted *Vaughn* Index (ECF No. 24-2) correct this fundamental failure.

Furthermore, "even if the document is predecisional at the time it is prepared, it can lose that status if it is adopted, formally or informally, as the agency position on an issue or is used by the agency in its dealings with the public." *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 866 (D.C. Cir. 1980). Here, because the FBI has failed to identify a specific decision to which the redacted paragraphs preceded and contributed, the records must be treated as the final agency positions and, thus, may not be withheld under the deliberative process privilege.

Finally, for each of the FBI's redactions pursuant to the deliberative process privilege, the agency simply has redacted complete paragraphs and fails to segregate out any purely factual material contained in those paragraphs. *See* ECF No. 17-1. With multiple consecutive paragraphs redacted in their entirety on the pages at issue, even assuming that these redacted paragraphs included some agency judgments, it is a near-certainty that the Bureau has withheld some purely factual material on which any such judgments were made. It is well established that the deliberative process privilege generally does not shield purely factual information from disclosure. *See, e.g., Judicial Watch v. Dep't of Justice*, 365 F.3d 1108, 1113 (D.C. Cir. 2004); *Petroleum Info. Corp.*, 976 F.2d at 1434. Indeed, the purposes underlying the deliberative process privilege are not served by permitting agencies to shield factual information from disclosure to the public. *See Quarles*, 893 F.2d at 392. Here, all factual material contained within the agency's block redactions is not properly withheld under Exemption 5. *See Citizens for Responsibility & Ethics v. Dep't of Homeland Sec.*, 648 F. Supp. 2d 152, 159 (D.D.C. 2009).

The FBI has thus failed to justify its broad claims under the deliberative process exemption and should be ordered to disclose the paragraphs redacted under Exemption 5.

**IV.    The FBI Has Failed to Release Documents that Address the Apparent Decision to Close the Investigation into Plaintiff.**

If it is true, as the FBI claims, that the information withheld under Exemption 5 does not contain a final agency decision, this suggests a deeper problem with the FBI's document production. The FBI is either improperly withholding its rationale for its apparent termination of the investigation of Plaintiff, or its search and document production has not properly accounted for records relating to the termination.

As noted previously, it is clear that the investigation into Plaintiff has been closed, either formally or informally. Plaintiff's six years of routine detentions and harassment at the U.S. border ceased in July 2012, a few months after Greenwald's *Salon* article. *See* First Poitras Decl. ¶ 8.

More notably, the FBI has made no withholdings under Exemption 7(A), the exemption invoked to shield information where disclosure "could reasonably be expected to interfere with enforcement proceedings." *See* 5 U.S.C. § 552(b)(7); *see also Citizens for Responsibility and Ethics in Wash. v. U.S. Dep't of Justice*, 746 F.3d 1082, 1097 (D.C. Cir. 2014) ("reliance on Exemption 7(A) may become outdated when the proceeding at issue comes to a close"). Nor has the agency claimed that it cannot confirm or deny the existence of any responsive records (*i.e.*, a *Glomar* response) on the basis of potential interference with a pending investigation. *See Looks Filmproduktionen GMBH v. Central Intelligence Agency*, 2016 U.S. Dist. LEXIS 102963, *3 (D.D.C. Aug. 5, 2016) (*Glomar* response may be used where records are protected under Exemption 7(A)). The FBI nonetheless has failed to produce any documents addressing its final decision to close its investigation of Plaintiff.

The Bureau is obligated to disclose all final agency decisions pursuant to FOIA. It is of no moment whether the FBI's final decision was formal or informal; once it was made, no withholdings under Exemption 5 remain proper. The Supreme Court has made clear that Exemption 5 cannot be used to frustrate the congressional policy expressed in FOIA that documents having the "force and effect of law" be disclosed. *Nat'l Labor Relations Board v. Sears, Roebuck & Co.*, 421 U.S. 132, 153 (1975). Thus, if an agency fails to specify the "relevant final decision" being considered in the withheld material, summary judgment in the agency's favor is improper. *Senate of the Com. of Puerto Rico on Behalf of Judiciary Committee v. Dep't of Justice*, 823 F.2d 547 at 585 (D.C. Cir. 1987); *see also Linn v. Dep't of Justice*, No. 36-1, 1995 WL 631847, at *5 (D.D.C. 1995).

The FBI's failure to disclose *any* documents addressing its final decision to terminate its investigation into Plaintiff casts further doubt on the agency's claim that the documents withheld under Exemption 5 are deliberative. *See Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 866 (D.C. Cir. 1980) ("[E]ven if the document is predecisional at the time it is prepared, it can lose that status if it is adopted, formally or informally, as the agency position on an issue or is used by the agency in its dealings with the public."); *Blank Rome LLP v. Dep't of Air Force*,

No. 15-CV-1200-RCL, 2016 WL 5108016, at *10 (D.D.C. Sept. 20, 2016) (although statements generated before a final Air Force decision were pre-decisional at the time of drafting, "the material in these redactions lost their predecisional status when they were adopted in the Air Force's final memorandum").

The FBI is either improperly withholding its rationale for its decision to terminate its investigation of Plaintiff, or the agency has not properly accounted for documentation of its final decision in its search and document production process in this case.

**V.      The FBI and CBP Have Failed to Segregate and Release Non-Exempt Information.**

Even when a responsive record contains exempt information, FOIA explicitly requires that "[a]ny reasonably segregable potion of [the] record shall be provided to any person requesting such record after deletion of the portions which are exempt[.]"  5 U.S.C. § 552(b); *see Oglesby v. Dep't of Army*, 79 F.3d 1172, 1176 (D.C. Cir. 1996) ("If a document contains exempt information, the agency must still release 'any reasonably segregable portion' after deletion of the nondisclosable portions."). The segregability requirement "applies to all documents and all exemptions in the FOIA." *Center for Auto Safety v. Environmental Protection Agency*, 731 F.2d 16, 21 (D.C. Cir. 1984). As with all aspects of FOIA litigation, the burden is on the government to "provide a 'detailed justification' for its non-segregability." *Johnson v. Exec. Office for U.S. Attorneys*, 310 F.3d 771, 776 (D.C. Cir. 2002) (citation omitted). This includes "a statement of [the government's] reasons," and a "descri[ption of] what proportion of the information in a document is non-exempt and how that material is dispersed throughout the document." *Mead Data Cent.,* 566 F.2d at 261. Simply claiming that a segregability review has been conducted is insufficient. *Oglesby*, 79 F.3d at 1180. Furthermore, district courts have an "affirmative duty to consider the segregability issue *sua sponte*." *Trans-Pac. Policing Agreement v. U.S. Customs Serv.*, 177 F.3d 1022, 1028 (D.C. Cir. 1999).

The FBI and CBP have provided nothing more than "empty invocation[s] of the segregability standard" that the Court must reject. *See Judicial Watch, Inc. v. Dep't of Homeland Security*, 841 F. Supp. 2d 142, 161 (D.D.C. 2012) (agency stating generally in submissions that it

"conducted a 'line-by-line' review of its entire release and disclosed all reasonably segregable, non-exempt information" not sufficient); *see also Stolt-Nielsen Transp. Grp. Ltd. v. United States*, 534 F.3d 728, 734 (D.C. Cir. 2008) ("conclusory" declaration that an agency paralegal had "reviewed each page line-by-line to assure himself that he was withholding from disclosure only information exempt pursuant to the Act" was "not sufficient support for a court to conclude that the self-serving conclusion is the correct one"). The government's motion essentially reiterates the language that the court rejected in *Judicial Watch,* 841 F. Supp. 2d at 161, stating that the FBI and CBP conducted a "document-by-document, line-by-line" review of the records "to ensure that there was no reasonable segregable information the agencies could produce[.]"[12] *See Judicial Watch*, 841 F. Supp. 2d at 161; Def. 2nd Mot. at 18 (citing First Hardy Decl. ¶ 110, Burroughs Decl. ¶ 52.). The government also points to its multiple declarations and the FBI and CBP *Vaughn* indexes. But these documents contain only vague and boilerplate categorical explanations for the government's redactions—and no information about "how [non-exempt] material is dispersed throughout the document[s]." *See Mead Data Cent.,* 566 F.2d at 261. Yet the government claims that these materials "more than satisfy the agencies' segregability obligations." Def. 2nd Mot. at 18

These statements are conclusions, not the detailed explanations FOIA requires. The FBI, CBP, and USACIC have together withheld over 3,200 pages of responsive records in their entirety, in addition to large blocks of redacted text on the majority of the released pages, thus concealing entire sentences, paragraphs, and pages from public disclosure. It is a near certainty that the agencies have withheld more information than is otherwise justifiable. In any event, despite their assertions that they have complied with FOIA's segregability requirement, the agencies have not satisfied their burden and are not entitled to summary judgment.

---

[12] Meanwhile, USACIC, which withheld 11 pages in full (pages referred from FBI to the agency), states merely that "[e]very effort was made to provide Plaintiffs with all material in the public domain and with reasonable segregable portions of releasable material." *See* Ali Decl. at ¶ 4; *see also* First Hardy Decl. ¶ 96.

**VI.**    **CBP Has Failed to Conduct a Sufficient Search for Records.**

Where, as here, the requester challenges the adequacy of the agency's search for responsive records, in order to prevail on summary judgment, "the agency must demonstrate beyond material doubt that its search was reasonably calculated to uncover all relevant documents." *Nation Magazine v. U.S. Customs Serv.*, 71 F.3d 885, 890 (D.C. Cir. 1995) (internal quotations and citations omitted). An agency must demonstrate that it searched for documents in good faith, using methods that are reasonably expected to produce the requested information. *Valencia-Lucena v. U.S. Coast Guard*, 180 F.3d 321, 326 (D.C. Cir. 1999) (citing *Oglesby v. Dep't of Arm*y, 920 F.2d 57, 68 (D.C. Cir. 1990)).

In response to the agency's showing, a "plaintiff may . . . provide 'countervailing evidence' as to the adequacy of the agency's search." *Duenas Iturralde v. Comptroller of the Currency*, 315 F.3d 311, 314 (D.C. Cir. 2003) (quoting *Founding Church of Scientology of Washington, D.C., Inc. v. Nat'l Sec. Agency*, 610 F.2d 824, 836 (D.C. Cir. 1979)). If the plaintiff provides "sufficient evidence to raise 'substantial doubt' concerning the adequacy of [the agency's] search," particularly when there is a "'well defined request[] and positive indications of overlooked materials,' summary judgment is inappropriate." *Id*. at 314 (quoting *Valencia-Lucena*, 180 F.3d at 326); *see also Concepcion v. U.S. Customs & Border Prot*., 767 F. Supp. 2d 141, 145-146 (D.D.C. 2011).

Here, Defendant DHS is not entitled to summary judgment because its component, CBP, has failed to demonstrate that it conducted an adequate search for responsive records. "The court applies a 'reasonableness' test to determine the 'adequacy' of a search methodology," and if "the record leaves substantial doubt as to the sufficiency of the search, summary judgment for the agency is not proper." *Campbell v. Dep't of Justice*, 164 F.3d 20, 27 (D.C. Cir. 1998) (citations and internal quotation marks omitted). In this case, CBP's search is suspect for two distinct reasons: (1) there are "positive indications of overlooked material," and (2) the Burroughs Declaration does not contain the requisite specificity with respect to the search. *See Duenas Iturralde*, 315 F.3d at 314.

First, there are "positive indications of overlooked materials." *Duenas Iturralde*, 315 F.3d at 314; *see also Valencia-Lucena*, 180 F.3d at 326; *Concepcion*, 767 F. Supp. 2d at 145–46. Most significantly, it is undisputed that on nine occasions, CBP agents searched and copied Plaintiff's reporter notebooks and/or the contents of her pockets and wallet, including handwritten notes, credit cards, receipts, and business cards. Poitras Decl. ¶ 52. CBP failed to produce any such photocopies. The agency's unsubstantiated assertion that it conducted an adequate search therefore cannot withstand judicial scrutiny.

As the D.C. Circuit has long emphasized, the adequacy of an agency's search "is judged by a standard of reasonableness and depends, not surprisingly, upon the facts of each case." *Weisberg v. Dep't of Justice*, 745 F.2d 1476, 1485 (D.C. Cir. 1984) (citation omitted). In conducting the requisite analysis, "the underlying facts and the inferences to be drawn from them are construed in the light most favorable to the FOIA requester." *People for the Ethical Treatment of Animals, Inc. v. Bureau of Indian Affairs*, 800 F. Supp. 2d 173, 177 (D.D.C. 2011) (citation and internal quotation marks omitted).

Here, CBP admits that its search of the electronic and paper files in the agency's New York field office was solely focused on Plaintiff's August 1, 2010 detention at JFK, with the electronic search limited to the date range August 1, 2010 through October 31, 2010. Burroughs Decl. at ¶ 31. A search with such a limited date range—a mere *three months* in 2010—is insufficient given Plaintiff's *six years* of detentions. *See* First Poitras Decl. ¶ 5. Plaintiff was detained at airports serving New York throughout this entire six-year period. Indeed, she was detained at JFK a total of 24 times over the course of those six years, and at Newark 12 times, including both her first and last detentions. First Poitras Decl. ¶¶ 4, 13–51. And each of the nine incidents where CBP agents photocopied Plaintiff's personal documents and effects occurred between 2006 and 2009—over a year before the August 1, 2010 incident. First Poitras Decl. ¶ 52. Eight of these nine incidents occurred at JFK, and one occurred at Newark. *See* First Poitras Decl. ¶ 52. A more thorough search of the New York field office's paper and electronic files would have been required to uncover the photocopies in question—and it likely would have

- 26 -

uncovered other relevant records as well. Even if the physical photocopies were never entered into CBP's electronic databases, as the government suggests, it seems the field office's paper files would be their most logical resting place.

Second, CBP provides minimal detail about the electronic searches conducted on the agency's databases, stating that CBP personnel "performed searches on relevant databases within those systems using Plaintiff's name and date of birth" but failing to provide a complete list of the specific database search terms used or any other information about how the searches were conducted. *See* Burroughs Decl. ¶ 5. CBP also fails to provide sufficient detail about the paper and electronic searches at CBP's New York field office. The only sufficiently specific detail provided—the date range—shows only that its search was far too narrow considering the number of times Plaintiff was detained in New York between 2006 and 2012. CBP states that office personnel performed electronic searches "using search criteria reasonably tailored to identify" records relating to Plaintiff's August 1, 2010 detention, but while it provides some examples, it fails to provide a complete list of the specific search criteria used. CBP also states that office personnel "reviewed paper files known or reasonably believed to include records relating to Plaintiff or the August 1, 2010 encounter," but it fails to explain the specific criteria used to identify relevant paper files or any other details of how the paper searches were conducted. *See* Burroughs Decl. ¶ 30.

Recognizing that such vague representations do not aid the court in conducting a *de novo* review of an agency's search efforts, the D.C. Circuit has long required agency declarations to identify the specific "search terms" employed by agency personnel conducting search for responsive records. *See Oglesby*, 920 F.2d at 68 ("A reasonably detailed affidavit, setting forth the search terms and the type of search performed, and averring that all files likely to contain responsive materials (if such records exist) were searched, is necessary to afford a FOIA requester an opportunity to challenge the adequacy of the search and to allow the district court to determine if the search was adequate in order to grant summary judgment.") (emphasis added);

*see also Ancient Coin Collectors Guild v. Dep't of State*, 641 F.3d 504, 514 (D.C. Cir. 2011);

*Valencia-Lucena*, 180 F.3d at 326; *Nation Magazine*, 71 F.3d at 890.

This Court has found agency representations similar to those at issue here deficient. In

*Judicial Watch v. Dep't of Homeland Sec.*, 857 F. Supp. 2d 129, 140 (D.D.C. 2012), the agency

declaration "omit[ted] necessary details regarding the searches of several component offices,"

including "the search terms used by [several] offices" and "how the search was conducted." The

Court held that "[u]nder the law of this Circuit, the omission of such information from the

agency declarations precludes the entry of summary judgment in the [agency's] favor." *Id.*

(footnote and citations omitted); *see also Friends of Blackwater v. Dep't of the Interior,* 391 F.

Supp. 2d 115, 119–121 (D.D.C. 2005) ("Without evidence in the agency's affidavit of the

specific search terms used to carry out the search, . . . the Court finds that the agency's search . . .

was inadequate.").

The lack of search terms and a description of "how the search was conducted" makes it

impossible for Plaintiff or the Court to assess the adequacy of CBP's efforts. CBP's failure to

describe its search efforts with the requisite specificity strongly suggests that the agency's search

did not "us[e] methods that are reasonably expected to produce the requested information,"

*Concepcion*, 767 F. Supp. 2d at 145, and was not "reasonably calculated to uncover all relevant

documents." *Nation Magazine*, 71 F.3d at 890. Indeed, it appears from the Burroughs

Declaration that CBP personnel did not employ common sense methods—such as searching for

Plaintiff's passport number, phone numbers, variations of Plaintiff's name, and common name

misspellings—when performing searches on the TECS and ATS databases. And the record's

meager description of the agency's search efforts at the New York field office makes it

impossible to determine whether such common sense search methods were employed there.

Under the facts of this case, the Court should find that CBP's search was not "reasonably

calculated to uncover all relevant documents" and was thus inadequate. Summary judgment for

Defendant DHS is thus inappropriate. *See Nation Magazine*, 71 F.3d at 890.

## **CONCLUSION**

For the foregoing reasons, the Court should deny the government's second motion for summary judgment and grant Plaintiff's second cross-motion for summary judgment.

Dated: August 21, 2017                    Respectfully Submitted,


   */s/ David L. Sobel*
DAVID L. SOBEL
D.C. Bar No. 360418
Electronic Frontier Foundation
5335 Wisconsin Avenue, N.W.
Suite 640
Washington, DC 20015
(202) 246-6180

NATHAN D. CARDOZO
D.C. Bar No. 1018696
JAMIE WILLIAMS
(*Admitted in California*)
Electronic Frontier Foundation
815 Eddy Street
San Francisco, CA 94109
(415) 436-9333

*Counsel for Plaintiff*
*Laura Poitras*