## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

LAURA POITRAS,

        Plaintiff,

      v.

DEPARTMENT OF HOMELAND
SECURITY, *et al.*,

        Defendants.

Civil Action No. 15-1091 (BAH)

Chief Judge Beryl A. Howell

## <u>MEMORANDUM OPINION</u>

The plaintiff, Laura Poitras, a journalist and documentary filmmaker, Compl. ¶ 2, ECF No. 1, challenges the responses of the Federal Bureau of Investigation ("FBI"), a component of the Department of Justice ("DOJ"), and U.S. Customs and Border Protection ("CBP"), a component of the Department of Homeland Security ("DHS"), to her records requests submitted pursuant to the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552.[1] The requests at issue seek "all agency records concerning, naming, or relating" to the plaintiff and arise from repeated detentions, searches, and questioning of the plaintiff during her international travel over a span of six years. Compl. ¶¶ 15–27. Pending before the Court are the defendants' second motion for summary judgment and the plaintiff's second cross-motion for summary judgment. *See generally* Defs.' Second Mot. Summ. J. ("Defs.' Mot."), ECF No. 24; Pl.'s Second Cross-Mot. Summ. J. ("Pl.'s Cross-Mot."), ECF No. 26. For the reasons set forth below, the defendants' motion is granted and the plaintiff's cross-motion is denied.

---

[1] The plaintiff also submitted FOIA requests to the Office of the Director of National Intelligence ("ODNI"), U.S. Citizenship and Immigration Services ("USCIS"), U.S. Immigration and Customs Enforcement ("ICE"), and the Transportation Security Administration ("TSA"), but those agencies were previously granted summary judgment. *See* Order Denying Mots. Summ. J. Without Prejudice and Requiring Submission of a *Vaughn* Index ("Summ. J. Order") at 6, ECF No. 22 (K.B. Jackson, J.).

## I.    BACKGROUND

Summarized below is the factual background underlying the plaintiff's FOIA requests and a review of the defendants' responses.

### A.    Background on the Plaintiff

The plaintiff is a U.S. citizen and "professional documentary filmmaker, journalist, and artist" based in New York.  Pl.'s Cross-Mot, Ex. 3, Pl.'s Second Statement of Material Facts ("Pl.'s SMF") ¶ 3, ECF No. 26-3.[2]  For the past decade, the plaintiff has been documenting "post-9/11 America" and often travels to Europe and the Middle East for her work.  Pl.'s First Cross-Mot. Summ. J. ("Pl.'s First Cross-Mot."), Ex. 2, Declaration of Laura Poitras ("Pl.'s First Decl.") ¶ 1–2, ECF No. 18-2; Pl.'s SMF ¶¶ 3–4.  The plaintiff initiated this action due to her "desire to understand why she was stopped, detained, and questioned at the U.S. border by her own government for every international flight she took entering her own country for *six years*."  Pl.'s Cross-Mot. at 1 (emphasis in original).  The exhibits submitted by the plaintiff appear to provide an explanation: namely, that her presence at, followed by her dissembling about, a fatal ambush of U.S. soldiers in Iraq raised suspicions about her prior knowledge of, and complicity in, the ambush.

The plaintiff submitted exhibits that describe a harrowing ambush of U.S. Forces, on November 20, 2004, in Adhamiya, Iraq, that resulted in the death of one American soldier and serious injuries to several others.  *See* Pl.'s Reply Supp. Second Cross-Mot Summ. J. ("Pl.'s Reply"), Ex. A, Letter from U.S. Army Criminal Investigation Command ("USACIC") to FBI ("USACIC Package") at A-1, ECF No. 35-1.  In the midst of this ambush, two soldiers witnessed

---

[2]    The parties filed multiple exhibits and declarations in connection with the pending cross-motions; each exhibit and submission from the parties has been reviewed, but only those exhibits necessary to provide context for resolution of the instant motion are cited herein.

an "unusual" sight, *id*. at A-17: "a white female and an Iraqi male on the roof of a building" overlooking the site of the ambush, *id.* at A-9, with the woman holding, "over her head," an "expensive looking" video camera "with a sound boom microphone on top," *id.* at A-17.  The soldiers' description of this woman resembled the plaintiff, Laura Poitras.  *Id.*

Two days after the ambush, a Lieutenant Colonel from the U.S. Army met at the military base in the area with the Chairman and Vice-Chairman of the Adhamiya District Council.  *Id.* at A-11.  The plaintiff also attended this meeting and was denied permission to film the meeting. *Id.*  During the ensuing discussion, the Lieutenant Colonel asked the Vice-Chairman whether he had been present during the ambush.  *Id.* at A-13.  The Vice-Chairman said he was not, but Army officers "noticed he was looking up and to the left, as if he were creating a memory, or about to not tell the truth."  *Id.*  The plaintiff was then asked directly "if she had ever seen any of these attacks or gotten these attacks on video."  *Id.* at A-14.  The plaintiff, "who had thus far sat through the entire meeting without saying a word, suddenly appeared nervous" and "made a sound that sounded like no, but her lower lip seized up as she spoke and all that came out was a nervous sound."  *Id.*

A second Army officer who was present also observed that "Ms. Poitras' lower lip began quivering" when these questions were asked and that "her body instantly became tense and she leaned forward and crossed her arms" when the Vice-Chairman was asked about his whereabouts at the time of the ambush.  *Id.*  This behavior "was not consistent with her average body language throughout the meeting."  *Id.*  The Lieutenant Colonel explained that he asked the plaintiff and the Vice-Chairman these questions because two soldiers at the ambush had "witnessed a white female and an Iraqi male on the roof of a building overlooking" the ambush site.  *Id.*  In fact, after the meeting concluded, the plaintiff "was deliberately walked past these

two soldiers who agreed later that Laura POITRAS was in fact the woman they observed on the roof top," *id.* at A-20. This identification of the plaintiff by two eyewitnesses was directly contrary to her mumbled denial about being present at the ambush.

After returning from Iraq, the Lieutenant Colonel was interviewed about his war experiences by a historian, who later provided a sworn statement to the FBI as well as copies of his communications with the plaintiff. In her communications with the historian, the plaintiff confirmed that she "was in Adhamiya on the 19th . . . and 20th filming" and had been "staying in the house of an Iraqi family." *Id.* at A-22. She further confirmed that "yes, indeed, I was the western woman w/camera & unarmed Iraqi civilians on the roof." *Id.* at A-24. In addition, she stated that her "footage is really focusing on the family. [T]here are a couple telephoto shots of the street, but nothing I'd consider a document of events." *Id.*

According to the historian's sworn statement, before the ambush, "all the businesses along the streets were closed," "metal gates were barring many of the store fronts," and "[t]here was no one on the streets, which is unusual for a Saturday morning in downtown Baghdad." *Id.* at A-20. In addition, "some of the windows had been taped from the inside to prevent glass from flying into stores and residences should they break," indicating to him that "[i]t's obvious that the neighborhood knew about and was prepared for an attack." *Id.*[3] Based on his communications with the plaintiff and his own observations, the historian reported in his sworn statement that "I believe Laura POITRAS had prior knowledge and the ability to report the forthcoming attack; however, purposely did not report this so she could obtain footage of the attack for her documentary." *Id.*

---

[3]      The plaintiff does not deny that "windows in her host family's neighborhood had reportedly been taped up prior to the incident." Pl.'s Reply at 1 n.1. Although these circumstances may have raised questions for an inquisitive journalist—for example, why the windows were taped up or whether the host expected a violent confrontation—the record does not reflect that the plaintiff expressed any concern about these unusual preparations.

On January 31, 2006, the Lieutenant Colonel's final debrief memorandum was sent to USACIC.  *Id.* at A-1.  In early 2006, USACIC conducted its own investigation into the plaintiff's involvement in the ambush, ultimately concluding that "credible information does not presently exist to believe Ms. Poitras committed a criminal offense," while noting that "this could quickly change if Ms. Poitras were to be interviewed and admitted she had knowledge of the ambush and refused to notify US Forces in order to further her documentary and media interest."  *Id.* at A-2.  USACIC sent this package of documents and reports to the FBI on April 6, 2006, "for any action you deem appropriate."  *Id.*  The FBI opened an investigation into the plaintiff and her possible involvement in the ambush.  *See* Defs.' Reply Supp. Second Mot. Summ. J. ("Defs.' Reply") at 2, ECF No. 30; Pl.'s Reply at 7–8.

In July 2006, shortly after the FBI opened its investigation, the plaintiff began being detained and questioned at the U.S. border when she returned to the United States from international travel.  Compl. ¶¶ 9–10.  The plaintiff claims that from July 2006 through April 2012, she was detained every time she entered the country and occasionally was detained in foreign countries before boarding a return flight to the United States.  *Id.* ¶¶ 10–25; Pl.'s SMF ¶ 7.  Each time she returned to the United States, CBP agents met her at the gate when her flight landed, detained and questioned her, and searched her bags before eventually allowing her to reenter the country.  Pl.'s SMF ¶¶ 7–8.  Agents frequently would make photocopies of the plaintiff's travel documents during these encounters, and on about ten occasions, agents made photocopies of the plaintiff's "reporters' notebooks and/or the contents of her pockets and wallet, including receipts, credit cards, and business cards."  *Id.* ¶ 9.  The plaintiff estimates that during this time, she was "detained, questioned, and searched on almost 40 occasions."  *Id.* ¶ 8.

In April 2012, another journalist published an article about the plaintiff's detentions and questioning while traveling, and a group of documentary filmmakers submitted a petition to DHS protesting the plaintiff's routine detentions.  Compl. ¶ 10.  In June 2012, the plaintiff "was detained, questioned, and searched for the last time and has not been detained at the U.S. border since."  Pl.'s SMF ¶ 8.

**B.      Plaintiff's FOIA Request and the Agencies' Responses**

On January 24, 2014, the plaintiff sent FOIA requests, pursuant to 5 U.S.C. § 552, to DHS, CBP, U.S. Citizenship and Immigration Services ("USCIS"), U.S. Immigration and Customs Enforcement ("ICE"), and the Transportation Security Administration ("TSA"), seeking "all agency records concerning, naming, or relating to Ms. Poitras."  Compl. ¶ 27; *see also* Defs.' First Mot. Summ. J. ("Defs.' First Mot."), Ex. 9, Declaration of Kevin L. Tyrrell (DHS) ("Tyrrell Decl.") ¶ 7, ECF No. 14-8; Defs.' First Mot., Ex. 4, Declaration of Sabrina Burroughs (CBP) ("Burroughs Decl."), Attach. A, Letter from David L. Sobel to CBP ("CBP Request") at 20, ECF No. 14-3; Defs.' First Mot., Ex. 7, Declaration of Jill A. Eggleston (USCIS) ("Eggleston Decl."), Attach. A, Letter from David L. Sobel to USCIS ("USCIS Request") at 7, ECF No. 14-6; Defs.' First Mot., Ex. 8, Declaration of Fernando Pineiro (ICE) ("Pineiro Decl."), Attach. A, Letter from David L. Sobel to ICE ("ICE Request") at 14, ECF No. 14-7; Defs.' First Mot., Ex. 5, Declaration of Regina Ann McCoy (TSA) ("McCoy Decl."), Attach. A, Letter from David L. Sobel to TSA ("TSA Request") at 12, ECF No. 14-4.  That request was also sent, on the same day, to the Office of the Director of National Intelligence ("ODNI") and the FBI, with the identification of specific locations within those agencies to be searched.  For example, the request to ODNI sought "records maintained by the National Counterterrorism Center ('NCTC')," Compl. ¶ 29, while the request to the FBI asked that "the FBI perform a complete and thorough search of all filing systems and locations for all records

maintained by the Bureau pertaining to Ms. Poitras," including "files and documents captioned in (or whose captions include) her name in the title" located on "the Central Records System, Electronic Surveillance Records (ELSUR), and Electronic Case File (ECF)," *id.  See also* Defs.' First Mot., Ex. 3, Declaration of Jennifer L. Hudson (ODNI) ("Hudson Decl."), Attach. A, Letter from David L. Sobel to ODNI ("ODNI Request") at 15, ECF No. 14-2; Defs.' First Mot., Ex. 2, Public Declaration of David M. Hardy (FBI) ("First Hardy Decl."), Attach. A, Letter from David L. Sobel to FBI ("FBI Request") at 57–58, ECF No. 14-1.  The plaintiff also "[s]pecifically request[ed] that the Bureau conduct a text search of the ECF to identify all potentially responsive main and cross-reference files," including both "'main' files and 'see references.'"  FBI Request at 57.  In her pending cross-motion for summary judgment, the plaintiff challenges only the responses of the FBI and the CBP.[4]  Accordingly, those agencies' responses are detailed below.

### 1.    *FBI Response*

Upon receiving the plaintiff's FOIA request, the FBI opened Request Number 1250943-000.  First Hardy Decl. ¶ 7.  Starting on February 2, 2015, the FBI referred sets of pages to other agencies, including USACIC, the U.S. Army, the Executive Office for United States Attorneys ("EOUSA"), the Department of the Air Force, the U.S. Army Intelligence and Security Command ("USAISC"), the Central Intelligence Agency ("CIA"), CBP, the Department of State, the Department of Transportation, and the National Guard Bureau for direct response to the plaintiff or for coordination with the FBI.  *Id.* ¶¶ 96–109.  On May 29, 2015, the plaintiff filed an administrative appeal with the FBI's Office of Information Policy ("OIP").  *Id.* ¶ 8.  OIP acknowledged the plaintiff's appeal and assigned it appeal number AP-2015-04130 before

---

[4]       On March 31, 2017, summary judgment was granted to the defendants, as conceded, with respect to "(1) the withholdings of CBP, TSA, and ODNI, (2) the FBI's withholdings under FOIA Exemptions 1, 3, 6, and 7(C), and (3) the adequacy of the searches for documents by the FBI, the ODNI, DHS, CIS, ICE, and TSA."  Summ. J. Order at 6 (K.B. Jackson, J.).

advising the plaintiff, on July 13, 2015, that "no adverse determination ha[d] yet been made by the FBI" so "there was no action for OIP to consider on appeal." *Id.* ¶¶ 9–10.

The plaintiff initiated this lawsuit on July 13, 2015.  On October 14, 2015, the FBI made its first interim release of records to the plaintiff. *Id.* ¶ 12.  After reviewing 145 pages of records, the FBI released 62 pages, in full or in part, and neither confirmed nor denied the existence of information indicating whether the plaintiff was or had been on a federal watch list. *Id.*  This initial release was followed by a second release, on November 10, 2015, of 8 pages, in full or in part; a third release, on December 14, 2015, of 10 pages, in full or in part; a fourth interim release, on February 16, 2016, of 120 pages, in full or in part; and a final release, on March 4, 2016, of 57 pages, in full or in part. *Id.* ¶¶ 13–16.  While briefing the pending motions, the FBI discovered that six pages "related to the closure of the FBI's investigation into Plaintiff's activities in Iraq[ ] had been inadvertently overlooked during the processing phase and were not processed and provided to Plaintiff."  Defs.' Reply, Ex. 1, Fourth Declaration of David M. Hardy (FBI) ("Fourth Hardy Decl.") ¶ 4, ECF No. 30-1.  Those six pages were provided to the plaintiff in a letter dated September 22, 2017, with some information withheld pursuant to Exemptions 5, 6, 7(C), and 7(E). *Id.*  In total, the FBI identified 350 responsive pages, released in full 1 page, released in part 262 pages, and withheld in full 87 pages.  First Hardy Decl. ¶ 110; Fourth Hardy Decl. ¶¶ 4, 8 & n.1.

In conducting its search, the FBI used the terms "Laura Poitras," "Laura Susan Poitras," "Lara Susan Poitras," a three-way phonetic breakdown of "Laura Poitras," and an on-the-nose search for "Laura Susan Poitras" and "Lara Susan Poitras."  First Hardy Decl. ¶ 28.  To justify its withholdings, the FBI relied on FOIA Exemptions 1, 3, 5, 6, 7(A), 7(C), 7(D), and 7(E). *Id.* ¶¶ 12–15.  As relevant to the pending motions, the FBI relied on Exemption 5 to withhold

"privileged deliberative materials," including an "intra-agency analysis from the New York Field Office" in which analysts are "discussing results of database checks conducted to aid in the investigation at issue and whether a court order or coordination with other agencies needed to be considered." *Id.* ¶¶ 60, 62.  Invoking Exemption 7(A), the FBI withheld "file numbers of pending FBI investigations." *Id.* ¶ 77.  The FBI also withheld, pursuant to Exemption 7(D), "the identity as well as the information provided by an intelligence agency of a foreign government with an implicit understanding of confidentiality," *id.* ¶ 81, and "information regarding an individual source who is a source symbol numbered informant under an express grant of confidentiality," *id.* ¶ 85.  Finally, the FBI withheld eight types of information under Exemption 7(E), including "sensitive case file numbers"; "internal e-mail addresses, non-public intranet web addresses, and a secure internal e-mail tool"; "information pertaining to the types and dates of investigations referenced in the records at issue"; "methods and techniques involving the location and identity of FBI units and/or joint units that were involved in this investigation"; "methods the FBI uses to collect and analyze the information it obtains for investigative purposes"; "the investigative focus of specific FBI investigations"; "strategies and law enforcement techniques utilized by the United States military and the FBI for countering [techniques, tactics, and/or procedures ("TTPs")] of a terrorist organization in Iraq" and "TTPs utilized by that terrorist organization"; and "monetary amounts requested by FBI personnel and/or paid by the FBI in order to implement particular investigative techniques." *Id.* ¶¶ 87–94.  The plaintiff now challenges the withholdings under Exemptions 5 and 7.

> ### 2.    *CBP Response*

After receiving and reviewing the plaintiff's request, CBP FOIA staff determined that responsive records within CBP's control were likely to be found within two CBP systems— TECS and the Automated Targeting System ("ATS")—and performed searches on those

databases "using Plaintiff's name and date of birth." Burroughs Decl. ¶ 5.[5]  CBP searched TECS

and its subsystems for all responsive records through June 16, 2015, and, on November 12, 2015,

after the plaintiff initiated this lawsuit, released 492 pages of records from TECS to the plaintiff

as part of an initial production. *Id.* ¶ 18; *see also* Burroughs Decl., Attach. B, Letter from

Christie Sharpe to David Sobel ("CBP Response") at 23, ECF No. 14-3.  As for the ATS records,

CBP ran a query "with Plaintiff's name and date of birth" and on November 12, 2015, CBP

released 220 pages of partially redacted records to the plaintiff.  Burroughs Decl. ¶ 26.  The

plaintiff does not challenge any of CBP's withholdings.  *See* Pl.'s First Cross-Mot. at 2; Order

Denying Mots. Summ. J. Without Prejudice and Requiring Submission of a *Vaughn* Index

("Summ. J. Order") at 6, ECF No. 22 (K.B. Jackson, J.).

 While processing the plaintiff's request, "CBP FOIA became aware that additional

responsive records" were likely to be found in CBP's New York field office.  Burroughs Decl.

¶ 30; *see also id.* ¶ 5 ("CBP personnel further determined that responsive records, both paper and

electronic, were likely to be found within CBP's New York field office.").  These records

specifically related to "an encounter between Plaintiff and CBP on August 1, 2010, at JFK

International Airport." *Id.* ¶ 30.  Following up on this lead, CBP conducted a supplemental

search by enlisting personnel from the New York field office to search "paper files known or

reasonably believed to include records relating to Plaintiff or the August 1, 2010 encounter." *Id.*

¶ 31.  In addition to the manual search of paper records in the New York field office, an

additional "electronic search" was performed "using search criteria reasonably tailored to

identify all records that may be responsive to the Request." *Id*.  CBP also searched the records of

---

[5] TECS was previously the abbreviation for the Treasury Enforcement Communication System.  *See* Pineiro Decl. ¶ 34 n.2.  After the creation of DHS and the migration of CBP systems to DHS, the system is now known simply as "TECS" and is no longer an abbreviation.  *Id.*

"several custodians deemed reasonably likely to have information related to Plaintiff or the August 1, 2010 encounter, us[ing] the timeframe of August 1, 2010 through October 31, 2010 so as to capture all known or reasonably likely to exist records concerning Plaintiff or the August 1, 2010 encounter." *Id.* The New York field office's search "utilized search terms that included 'Poitras,' 'Laura Poitras,' and the name and email address of Plaintiff's legal counsel related to the August 1, 2010 encounter, 'David B. Smallman' and 'dbs@smallmanlaw.com.'" *Id.* On February 27, 2016, CBP released 223 pages of partially redacted documents from the New York field office. *Id.* In addition, CBP withheld in full 26 documents, totaling 3,182 pages, from the New York field office pursuant to Exemptions 5, 6, 7(C), and 7(E). *Id.* ¶ 38.

The plaintiff does not challenge CBP's withholdings in the pending motion but rather challenges the adequacy of CBP's search. *See* Summ. J. Order at 3 n.2, 6.

### C.       The FOIA Lawsuit

The plaintiff initiated this lawsuit on July 13, 2015, challenging the agencies' responses to her request. The parties' first motions for summary judgment were granted in part and denied in part on March 31, 2017. *See supra*, n.4; Summ. J. Order at 6. Specifically, the defendants' motion was granted, as conceded, with respect to "(1) the withholdings of CBP, TSA, and ODNI, (2) the FBI's withholdings under FOIA Exemptions 1, 3, 6, and 7(C), and (3) the adequacy of the searches for documents by the FBI, the ODNI, DHS, CIS, ICE, and TSA." Summ. J. Order at 6. The Court noted that neither of the FBI's two declarations from the FBI's lead FOIA officer "contain[ed] a full *Vaughn* Index or any other detailed listing of the documents and information that the agency is withholding, or the particularized justifications for each withholding." *Id.* at 3. Thus, the pending motions were granted in part and denied in part to "provide the agency with an opportunity to refile the motion with the requisite supporting documents." *Id.* at 6. Although the plaintiff's first cross-motion challenged the adequacy of CBP's search on the same grounds

given in the pending motion, *see* Pl.'s First Cross-Mot. at 20–23, the first Summary Judgment

Order focused only on the FBI's withholdings and did not address or resolve any issues

regarding CBP, *see* Summ. J. Order at 3–6.  The parties' second motions for summary judgment

are now pending before this Court.[6]

## II.    LEGAL STANDARD

Federal Rule of Civil Procedure 56 provides that summary judgment shall be granted "if

the movant shows that there is no genuine dispute as to any material fact and the movant is

entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).  "In FOIA cases, 'summary

judgment may be granted on the basis of agency affidavits if they contain reasonable specificity

of detail rather than merely conclusory statements, and if they are not called into question by

contradictory evidence in the record or by evidence of agency bad faith.'"  *Judicial Watch, Inc.*

*v. U.S. Secret Serv.*, 726 F.3d 208, 215 (D.C. Cir. 2013) (internal quotation marks and alteration

omitted) (quoting *Consumer Fed'n of Am. v. Dep't of Agric.*, 455 F.3d 283, 287 (D.C. Cir.

2006)).  Indeed, the D.C. Circuit has observed that "the vast majority of FOIA cases can be

resolved on summary judgment."  *Brayton v. Office of the U.S. Trade Representative*, 641 F.3d

521, 527 (D.C. Cir. 2011).

The FOIA was enacted "to promote the 'broad disclosure of Government records' by

generally requiring federal agencies to make their records available to the public on request."

*DiBacco v. U.S. Army*, 795 F.3d 178, 183 (D.C. Cir. 2015) (quoting *U.S. Dep't of Justice v.*

*Julian*, 486 U.S. 1, 8 (1988)).  Reflecting the necessary balance between the public's interest in

governmental transparency and "legitimate governmental and private interests that could be

harmed by release of certain types of information," *United Techs. Corp. v. U.S. Dep't of Def.*,

---

[6]    This case was reassigned to the undersigned Judge on October 24, 2017.

601 F.3d 557, 559 (D.C. Cir. 2010) (alteration adopted) (quoting *Critical Mass Energy Project v. Nuclear Regulatory Comm'n*, 975 F.2d 871, 872 (D.C. Cir. 1992) (en banc)), the FOIA contains nine exemptions, set forth in 5 U.S.C. § 552(b), which "are explicitly made exclusive and must be narrowly construed," *Milner v. Dep't of Navy*, 562 U.S. 562, 565 (2011) (internal quotation marks and citation omitted); *see also Murphy v. Exec. Office for U.S. Attorneys*, 789 F.3d 204, 206 (D.C. Cir. 2015); *Citizens for Responsibility & Ethics in Wash. v. U.S. Dep't of Justice* ("*CREW*"), 746 F.3d 1082, 1088 (D.C. Cir. 2014); *Pub. Citizen, Inc. v. Office of Mgmt. & Budget*, 598 F.3d 865, 869 (D.C. Cir. 2010). "[T]hese limited exemptions do not obscure the basic policy that disclosure, not secrecy, is the dominant objective of the Act." *Dep't of Air Force v. Rose*, 425 U.S. 352, 361 (1976).

In litigation challenging the sufficiency of "the release of information under the FOIA, 'the agency has the burden of showing that requested information comes within a FOIA exemption.'" *Pub. Citizen Health Research Grp. v. Food & Drug Admin.*, 185 F.3d 898, 904 (D.C. Cir. 1999) (quoting *Niagara Mohawk Power Corp. v. U.S. Dep't of Energy*, 169 F.3d 16, 18 (D.C. Cir. 1999)); *see also U.S. Dep't of Justice v. Landano*, 508 U.S. 165, 171 (1993) (noting that "[t]he Government bears the burden of establishing that the exemption applies"); *Fed. Open Mkt. Comm. of Fed. Reserve Sys. v. Merrill*, 443 U.S. 340, 352 (1979) (finding that the agency invoking an exemption bears the burden "to establish that the requested information is exempt"); *Elec. Frontier Found. v. U.S. Dep't of Justice*, 739 F.3d 1, 7 (D.C. Cir. 2014). This burden does not shift even when the requester files a cross-motion for summary judgment because "the Government 'ultimately [has] the onus of proving that the [documents] are exempt from disclosure,'" while the "burden upon the requester is merely 'to establish the absence of material factual issues before a summary disposition of the case could permissibly occur.'" *Pub.*

*Citizen Health Research Grp.*, 185 F.3d at 904–05 (alterations in original) (quoting *Nat'l Ass'n of Gov't Emps. v. Campbell*, 593 F.2d 1023, 1027 (D.C. Cir. 1978)).[7]

An agency may carry its burden of showing an exemption was properly invoked by submitting sufficiently detailed affidavits or declarations, a *Vaughn* index of the withheld documents, or both, to demonstrate that the government has analyzed carefully any material withheld and provided sufficient information as to the applicability of an exemption to enable the adversary system to operate.[8]  *See Judicial Watch*, 726 F.3d at 215 ("In FOIA cases, 'summary judgment may be granted on the basis of agency affidavits if they contain reasonable specificity of detail rather than merely conclusory statements, and if they are not called into question by contradictory evidence in the record or by evidence of agency bad faith.'" (alteration adopted) (quoting *Consumer Fed'n*, 455 F.3d at 287)); *CREW*, 746 F.3d at 1088 (noting that an agency's burden is sustained by submitting affidavits that "describe the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemption, and are not controverted by either contrary evidence in the record nor by evidence of agency bad faith" (quoting *Larson v. Dep't of State*, 565 F.3d 857, 862 (D.C. Cir. 2009))); *Oglesby v. U.S. Dep't of Army*, 79 F.3d 1172, 1176 (D.C. Cir. 1996) (instructing that an agency's description "should reveal as much detail as possible as to the nature of the document, without actually disclosing information that deserves protection[,] . . . [which] serves the purpose of providing the requestor with a realistic opportunity to challenge the agency's decision").

"Ultimately, an agency's justification for invoking a FOIA exemption is sufficient if it appears

---

[7]     "The rule governing cross-motions for summary judgment . . . is that neither party waives the right to a full trial on the merits by filing its own motion; each side concedes that no material facts are at issue only for the purposes of its own motion." *McKenzie v. Sawyer*, 684 F.2d 62, 68 n.3 (D.C. Cir. 1982).

[8]     "A *Vaughn* index describes the documents withheld or redacted and the FOIA exemptions invoked, and explains why each exemption applies." *Prison Legal News v. Samuels*, 787 F.3d 1142, 1145 n.1 (D.C. Cir. 2015).

'logical' or 'plausible.'" *Judicial Watch, Inc. v. U.S. Dep't of Def.*, 715 F.3d 937, 941 (D.C. Cir. 2013) (quoting *ACLU v. U.S. Dep't of Def.*, 628 F.3d 612, 619 (D.C. Cir. 2011)); *Larson*, 565 F.3d at 862 (quoting *Wolf v. CIA*, 473 F.3d 370, 374–75 (D.C. Cir. 2007)).

The FOIA provides federal courts with the power to "enjoin the agency from withholding agency records and to order the production of any agency records improperly withheld from the complainant." 5 U.S.C. § 552(a)(4)(B). District courts must "determine *de novo* whether non-disclosure was permissible," *Elec. Privacy Info. Ctr. v. U.S. Dep't of Homeland Sec.*, 777 F.3d 518, 522 (D.C. Cir. 2015), by reviewing the *Vaughn* index and any supporting declarations "to verify the validity of each claimed exemption," *Summers v. Dep't of Justice*, 140 F.3d 1077, 1080 (D.C. Cir. 1998).

In addition, the court has an "affirmative duty" to consider whether the agency has produced all segregable, nonexempt information. *Elliott v. U.S. Dep't of Agric.*, 596 F.3d 842, 851 (D.C. Cir. 2010) (referring to court's "affirmative duty to consider the segregability issue sua sponte" (quoting *Morley v. CIA*, 508 F.3d 1108, 1123 (D.C. Cir. 2007))); *see also Stolt-Nielsen Transp. Grp. Ltd. v. United States*, 534 F.3d 728, 734 (D.C. Cir. 2008) ("[B]efore approving the application of a FOIA exemption, the district court must make specific findings of segregability regarding the documents to be withheld." (quoting *Sussman v. U.S. Marshals Serv.*, 494 F.3d 1106, 1116 (D.C. Cir. 2007))); *Trans-Pac. Policing Agreement v. U.S. Customs Serv.*, 177 F.3d 1022, 1028 (D.C. Cir. 1999) ("[W]e believe that the District Court had an affirmative duty to consider the segregability issue *sua sponte* . . . even if the issue has not been specifically raised by the FOIA plaintiff."); 5 U.S.C. § 552(b) ("Any reasonably segregable portion of a record shall be provided to any person requesting such record after deletion of the portions which are exempt under this subsection.").

## III.    DISCUSSION

The issues remaining in this case pertain only to the FBI and CBP.  Specifically, the

plaintiff challenges the FBI's withholdings under Exemptions 5 and 7, the adequacy of CBP's

search, and the agencies' determinations that no additional nonexempt information could

reasonably be segregated from the withheld material.  These issues are taken in turn.

### A.    The FBI's Withholdings under Exemptions 5 and 7 Were Appropriate

#### 1.    *Exemption 5*

The parties dispute the FBI's withholding under Exemption 5, pursuant to the

deliberative-process privilege, of portions of three pages from an "electronic communication"

from the New York field office "documenting and providing intelligence analysis and analytical

support for the investigation into Poitras' potential involvement in an ambush on US forces in

Iraq."  Pl.'s Reply at 9; Defs.' Mot., Ex. 2, Withheld in Full/Release in Part *Vaughn* Index for

Specific Exemptions ("FBI *Vaughn* Index") at 46, ECF No. 24-2.[9]  As explained below, the FBI

has provided sufficient explanation for the withholding and redactions of these documents under

Exemption 5.

#### a)    *Overview of FOIA Exemption 5*

Exemption 5 protects from disclosure "inter-agency or intra-agency memorandums or

letters that would not be available by law to a party other than an agency in litigation with the

agency."  5 U.S.C. § 552(b)(5).  Two conditions must be met for a record to qualify for this

exemption: (1) "its source must be a Government agency," and (2) "it must fall within the ambit

of a privilege against discovery under judicial standards that would govern litigation against the

---

[9]     After the FBI produced, on September 22, 2017, six additional pages documenting its decision to close the investigation into the plaintiff, *see* Fourth Hardy Decl. ¶ 4, the plaintiff advised the FBI that "she intend[ed] to challenge the FBI's withholding of attorney work product" on one of the six new pages.  Defs.' Reply at 10.  The plaintiff later abandoned this argument.  *See* Pl.'s Reply at 3 n.6.

agency that holds it." *Dep't of Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8 (2001); *see also Nat'l Inst. of Military Justice v. U.S. Dep't of Def.*, 512 F.3d 677, 680 & n.4 (D.C. Cir. 2008). Exemption 5 may be used to withhold records subject to, *inter alia*, "the deliberative-process privilege, the attorney-client privilege, and the attorney work-product privilege." *Nat'l Ass'n of Criminal Def. Lawyers v. U.S. Dep't of Justice Exec. Office for U.S. Attorneys*, 844 F.3d 246, 249 (D.C. Cir. 2016) (citing *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 862 (D.C. Cir. 1980)).

For the deliberative-process privilege to apply, the materials must be "both predecisional and deliberative." *Mapother v. Dep't of Justice*, 3 F.3d 1533, 1537 (D.C. Cir. 1993). A document is predecisional if "it was generated before the adoption of an agency policy" and is deliberative if "it reflects the give-and-take of the consultative process." *Coastal States Gas*, 617 F.2d at 866. Thus, Exemption 5 "covers recommendations, draft documents, proposals, suggestions, and other subjective documents which reflect the personal opinions of the writer rather than the policy of the agency." *Id.* "Factual material that does not reveal the deliberative process is not protected by this exemption." *Paisley v. CIA*, 712 F.2d 686, 698 (D.C. Cir. 1983) (citing *EPA v. Mink*, 410 U.S. 73, 89–91 (1973)). The D.C. Circuit has emphasized that "[t]he identity of the parties to the memorandum is important; a document from a subordinate to a superior official is more likely to be predecisional, while a document moving in the opposite direction is more likely to contain instructions to staff explaining the reasons for a decision already made." *Coastal States Gas*, 617 F.2d at 868.

b)      *The FBI's Exemption 5 Withholdings*

The plaintiff challenges the FBI's invocation of Exemption 5 and the deliberative-process privilege on three pages, Poitras-158, Poitras-159, and Poitras-163, contending that "the FBI has failed to identify a *specific* agency decision to which the redacted paragraphs are predecisional or

a decision-making process to which the redacted paragraphs contributed," Pl.'s Cross-Mot. at 20 (emphasis in original), and that the FBI's *Vaughn* index did not "identify with any particularity the reasons why the FBI was unable to segregate the factual material contained within the eight paragraphs redacted pursuant to Exemption 5's deliberative process privilege across the three pages at issue," Pl.'s Reply at 10.[10]  Based on the details provided in the FBI's *Vaughn* index and affidavits, the plaintiff's Exemption 5 arguments fail.

The FBI has explained, in both its declarations and its *Vaughn* index, the specific agency decision under deliberation in the redacted pages: whether further investigative steps needed to be taken, or court involvement sought, in light of the FBI's database checks about the plaintiff's role, if any, in an ambush resulting in the death of an American soldier.  The *Vaughn* index states that pages Poitras-158, Poitras-159, and Poitras-163 are part of the same document: an electronic communication dated February 12, 2009, from the New York field office, "documenting and providing intelligence analysis and analytical support for the investigation into Poitras's potential involvement in an ambush on US forces in Iraq."  FBI *Vaughn* Index at 46.[11]  The FBI explained that this document is "an intra-agency analysis" reflecting the New York field office "discussing results of database checks conducted to aid in the investigation at issue and whether a court order or coordination with other agencies needed to be considered."  First Hardy Decl. ¶ 62; *see also* Defs.' Reply at 7 (noting that the redacted information included "deliberation over what further investigative steps the FBI could or should take in light of the results" and "recommendations to the special agent as to how to proceed in the investigation, including recommendations to

---

[10]     The plaintiff requests *in camera* review of the three pages at issue to determine whether the FBI "has adequately segregated completely factual material." Pl.'s Reply at 11.  The segregability argument will be addressed below, *infra* Part III.C.

[11]     The FBI uses the term "electronic communication" to refer to communications "within the FBI in a consistent format that can be uploaded by the originating Division or office, transmitted, and downloaded by recipient Divisions or offices within the FBI's internal computer network."  FBI *Vaughn* Index at 3 n.6.

consider seeking a court order and coordinating with other agencies.").  Indeed, on Poitras-158,

the header above the redacted text reads "Analytical Recommendations."  Pls.' First Cross-Mot.,

Ex. A, Poitras-157 to Poitras-167 ("FBI Memo") at 2, ECF No. 18-1.  The portion of Poitras-159

that was redacted pursuant to the deliberative-process privilege is the next paragraph under the

"Analytical Recommendations" heading, and Poitras-163 is the final page in this document.  *Id.*

at 3, 7.  The declaration's description, contrary to the plaintiff's arguments, does provide "a

*specific* agency decision," Pl.'s Cross-Mot. at 20 (emphasis in original), being deliberated in the

document in question: "whether a court order or coordination with other agencies needed to be

considered" as part of the FBI's investigation into the plaintiff's possible involvement in the fatal

ambush.  First Hardy Decl. ¶ 62.  Thus, given the predecisional and deliberative nature of the

"[a]nalytical [r]ecommendations" at issue, FBI Memo at 2, the FBI properly invoked Exemption

5 and the plaintiff's request for *in camera* review of the disputed pages is denied.

### 2.    *Exemption 7*

The plaintiff also disputes the FBI's withholdings on 252 pages in part and 19 pages in

full, *see* Pl.'s Cross-Mot. at 14, pursuant to Exemptions 7(A), 7(D), and 7(E), arguing that

"[b]ecause the FBI has failed to meet the threshold" showing of Exemption 7, namely, that the

records or information were compiled for law-enforcement purposes, "the Court need not reach

the applicability of the specific criteria set forth in 7(A), 7(D), and 7(E)," *id.* at 11.  As discussed

below, however, the threshold requirement for Exemption 7 is satisfied and the FBI has properly

invoked Exemptions 7(A), 7(D), and 7(E) as the bases for its withholdings.

### a)    *Exemption 7 Threshold Requirement*

Exemption 7 protects from disclosure "'records or information' [ ] 'compiled for law

enforcement purposes,'" but only to the extent that "production of such 'records or information'

would cause at least one of the specific harms described in the lettered subsections of Exemption

7." *Sack v. U.S. Dep't of Def.*, 823 F.3d 687, 693–94 (D.C. Cir. 2016) (quoting 5 U.S.C.

§ 552(b)(7)); *see also Milner*, 562 U.S. at 581 ("Exemption 7 . . . protects 'information compiled

for law enforcement purposes' that meets one of six criteria" (quoting 5 U.S.C. § 552(b)(7)));

*John Doe Agency v. John Doe Corp.*, 493 U.S. 146, 156 (1989) ("Exemption 7 requires the

Government to demonstrate that a record is 'compiled for law enforcement purposes' *and* that

disclosure would effectuate one or more of the six specified harms.") (emphasis in original);

*Pub. Emps. for Envtl. Responsibility v. U.S. Section, Int'l Boundary & Water Comm'n, U.S.-Mex.*

("*PEER*"), 740 F.3d 195, 202–03 (D.C. Cir. 2014) ("To fall within Exemption 7, documents

must first meet a threshold requirement: that the records were 'compiled for law enforcement

purposes.'" (quoting 5 U.S.C. § 552(b)(7))).  "To show that the disputed documents were

compiled for law enforcement purposes, the [agency] need only establish a rational nexus

between the investigation and one of the agency's law enforcement duties and a connection

between an individual or incident and a possible security risk or violation of federal law."

*Blackwell v. FBI*, 646 F.3d 37, 40 (D.C. Cir. 2011) (internal quotation marks and citations

omitted).

     The plaintiff contends that the FBI "has not established a connection between Plaintiff

and a possible violation of federal law or security risk," Pl.'s Reply at 4, and "cannot establish

that its investigatory activities are realistically based on a *legitimate concern* that federal laws

have been or may be violated or that national security may be breached," *id.* at 5–6 (emphasis in

original) (internal quotation marks omitted).  The plaintiff also argues that "the Hardy

declarations' vague and highly generalized references to the FBI's 'criminal investigation' are

not sufficient to satisfy the government's burden," Pl.'s Cross-Mot. at 16, and that "the Bureau's

investigation of Plaintiff was conducted for intelligence gathering purposes—not law

enforcement purposes—and that Exemption 7 therefore does not apply to the disputed records,"
*id.* at 14.  The plaintiff is wrong.

The FBI has established that its investigation of the plaintiff was realistically based on a
legitimate concern that she may have been either an intentional or unwitting tool to film or
otherwise document an ambush that resulted in the death of one American soldier and serious
injury to several others.  As the declarations make clear, "the FBI initiated an investigation on
the basis of an allegation and information indicating that the plaintiff may have been involved in
an activity constituting a federal crime and/or threat to national security."  Defs.' Reply Supp.
First Mot. Summ. J. ("Defs.' First Reply"), Ex. 1, Second Declaration of David M. Hardy (FBI)
("Second Hardy Decl.") ¶ 8, ECF No. 19-1.  This investigation stemmed from the plaintiff's
"possible involvement with anti-coalition forces during her time in Iraq as an independent media
representative."  First Hardy Decl. ¶ 64.  The Hardy declarations provide the requisite specific
facts and circumstances giving rise to this investigation: the FBI learned from USACIC that the
"plaintiff watched and filmed the ambush from on top of a nearby building and when questioned
denied being present on the roof when several U.S. soldiers had positively identified her as being
present during the ambush," Second Hardy Decl. ¶ 9.  The FBI also "received further
information about Poitras's involvement, including the possibility that she had prior knowledge
of the ambush and purposely chose not to report it."  First Hardy Decl. ¶ 31.  The FBI thus
opened an investigation into whether "the alleged activities constitute a federal crime and a threat
to national security . . . for potential prosecution and intelligence purposes," Second Hardy Decl.
¶ 9, in furtherance of the agency's law-enforcement duties of "investigat[ing] all violations of
federal law not exclusively assigned to another agency, [ ] conduct[ing] investigations and
activities to protect the United States and its people from terrorism and threats to national

security, and further[ing] the foreign intelligence objectives of the United States."  First Hardy Decl. ¶ 63.  Thus, the FBI has established both "a rational nexus between the investigation and one of the agency's law enforcement duties" and a "connection between an individual or incident and a possible security risk or violation of federal law," *Blackwell*, 646 F.3d at 40, thereby satisfying the Exemption 7 threshold requirement.

The plaintiff nevertheless contends that the FBI's investigation was for purely intelligence-gathering, rather than law-enforcement, purposes, thus making Exemption 7 inapplicable.  *See* Pl.'s Cross-Mot. at 14.  She draws support for this argument from the USACIC's April 2006 package to the FBI, which stated that "credible information does not presently exist to believe Ms. Poitras committed a criminal offense," USACIC Package at A-2, and from the fact that the FBI never interviewed the plaintiff during its investigation, Pl.'s Cross-Mot. at 15; Pl.'s Reply at 7 n.10.  These arguments are not persuasive.  First, the FBI may conduct a criminal investigation without interviewing the subject of the investigation.  Second, the USACIC's determination is not binding on the FBI.  The FBI was entitled to carry out its own investigation into whether the plaintiff "may have been involved in an activity constituting a federal crime and/or threat to national security."  Second Hardy Decl. ¶ 8.

The plaintiff's dissembling about her whereabouts at the time of the fatal ambush and about whether she documented the events, despite two eyewitnesses who saw her on a rooftop over-looking the ambush area with her camera and sound equipment, may reasonably have contributed to the FBI's view that an investigation was warranted.  Indeed, the FBI repeatedly has explained that it was investigating the plaintiff's involvement in the ambush for both "potential prosecution *and* intelligence purposes," *id.* ¶ 9 (emphasis added), because "Plaintiff's potential involvement was at once a threat to national security warranting further intelligence

gathering *and* a potential federal crime," Defs.' Reply at 5–6 (emphasis in original).  Given that

"[t]he FBI is an agency 'specializ[ing] in law enforcement,' [ ] its claim of a law enforcement

purpose is entitled to deference."  *Kidder v. FBI*, 517 F. Supp. 2d 17, 27 (D.D.C. 2007) (second

and third alterations in original) (quoting *Campbell v. U.S. Dep't of Justice*, 164 F.3d 20, 32

(D.C. Cir. 1998)); *see also Manning v. U.S. Dep't of Justice*, 234 F. Supp. 3d 26, 34 (D.D.C.

2017) ("The court must give 'substantial weight' to agency declarations absent contrary evidence

or evidence of bad faith." (quoting *Judicial Watch*, 715 F.3d at 940–41)).[12]

The plaintiff relies on several cases that, ironically, undercut her position and provide

further support for the conclusion that the FBI compiled the records at issue for law-enforcement

purposes.  Pl.'s Cross-Mot. at 13, 18.  In *Shapiro v. U.S. Department of Justice*, 37 F. Supp. 3d 7

(D.D.C. 2014), the plaintiff sought records concerning the "Occupy Houston" movement and "an

alleged plot by unidentified actors to assassinate the leaders" of that movement.  *Id.* at 13–14.

The declaration submitted by the FBI was found insufficient to justify withholding documents

under the exemption for law-enforcement records, due in part to the fact that the FBI had

compiled the documents at issue "as a result of assistance FBI rendered to various state and local

law enforcement agencies which were investigating potential criminal activity by protestors."  *Id.*

at 29.  The declaration never "suppl[ied] specific facts as to the basis for FBI's belief that the

Occupy protestors might have been engaged in terroristic or other criminal activity."  *Id.*  In this

case, by contrast, the FBI has identified the specific facts giving rise to its investigation, namely,

---

[12]     The plaintiff further claims that the FBI "has consistently mischaracterized the circumstances surrounding
its initiation of its investigation" by claiming that USACIC asked the FBI to investigate the plaintiff, thereby
"attempt[ing] to establish a law enforcement purpose after the fact."  Pl.'s Reply at 7 (capitalization omitted).  While
the parties dispute which agency requested the investigation into the plaintiff's involvement in this ambush, they
agree that the FBI opened an investigation.  *See* Defs.' Mot., Ex. 1, Mem. Supp. Second Mot. Summ. J. ("Defs.'
Mem.") at 7, ECF No. 24-1; Pl.'s Cross-Mot. at 3.  Whether USACIC requested the investigation or the FBI
independently initiated the investigation does not change the fact that the FBI was investigating the plaintiff's
involvement "in an activity constituting a federal crime and/or threat to national security."  Second Hardy Decl. ¶ 8.

that the plaintiff "watched and filmed the ambush from on top of a nearby building and when questioned denied being present on the roof when several U.S. soldiers had positively identified her as being present during the ambush."  Second Hardy Decl. ¶ 9.

The plaintiff also relies on *Lamont v. Department of Justice*, 475 F. Supp. 761 (S.D.N.Y. 1979), and *Weissman v. CIA*, 565 F.2d 692 (D.C. Cir. 1977), to argue that the FBI's "six years of generalized monitoring of Plaintiff" was not conducted for law-enforcement purposes.  Pl.'s Reply at 6; *see also* Pl.'s Cross-Mot. at 18.  In *Lamont*, the plaintiff, who was the subject of "a three-decade period of surveillance," sought all FBI records containing information relating to himself.  *Lamont*, 475 F. Supp. at 764.  The plaintiff in that case conceded that the FBI was acting with a law-enforcement purpose while the agency was investigating his alleged association with the Communist Party, but he claimed that the seventeen years of surveillance conducted after the FBI closed its investigation was not carried out for any law-enforcement purpose.  *Id.* at 774.  The Court agreed that for this post-investigation period, "there [wa]s nothing in the record . . . to indicate that the FBI conceived of" the plaintiff's association with various educational and political organizations "as violative of the Smith Act or evidencing a possibility of future violation of that law," *id.*, and that, accordingly, the seventeen years of post-investigation surveillance was not "related to the Bureau's law enforcement duties," *id.* at 775. Here, however, the FBI did not close its investigation into the plaintiff until sometime in 2012, as evidenced by an internal memorandum "relating to the closure of the investigation into Plaintiff's activities involving anti-coalition forces in Iraq," Def.'s Reply at 10, dated August 28, 2012, concluding that "[n]o potential criminal violations or priority threats to national security warranting further investigation were identified."  Pl.'s Reply, Ex. E, Poitras-345 to Poitras-349 ("Closure Memo") at E-1, E-5, ECF No. 35-5.  Unlike in *Lamont*, then, the FBI's investigation

of the plaintiff in this case was "related to the FBI's duties to enforce federal law," *Lamont*, 475

F. Supp. at 775, for the entire six-year span of the plaintiff's airport detentions and questionings.

Finally, in *Weissman*, the plaintiff was concerned about CIA investigative activity

directed at left-of-center political activists, like himself, and sought "all files completed on [him]

by the CIA." *Weissman*, 565 F.2d at 693.  Unbeknownst to the plaintiff in that case, the CIA

previously had considered him for employment some twenty years earlier and had, "without his

knowledge or permission," placed him "under a periodic but continuing investigation,"

conducted over five years, regarding his fitness for employment at the agency.  *Id.*  The D.C.

Circuit acknowledged that the employment investigation, twenty years before the FOIA request,

"may well have been a genuine attempt to determine whether he was a safe candidate for

recruiting by the Agency," but nevertheless concluded that "[i]t cannot be contended that this

activity was for law-enforcement purposes."  *Id.* at 695.  Unlike *Weissman*, in which no pending

criminal or national-security investigation was pending, the FBI's investigation in this case was

conducted for the express purpose of determining whether the plaintiff violated any criminal

laws or breached the national security.  Accordingly, the FBI has satisfied Exemption 7's

threshold requirement.

> b)      *The FBI's Withholdings under Exemption 7 Were Proper*

The FBI also asserts that its withholdings under Exemptions 7(A), 7(D), and 7(E) were

proper.  *See* Defs.' Mot., Ex. 1, Mem. Supp. Second Mot. Summ. J. ("Defs.' Mem.") at 11–17,

ECF No. 24-1.  The plaintiff presents no arguments regarding the withholdings made under these

exemptions and limits her challenge to the Exemption 7 threshold.  As explained below, the FBI

has met its burden of establishing that these withholdings were appropriate.

i)      *Exemption 7(A)*

Exemption 7(A) protects from disclosure "records or information compiled for law enforcement purposes," but only to the extent that the production of such records or information "could reasonably be expected to interfere with enforcement proceedings." 5 U.S.C. § 552(b)(7)(A).  The exemption contemplates enforcement proceedings that are "pending or reasonably anticipated." *Mapother*, 3 F.3d at 1540 (emphasis omitted).  Thus, to justify withholdings under Exemption 7(A), the agency must demonstrate that disclosure of the materials "(1) could reasonably be expected to interfere with (2) enforcement proceedings that are (3) pending or reasonably anticipated." *CREW*, 746 F.3d at 1096 (quoting *Mapother*, 3 F.3d at 1540).  Importantly, however, "Exemption 7(A) is temporal in nature," and an agency seeking to invoke the exception must "'show that the material withheld relates to a concrete prospective law enforcement proceeding.'" *Id.* at 1097 (quoting *Juarez v. Dep't of Justice*, 518 F.3d 54, 58 (D.C. Cir. 2008)).  "Thus, reliance on Exemption 7(A) may become outdated when the proceeding at issue comes to a close." *Id.*

Here, the FBI relied on Exemption 7(A) to withhold the "file numbers of pending FBI investigations."  First Hardy Decl. ¶ 77.  These investigations "pertain[ ] to investigative activities of third parties of an on-going FBI investigation," and the file numbers are "intertwined with other ongoing investigations of known and suspected third party terrorists." *Id.* Consequently, the FBI avers, "the release of this information would interfere with pending and prospective enforcement proceedings, including investigations and prosecutions," and would "jeopardize the investigation." *Id.*  As of the filing of that declaration, the investigations were "pending" and "ongoing," satisfying the temporal requirements of Exemption 7(A). *Id.* Accordingly, the FBI properly invoked Exemption 7(A) to withhold these file numbers.

ii)  *Exemption 7(D)*

Exemption 7(D) applies to records or information compiled for law-enforcement

purposes that "could reasonably be expected to disclose the identity of a confidential source"

who "furnished information on a confidential basis, and, in the case of a record or information

compiled by criminal law enforcement authority in the course of a criminal investigation . . . ,

information furnished by a confidential source."  5 U.S.C. § 552(b)(7)(D).  "[T]he Government

is not entitled to a presumption that a source is confidential within the meaning of Exemption

7(D) whenever [a] source provides information [to a law-enforcement agency] in the course of a

criminal investigation."  *Landano*, 508 U.S. at 181.  Rather, a source's confidentiality must be

determined on a case-by-case basis.  *Id.* at 179–80.  "A source is confidential within the meaning

of [E]xemption 7(D) if the source 'provided information under an express assurance of

confidentiality or in circumstances from which such an assurance could be reasonably inferred.'"

*Williams v. FBI*, 69 F.3d 1155, 1159 (D.C. Cir. 1995) (per curiam) (quoting *Landano*, 508 U.S.

at 170–74).  "An 'implied' assurance may be inferred from evidence showing the circumstances

surrounding the imparting of the information, including the nature of the criminal investigation

and the confidential source's relationship to the target."  *Willis v. U.S. Dep't of Justice*, 581 F.

Supp. 2d 57, 77 (D.D.C. 2008) (citing *Landano*, 508 U.S. at 171–72).

The FBI relied on Exemption 7(D) to withhold "two categories of sources: confidential

information from foreign governments, and information from third parties who provided

information under an implied assurance of confidentiality."  Defs.' Mem. at 14; *see also* First

Hardy Decl. ¶¶ 81–85.  According to the FBI, the Foreign Government Information Classification

Guide #1, which "governs classification of foreign government information that foreign

governments have asked the FBI to protect over the course of time," First Hardy Decl. ¶ 81,

indicates that "the foreign agency referenced in the records at issue here requested its

relationship with the FBI be classified," *id.* ¶ 83, thus providing "an express assurance of confidentiality," *Williams*, 69 F.3d at 1159.  Accordingly, the FBI properly withheld confidential information provided by foreign governments.

The FBI also withheld information "regarding an individual source who is a source symbol numbered informant under an express grant of confidentiality."  First Hardy Decl. ¶ 85. This Court previously has recognized that "it is the FBI's practice to assign source symbols to informants only if those individuals report information to the FBI on a regular basis pursuant to an express grant of confidentiality."  *Clemente v. FBI*, 741 F. Supp. 2d 64, 87 (D.D.C. 2010) (internal quotation marks omitted); *see also Amuso v. U.S. Dep't of Justice*, 600 F. Supp. 2d 78, 99 (D.D.C. 2009) ("As a matter of policy and practice, all symbol numbered sources are given an express grant of confidentiality." (internal quotation marks omitted)).  Given this express grant of confidentiality, the FBI's withholding of the source's "name, social security number, phone number, file number, source number, and [ ] type of source expenditures" under Exemption 7(D) was proper.  First Hardy Decl. ¶ 85.

<i>iii)</i>    <i>Exemption 7(E)</i>

Finally, the FBI withheld certain information under Exemption 7(E), which protects from disclosure "records or information compiled for law enforcement purposes" that "would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law."  5 U.S.C. § 552(b)(7)(E).  The "requirement that disclosure risk circumvention of the law 'sets a relatively low bar for the agency to justify withholding.'"  *PEER*, 740 F.3d at 204–05 (quoting *Blackwell*, 646 F.3d at 42).[13]  The D.C.

---

[13]     Despite some disagreement among the circuits as to whether the phrase "could reasonably be expected to risk circumvention of the law" applies only to "guidelines for law enforcement investigations," or to "techniques and

Circuit has held that "[t]o clear that relatively low bar, an agency must demonstrate only that release of a document might increase the risk 'that a law will be violated or that past violators will escape legal consequences.'"  *Id.* at 205 (quoting *Mayer Brown LLP v. IRS*, 562 F.3d 1190, 1193 (D.C. Cir. 2009)).  "Rather than requiring a highly specific burden of showing how the law will be circumvented, exemption 7(E) only requires that the agency demonstrate logically how the release of the requested information might create a risk of circumvention of the law." *Blackwell*, 646 F.3d at 42 (internal quotation marks and alteration omitted) (quoting *Mayer Brown*, 562 F.3d at 1194).

The FBI invoked Exemption 7(E) to withhold "(1) sensitive file numbers or sub-file names; (2) internal, non-public email or IP addresses; (3) dates or types of investigations; (4) identity or location of FBI or Joint Units, Squads, or Divisions; (5) collection or analysis of information; (6) investigative focus; (7) law enforcement strategies or techniques for addressing the techniques, tactics or procedures (TTPs) used by an organization; [and] (8) monetary payments for investigative techniques."  Defs.' Mem. at 16 (citing First Hardy Decl. ¶¶ 87–95).  This information properly was withheld to prevent the disclosure of FBI techniques and procedures and to prevent the dissemination of information that might be gleaned from those techniques and procedures.

For example, releasing sensitive case file numbers would "identif[y] the investigative interest or priority given to such matters" because, "[a]pplying a mosaic analysis, suspects could use these numbers (indicative of investigative priority), in conjunction with other information known about other individuals and/or techniques, to change their pattern of activity to avoid

---

procedures" as well, the D.C. Circuit "has applied the 'risk circumvention of the law' requirement both to records containing guidelines and to records containing techniques and procedures," noting that "given the low bar posed by the 'risk circumvention of the law' requirement, it is not clear that the difference matters much in practice."  *PEER*, 740 F.3d at 204 n.4.

detection, apprehension, or create alibis for suspected activities."  First Hardy Decl. ¶ 87; *see also Ctr. for Nat'l Sec. Studies v. U.S. Dep't of Justice*, 331 F.3d 918, 928 (D.C. Cir. 2003) (noting that "courts have relied on [ ] mosaic arguments in the context of national security").  The disclosure of information pertaining to other internal procedures, including "protected internal e-mail addresses, non-public intranet web addresses, and a secure internal e-mail tool," would increase the likelihood that "individuals under investigation [could] exploit the FBI's Information Technology system to gain unauthorized access to, view and manipulate data on, or otherwise interfere with the FBI's non-public intranet protocol."  First Hardy Decl. ¶ 88.  Still other information, if disclosed, would reveal sensitive strategic decisions made by the FBI: "Revealing the amount of money the FBI has paid or plans to pay in order to implement certain investigative techniques would reveal the FBI's level of focus on certain types of law enforcement or intelligence gathering efforts," *id.* at 46, while disclosing "the investigative focus of specific FBI investigations" would "reveal the scope of the FBI's programs and the strategies it plans to pursue in preventing and disrupting criminal activity," *id.* ¶ 92.  As even this brief recounting establishes, the First Hardy Declaration "demonstrate[s] logically how the release of the requested information might create a risk of circumvention of the law," *Blackwell*, 646 F.3d at 42 (internal quotation marks omitted), and describes the harms attendant to the disclosure of each category of withheld information.  *See* First Hardy Decl. ¶¶ 87–95.  Thus, the FBI's withholdings under Exemption 7(E) were proper.

**B.**      **The CBP's Search of the New York Field Office Was Adequate**

The plaintiff next challenges the adequacy of CBP's search.  *See* Pl.'s Cross-Mot. at 25–28.  The CBP has carried its burden of establishing that its search was adequate.

1.       *Legal Standard for Evaluating the Adequacy of a FOIA Search*

An agency "fulfills its obligations under [the] FOIA if it can demonstrate beyond material doubt that its search was reasonably calculated to uncover all relevant documents" and "perform[s] more than a perfunctory search" to identify responsive records.  *Ancient Coin Collectors Guild v. U.S. Dep't of State*, 641 F.3d 504, 514 (D.C. Cir. 2011) (internal quotation marks omitted); *see also Truitt v. Dep't of State*, 897 F.2d 540, 542 (D.C. Cir. 1990).  "[T]he issue to be resolved is not whether there might exist any other documents possibly responsive to the request, but rather whether the *search* for those documents was *adequate*."  *Weisberg v. U.S. Dep't of Justice*, 745 F.2d 1476, 1485 (D.C. Cir. 1984) (emphasis in original).  In this regard, "[t]here is no requirement that an agency search every record system," although "the agency cannot limit its search to only one record system if there are others that are likely to turn up the information requested."  *Oglesby v. U.S. Dep't of Army*, 920 F.2d 57, 68 (D.C. Cir. 1990). Further, agencies are not obligated to search "beyond 'the four corners of the request,' nor are they 'required to divine a requester's intent.'"  *Am. Chemistry Council, Inc. v. U.S. Dep't of Health & Human Servs.*, 922 F. Supp. 2d 56, 62 (D.D.C. 2013) (quoting *Landmark Legal Found. v. EPA*, 272 F. Supp. 2d 59, 64 (D.D.C. 2003)); *see also Kowalczyk v. Dep't of Justice*, 73 F.3d 386, 389 (D.C. Cir. 1996).

At the summary judgment stage, an agency meets its burden of demonstrating beyond material doubt that it "made a 'good faith effort to conduct a search using methods which can be reasonably expected to produce the information requested,'" *DiBacco*, 795 F.3d at 188 (alterations adopted) (quoting *Oglesby*, 920 F.2d at 68), by submitting to the court a "reasonably detailed affidavit, setting forth the search terms and the type of search performed, and averring that all files likely to contain responsive materials (if such records exist) were searched," *Ancient Coin Collectors Guild*, 641 F.3d at 514 (quoting *Valencia-Lucena v. U.S. Coast Guard*, 180 F.3d

321, 326 (D.C. Cir. 1999)).  Agency affidavits or declarations explaining search scope and

methodology are "accorded a presumption of good faith, which cannot be rebutted by purely

speculative claims about the existence and discoverability of other documents."  *SafeCard*

*Servs., Inc. v. SEC*, 926 F.2d 1197, 1200 (D.C. Cir. 1991) (internal quotation marks omitted);

*Chambers v. U.S. Dep't of Interior*, 568 F.3d 998, 1003 (D.C. Cir. 2009) (recognizing substantial

weight traditionally accorded to agency affidavits in FOIA adequacy-of-search cases).  The

FOIA requester bears the burden, then, of overcoming the presumption of good faith afforded to

agency declarations by "rais[ing] substantial doubt, particularly in view of well defined requests

and positive indications of overlooked materials," *DiBacco*, 795 F.3d at 188 (internal quotation

marks omitted), that the search was adequate.  *See also Hodge v. FBI*, 703 F.3d 575, 582 (D.C.

Cir. 2013) (upholding agency response to FOIA request when requester "ha[d] not presented

sufficient evidence to rebut [the] presumption" accorded to the agency's averments).

### 2.    *CBP's Search*

CBP conducted two searches: one of CBP's central office and another of its New York

field office.  The adequacy of each of those searches is examined.  In support of its motion, CBP

submitted the declaration of the Director of CBP's FOIA Division, who averred that "CBP

personnel determined that responsive records within CBP's control were likely to be found"

within the TECS and ATS databases, and searches were performed on those databases "using

Plaintiff's name and date of birth."  Burroughs Decl. ¶¶ 1, 5.  The plaintiff contends that this

search was inadequate because "CBP has failed to provide the actual search terms used for its

searches of the TECS an[d] ATS databases" and has "provided only descriptions of those search

terms."  Pl.'s Reply at 17.  CBP explained, however, that "Plaintiff's name and date of birth *were*

the search terms utilized by CBP," Defs.' Reply at 15 (emphasis in original), a description

specific enough to target CBP records about the plaintiff.  *See Strunk v. U.S. Dep't of State*, 845

F. Supp. 2d 38, 44 (D.D.C. 2012) (finding that CBP's search of TECS "using variations of the subject's name and date of birth as search terms" was adequate); *cf. Reporters Comm. for Freedom of Press v. FBI*, 877 F.3d 399, 404 (D.C. Cir. 2017) (rejecting as inadequate a search when the declaration was "utterly silent" regarding "which search terms were used to hunt within electronically stored materials"). Given the broad nature of the plaintiff's request, a search using her name and date of birth "can be reasonably expected to produce the information requested." *DiBacco*, 795 F.3d at 188 (internal quotation marks omitted).

The plaintiff also argues that CBP's searches of its central office and its New York field office were inadequate because she "has identified paper documents that are missing from the agency's production," namely, "photocopies of Plaintiff's reporter notebooks and/or the contents of her pockets and wallet . . . which were made by local CBP agents during her detentions." Pl.'s Reply at 15–16. The law is well established in this Circuit, however, that the adequacy of a FOIA search is judged not by the results of an agency's search but by the appropriateness of the agency's search methods. *Iturralde v. Comptroller of Currency*, 315 F.3d 311, 315 (D.C. Cir. 2003). Thus, a search is not automatically rendered inadequate by an agency's failure to locate a specific document, *id.*, or by an agency's refusal to take every step desired by a requester, *Wright v. Admin. for Children & Families*, No. 15-cv-218, 2016 WL 5922293, at *6 (D.D.C. Oct. 11, 2016) (citing *Valencia-Lucena*, 180 F.3d at 325); *see also Reporters Comm. for Freedom of Press*, 877 F.3d at 408 ("That a few responsive documents may have slipped through the cracks does not, without more, call into question the search's overall adequacy."); *Mobley v. CIA*, 806 F.3d 568, 583 (D.C. Cir. 2015) ("[A] search, under FOIA, is not unreasonable simply because it fails to produce all relevant material." (internal quotation marks omitted)). As the defendants note, "there are numerous reasons why such photocopies, to the extent they were even retained

by CBP, may not have been included in CBP's production."  Defs.' Reply at 15.  For example, "particular documents may have been accidentally lost or destroyed, or a reasonable and thorough search may have missed them."  *Id.* (quoting *Iturralde*, 315 F.3d at 315).  The fact that the plaintiff expected to, but did not, receive certain documents does not render CBP's search inadequate.

The plaintiff raises additional concerns about the adequacy of CBP's supplemental search at the New York field office.  As noted, while processing the plaintiff's request, CBP "became aware that additional responsive records," relating specifically to "an encounter between Plaintiff and CBP on August 1, 2010, at JFK International Airport," were "reasonably likely to exist in files located within CBP's New York field office."  Burroughs Decl. ¶ 30.  Staff at the New York field office thus "reviewed paper files known or reasonably believed to include records relating to Plaintiff or the August 1, 2010 encounter" and conducted an electronic search of "several custodians deemed reasonably likely to have information related to Plaintiff or the August 1, 2010 encounter, us[ing] the timeframe of August 1, 2010 through October 31, 2010 so as to capture all known or reasonably likely to exist records concerning Plaintiff or the August 1, 2010 encounter."  *Id.* ¶ 31.  The New York field office "utilized search terms that included 'Poitras,' 'Laura Poitras,' and the name and email address of Plaintiff's legal counsel related to the August 1, 2010 encounter."  *Id.*

The plaintiff contends that this search was inadequate because it was limited "to a three-month period and failed to search any other New York field office files likely to contain records responsive to Plaintiff's request—which covers six years of airport detentions."  Pl.'s Reply at 13–14.  As the Burroughs declaration makes clear, however, the search of the New York field office was conducted only because "additional responsive records," specifically related to the

August 1, 2010, encounter, were likely to be found at the New York field office.  Burroughs Decl. ¶ 30.  Importantly, the FOIA requires only that an agency conduct a reasonable search that is tailored to the "four corners of the request."  *Am. Chemistry Council*, 922 F. Supp. 2d at 62 (internal quotation marks omitted); *see also Kowalczyk*, 73 F.3d at 389 ("[T]he [agency] is not obliged to look beyond the four corners of the request for leads to the location of responsive documents.").  The four corners of the plaintiff's request to CBP did not offer any details about her encounters with airport officials, the locations of those encounters, or the dates for which she expected to find documents pertaining to those encounters.  *See* CBP Request at 20.  The plaintiff provided a wholly different agency—USCIS—with detailed information about several detentions or encounters between herself and CBP officials at airports in Newark and New York City, *see* Eggleston Decl. ¶ 8, but these details were not provided to CBP.  In fact, USCIS FOIA officials repeatedly informed the plaintiff that she should request any CBP-related information for these specific encounters from the CBP FOIA Division—not from USCIS, *id.* ¶¶ 8–9, but the plaintiff does not appear to have done so.  CBP's search of TECS and ATS provided reason to believe that documents related specifically to the August 1, 2010, encounter would be found in the New York office, but no other encounters raised similar concerns.  Burroughs Decl. ¶ 30.  Thus, CBP's search was "reasonably calculated to uncover all relevant documents."  *Truitt*, 897 F.2d at 542 (internal quotation marks omitted); *see also Cause of Action v. IRS*, 253 F. Supp. 3d 149, 159–60 (D.D.C. 2017).

The plaintiff further contends that CBP's search of its New York office was inadequate because the Burroughs declaration does not "identify the specific files searched at the New York field office."  Pl.'s Reply at 18.  "To prevail on summary judgment," however, CBP must show only that "it made a good faith effort to conduct a search for the requested records, using

methods which can be reasonably expected to produce the information requested." *Reporters Comm. for Freedom of Press*, 877 F.3d at 402 (quoting *Oglesby*, 920 F.2d at 68).  This burden is satisfied by "submitting '[a] reasonably detailed affidavit, setting forth the search terms and the type of search performed, and averring that all files likely to contain responsive materials (if such records exist) were searched.'"  *Id.* (quoting *Oglesby*, 920 F.2d at 68).  CBP met this standard by conducting, in good faith, an additional search of the New York field office after recognizing that certain responsive records, pertaining to the August 1, 2010, encounter, might be found in that office.  Burroughs Decl. ¶ 30.  The declaration explains that CBP FOIA officials "perform[ed] an electronic search using search criteria reasonably tailored to identify all records that may be responsive to the Request" and conducted a thorough search of "paper files related to Plaintiff."  *Id.* ¶ 31.  Moreover, the search terms used in this additional search were even broader than those used in the search of the main office, including not only the plaintiff's name but also "the name and email address of Plaintiff's legal counsel related to the August 1, 2010 encounter."  *Id.*  Admittedly, the Burroughs Declaration could have been more specific regarding the method used to identify the custodians and which of their files were searched—but "[t]he arguable inadequacy of the search description[ ] here is, however, no more than marginal and does not render the grant of summary judgment inappropriate."  *Perry v. Block*, 684 F.2d 121, 127 (D.C. Cir. 1982).  CBP has adequately explained "in reasonable detail the scope and method of the search conducted by the agency," which "suffice[s] to demonstrate compliance with the obligations imposed by the FOIA."  *Id.*; *see also Cause of Action*, 253 F. Supp. 3d at 160 ("The law is clear that FOIA does not provide requesters with a right to demand an all-encompassing fishing expedition of files in every office within an agency.") (internal quotation marks omitted).

### C.    The FBI and the CBP Have Satisfied Their Segregability Obligations

Finally, the plaintiff argues that the FBI and the CBP failed to satisfy their segregability obligations.  *See* Pl.'s Cross-Mot. at 23–24.  "The FOIA requires that '[a]ny reasonably segregable portion of a record shall be provided to any person requesting such record after deletion of the portions which are exempt.'" *Morley*, 508 F.3d at 1123 (alteration in original) (quoting 5 U.S.C. § 552(b)).  To satisfy its segregability obligation, an "agency must provide a 'detailed justification' for [ ] non-segregability," but the agency "is not required to provide so much detail that the exempt material would be effectively disclosed."  *Johnson v. Exec. Office for U.S. Attorneys*, 310 F.3d 771, 776 (D.C. Cir. 2002) (quoting *Mead Data Cent., Inc. v. U.S. Dep't of Air Force*, 566 F.2d 242, 261 (D.C. Cir. 1977)).  An agency may provide sufficient justification by describing the materials withheld, the exemption under which they were withheld, and an affidavit attesting that "it released all segregable material."  *Loving v. Dep't of Def.*, 550 F.3d 32, 41 (D.C. Cir. 2008) (stating that "the description of the document set forth in the *Vaughn* index and the agency's declaration that it released all segregable material" are "sufficient for [the segregability] determination").  Notably, "[a]gencies are entitled to a presumption that they complied with the obligation to disclose reasonably segregable material."  *Sussman*, 494 F.3d at 1117.

Here, the FBI and the CBP met their segregability burdens by submitting *Vaughn* indices, in combination with the attestations of their respective declarants, that the responsive documents were reviewed on a line-by-line basis and that no further segregation would be possible.  *See Judicial Watch, Inc. v. Consumer Fin. Prot. Bureau*, 60 F. Supp. 3d 1, 13 (D.D.C. 2014) ("The reviewing court may rely on the description of the withheld records set forth in the Vaughn index and the agency's declaration that it released all segregable information."); *Canning v. U.S. Dep't of State*, 134 F. Supp. 3d 490, 517–18 (D.D.C. 2015) (same).  Specifically, the FBI averred that "[d]uring the processing of plaintiff's request, each responsive page was individually examined

to identify non-exempt information that could be reasonably segregated from exempt information for release" and that "[t]he FBI conducted a page-by-page, line-by-line review of all responsive information."  Second Hardy Decl. ¶ 10.  Similarly, the CBP stated that its officials "conducted a line-by-line review of the records determined to be responsive, to identify information exempt from disclosure or for which a discretionary waiver of exemption could apply," and that they were "satisfied that all reasonably segregable portions of the relevant record have been released to the Plaintiff."  Burroughs Decl. ¶ 52.  The plaintiff offers no reason to rebut the "presumption that [the agencies] complied with the obligation to disclose reasonably segregable material."  *Sussman*, 494 F.3d at 1117.  Thus, based on the FBI's and the CBP's supporting declarations, the agencies have adequately specified "which portions of the document[s] are disclosable and which are allegedly exempt."  *Vaughn v. Rosen*, 484 F.2d 820, 827 (D.C. Cir. 1973).

## IV.    CONCLUSION

For the foregoing reasons, the defendants' Second Motion for Summary Judgment is GRANTED and the plaintiff's Second Cross-Motion for Summary Judgment is DENIED.  An appropriate Order accompanies this Memorandum Opinion.

Date: March 29, 2018

_____
BERYL A. HOWELL
Chief Judge