UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| LAURA POITRAS, <br><br> Plaintiff, <br><br> v. <br><br> DEPARTMENT OF HOMELAND SECURITY, *et al.*, <br><br> Defendants. | Civil Action No. 15-1091 (BAH) <br><br> Chief Judge Beryl A. Howell |

**MEMORANDUM OPINION**

Pending before the Court is the plaintiff Laura Poitras's motion for attorneys' fees and costs, pursuant to the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552(a)(4)(E), against the defendants Department of Homeland Security ("DHS"), the Department of Justice, and the Office of the Director of National Intelligence ("ODNI"). *See* Pl.'s Mot. Att'ys Fees ("Pl.'s Mot."), ECF No. 45. The underlying FOIA requests sought records related to the "plaintiff and her repeated border stops and detentions at airports while traveling in pursuit of her journalistic endeavors." *Id.* at 1. Shortly after the plaintiff initiated this lawsuit, several of the defendants' components released previously withheld records responsive to the plaintiff's FOIA requests, prompting the plaintiff to contend that she is both eligible for, and entitled to, attorneys' fees. *See generally id.* The defendants concede the plaintiff's eligibility but contest her entitlement to attorneys' fees. *See generally* Defs.' Opp'n to Pl.'s Mot. ("Defs.' Opp'n"), ECF No. 48. For the following reasons, the plaintiff's motion is denied.

I. **BACKGROUND**

Set out below is the procedural and factual background relevant to the plaintiff's pending motion, with a fuller account provided in the Court's previous opinions resolving the parties'

cross-motions for summary judgment. *See Poitras v. U.S. Dep't of Homeland Sec.* ("*Poitras II*"), 303 F. Supp. 3d 136, 143–49 (D.D.C. 2018); *Poitras v. U.S. Dep't of Homeland Sec.* ("*Poitras I*"), No. 15-CV-1091 (KBJ), 2017 WL 7053929 (D.D.C. Mar. 31, 2017).

### A. The Plaintiff's FOIA requests

The plaintiff is a U.S. citizen, a journalist, and an Oscar-winning filmmaker who, between July 2006 and April 2012, was subjected to "Secondary Security Screening Selection" at the United States border for every international flight she took into the country. Compl. ¶¶ 2–3. The plaintiff was subjected to the same screening prior to several international flights out of the United States and some domestic flights. *Id.* ¶ 3. In total, the plaintiff was detained for secondary screening more than 50 times over the six-year period. *Id.* ¶ 3.

"[O]ut of [her] desire to understand why she was stopped, detained, and questioned at the U.S. border by her own government for every international flight she took entering her own country for *six years*," *see* Pl.'s Mem. Opp'n to Defs.' Second Mot. Summ. J. & Mem. Supp. Pl.'s Second Cross-Mot. Summ. J. ("Pl.'s Second Mem.") at 1, ECF No. 26 (emphasis in original), the plaintiff, on January 24, 2014, sent FOIA requests to the Federal Bureau of Investigation ("FBI"), to ODNI, to DHS, and to several DHS components, including U.S. Customs and Border Protection ("CBP"), U.S. Citizenship and Immigration Services ("USCIS"), U.S. Immigration and Customs Enforcement ("ICE"), the Transportation Security Administration ("TSA"), for "all agency records concerning, naming, or relating to Ms. Poitras." Compl. ¶¶ 27–29.

### B. The Defendants' Responses to the Plaintiff's FOIA Requests

Initial responses to the plaintiff's FOIA requests varied. DHS sent the plaintiff a letter on February 3, 2014 confirming receipt of her request and asking for additional search parameters.

Defs.' First. Mot. Summ. J. ("Defs.' First Mot."), Decl. of Kevin L. Tyrell ("DHS Decl.") ¶ 8, ECF No. 14-8. After the plaintiff provided clarification, DHS responded, on March 26, 2014, informing the plaintiff that her request had been referred to CBP and TSA. *Id.* ¶¶ 10–11.

TSA, for its part, on February 6, 2014, and again on March 26, 2014, acknowledged receipt of the plaintiff's FOIA request but asked for additional information to help identify the requested records. Defs.' First Mot., Decl. of Regina Ann McCoy ("TSA Decl.") ¶¶ 7, 10, ECF No. 14-4. The plaintiff never provided the information TSA solicited. *Id.* ¶¶ 9, 11.

Although CBP did not acknowledge to the plaintiff receipt of her FOIA request, Compl. ¶ 37, upon such receipt, CBP began searching databases thought most likely to have responsive records, Defs.' First Mot., Decl. of Sabrina Burroughs ("CBP Decl.") ¶ 5, ECF No. 14-3.

The FOIA request sent to ICE was delivered to the wrong address, and so, unremarkably, ICE was unaware of the plaintiff's request until the civil complaint was filed. Defs.' First Mot., Decl. of Fernando Pineiro ("ICE Decl.") ¶¶ 5-11, ECF No. 14-7. In any event, ICE did not have responsive records. *Id.* ¶ 37.

USCIS, upon receipt of the plaintiff's request, sent two letters—one on January 30, 2014 and the other on April 2, 2014—informing the plaintiff that USCIS had no responsive records. Defs.' First Mot., Decl. of Jill A. Eggleston ("USCIS Decl.") ¶¶ 7–8, ECF No. 14-6. The plaintiff administratively appealed USCIS's determination that it had no responsive records, but that appeal was denied. *Id.* ¶ 9.

ODNI, on January 31, 2014, confirmed receipt of the plaintiff's FOIA request, Compl. ¶ 67, but informed her, on February 25, 2014, that the agency could neither confirm nor deny the existence of responsive information that may have been classified, Defs.' First Mot., Decl. of Jennifer L. Hudson ("ODNI Decl.") ¶ 21, ECF No. 14-2. The plaintiff administratively appealed

3

the denial the request sent to ODNI, *id.* ¶ 22, which appeal was pending at the time the plaintiff filed her complaint, Compl. ¶¶ 69, 71.

Finally, the FBI sent the plaintiff a letter on February 19, 2014 acknowledging receipt of the FOIA request, *see* Defs.' First Mot., First Decl. of David M. Hardy ("First FBI Decl.") ¶ 7, ECF No. 14-1, and then, on February 2, 2015, referred "sets of pages to other agencies, including [U.S. Army Criminal Investigation Command], the U.S. Army, the Executive Office for United States Attorneys ("EOUSA"), the Department of the Air Force, the U.S. Army Intelligence and Security Command ("USAISC"), the Central Intelligence Agency ("CIA"), CBP, the Department of State, the Department of Transportation, and the National Guard Bureau for direct response to the plaintiff or for coordination with the FBI," *Poitras II*, 303 F. Supp. 3d at 146 (citing First FBI Decl. ¶¶ 96–109). Despite the lack of any adverse determination on the plaintiff's FOIA request, the plaintiff, on May 29, 2015, filed an administrative appeal with the FBI's Office of Information Policy. First FBI Decl. ¶ 8. On July 13, 2015, the same day that the plaintiff initiated this lawsuit, the Office of Information Policy informed the plaintiff that the FBI had not made any decisions about the plaintiff's FOIA request and, consequently, no decision was subject to administrative review. *Id.* ¶ 9.

At bottom, although several of the agencies had responded to the plaintiff's FOIA request, or were in the process of doing so, as of July 2015, none of the entities to which the plaintiff had submitted a FOIA request had produced responsive records. *See Poitras I*, 2017 WL 7053929, at *1. Accordingly, the plaintiff filed her complaint, on July 13, 2015, alleging that each agency to which she submitted a FOIA request had "wrongfully withheld agency records requested by Plaintiff by failing to comply with the statutory time limit for the

processing of her FOIA requests, and/or by rendering final decisions to withhold the records Plaintiff requested." Compl. ¶ 76.

After the plaintiff filed her complaint, the Court ordered the parties to confer about a proposed schedule either for briefing or for the disclosure of records responsive to the FOIA requests. Min. Order (Sept. 18, 2015). The result was an agreement "that FBI, CBP, and TSA [would] begin producing non-exempt responsive records no later than November 13, 2015." Joint Status Report (Oct. 1, 2015) at 2, ECF No. 8. Additionally, by the same date, ODNI agreed to "provide Plaintiff with an interim or final response to her administrative appeal." *Id.*

To identify responsive records, the FBI used the search terms "'Laura Poitras,' 'Laura Susan Poitras,' 'Lara Susan Poitras,' a three-way phonetic breakdown of 'Laura Poitras,' and an on-the-nose search for 'Laura Susan Poitras' and 'Lara Susan Poitras.'" *Poitras II*, 303 F. Supp. 3d at 147. From those searches, the FBI made five releases of information between October 14, 2015 and March 4, 2016. First FBI Decl. ¶¶ 12–16.[1] "In total, the FBI identified 350 responsive pages, released in full 1 page, released in part 262 pages, and withheld in full 87 pages." *Poitras II*, 303 F. Supp. 3d at 146–47. The redactions were applied pursuant to FOIA Exemptions 1, 3, 5, 6, 7(A), 7(C), 7(D), and 7(E). *Id.* at 147. Later, between the two rounds of summary judgment briefing that eventually ensued, "the FBI discovered that three records relating to the closure of the investigation into Plaintiff's activities in Iraq had been inadvertently missed and not previously produced to Plaintiff." Joint Mot. to Temporarily Suspend Briefing at 1, ECF No. 27; *see also* Defs.' Reply Supp. Second Mot. Summ. J & Opp'n Pl.'s Second Cross-Mot. Summ. J., Fourth Decl. of David M. Hardy ("Fourth FBI Decl.") ¶ 4, ECF No. 29-1 ("Upon review of the final production of this [FOIA/Privacy Act] request, it was determined that three (3) serials,

---

[1] Separately, the FBI referred 35 pages to the U.S. Army Criminal Investigation Command, which released 24 of those pages on October 2, 2015. Pl.'s Mot. at 4. In turn, the Criminal Investigation Command referred eight pages to the U.S. Army, which provided those pages to the plaintiff on February 12, 2018. *Id.* at 4 n.3.

consisting of six (6) pages related to the closure of the FBI's investigation into Plaintiff's activities in Iraq, had been inadvertently overlooked during the processing phase and were not processed and provided to Plaintiff."). The plaintiff received those six pages on September 25, 2017, revealing that the FBI had investigated the plaintiff's involvement in a November 2004 ambush of U.S. Soldiers in Iraq, which resulted in the death of one soldier, but, as of August 30, 2012, the FBI had concluded that "[b]ased on the investigation to date, it is not believed that POITRAS is involved in terrorist activities and investigative methods have not revealed threats to national security warranting further action." Pl.'s Mot., Ex. A, FBI Electronic Communication (Aug. 30, 2012), ECF No. 45-1.

As for CBP, that agency, upon receipt of the plaintiff's FOIA request, searched two internal systems—TECS and the Automated Targeting System—"using Plaintiff's name and date of birth." *Poitras II*, 303 F. Supp. 3d at 147. On November 12, 2015, after the plaintiff initiated this lawsuit, CBP released 492 pages of records from TECS and 220 pages of partially redacted records found in the Automated Targeting System. *Id.* Later, CBP became aware of records likely to be found in a New York office related to an August 1, 2010 incident at JFK International Airport, and, on February 27, 2016, after conducting a supplemental search utilizing search terms including "Poitras," "Laura Poitras," and the name and email address of the plaintiff's legal counsel during that encounter, released 223 pages of partially redacted records. *Id.* at 148. Twenty-six CBP documents, totaling 3,182 pages, were withheld in full. *Id.*

TSA produced 21 pages of responsive records, with redactions, on November 12, 2015. TSA Decl. ¶ 27.

On November 12, 2015, ODNI confirmed no responsive records existed in the agency's personnel files and that the agency could not confirm or deny the existence of any records in its classified holdings. ODNI Decl. ¶ 25.

### C. Summary Judgment Briefing

On June 2, 2016, all defendants moved for summary judgment claiming that they had adequately searched for responsive records and that any withholdings were proper under FOIA's exemptions. Defs.' Mem. Supp. First Mot. Summ. J. ("Defs.' First Mem.") at 1, ECF No. 14. The plaintiff, for her part, cross-moved for summary judgment, Pl.'s First Cross-Mot. Summ. J., ECF No. 18, but challenged only the adequacy of CBP's search, whether the FBI's withholdings under Exemptions 5, 7(A), 7(D), and 7(E) were proper, and whether CBP and the FBI produced all reasonably segregable information, *Poitras I*, 2017 WL 7053929, at *1. The plaintiff did not contest any of CBP's, TSA's, or ODNI's withholdings, the FBI's withholdings under Exemptions 1, 3, 6, and 7(c), or the adequacy of any component's search other than that of CBP. Pl.'s Mem. Opp'n Defs.' Mot. Summ. J. & Supp. Pl.'s Cross-Mot. Summ J. ("Pl.'s First Mem.") at 2, ECF No. 18. Thus, the defendants were granted summary judgment as to each of those issues. *Poitras I*, 2017 WL 7053929, at *1 n.2. As to the disputed matters, each cross-motion for summary judgment was denied without prejudice and the defendants were instructed to explain more thoroughly the basis of the FBI's withholdings under FOIA Exemptions 5, 7(A), 7(D), and 7(E). *Id.* at *2–3. The Court reserved judgment on the remaining issues. *Id.*

Three and a half months after the Court's first ruling, the defendants filed their second motion for summary judgment, *see* Defs.' Second Mot. Summ. J., ECF No. 24, which included an index explaining the bases for their withholdings, *see Vaughn* Index, ECF No. 24-2. Again, the plaintiff cross moved for summary judgment, *see* Pl.'s Second Cross-Mot. Summ. J., ECF

7

No. 26, renewing her arguments that the FBI misapplied Exemptions 5, 7(A), 7(D), and 7(E) and failed to segregate non-exempt information, and that CBP failed to conduct a sufficient search of its records, *see* Pl.'s Second Mem. at 2. While briefing was ongoing, this case was transferred to the undersigned judge. Following a brief stay, entered at the parties' request, *see* Consent Mot. Stay, ECF No. 32, the defendants' motion for summary judgment was granted, and the plaintiff's cross-motion was denied, *Poitras II*, 303 F. Supp. 3d at 164. The FBI's exemptions were proper and sufficiently explained, *id.* at 151–59, the CBP's search was adequate, *id.* at 160–63, and the defendants satisfied their segregability obligations, *id.* at 163–64.

### D. The Plaintiff's Attorneys' Fee Motion

The denial of her summary judgment cross-motion notwithstanding, the plaintiff filed a motion for attorneys' fees and costs on October 1, 2018. *See generally* Pl.'s Mot. Following several extensions, the defendants' filed an opposition, *see* Defs.' Opp'n, and the plaintiff filed her reply, *see* Pl.'s Reply. Supp. Pl.'s Mot. ("Pl.'s Reply"), ECF No. 50. The plaintiff's motion for attorneys' fees is now ripe.

## II. LEGAL STANDARD

The FOIA authorizes the "assess[ment] against the United States [of] reasonable attorney fees and other litigation costs reasonably incurred in any case . . . in which the complainant has substantially prevailed." 5 U.S.C. § 552(a)(4)(E)(i). This provision "'was not enacted to provide a reward for any litigant who successfully forces the government to disclose information it wished to withhold,' but instead 'had a more limited purpose—to remove the incentive for administrative resistance to disclosure requests based not on the merits of exemption claims, but on the knowledge that many FOIA plaintiffs do not have the financial resources or economic incentives to pursue their requests through expensive litigation.'" *Davy v. CIA* ("*Davy II*"), 550

F. 3d 1155, 1158 (D.C. Cir. 2008) (quoting *Nationwide Bldg. Maint., Inc. v. Sampson*, 559 F.2d 704, 711 (D.C. Cir. 1977)).

The D.C. Circuit recognizes that "[t]he statute contains no express limitation on who counts as an eligible 'complainant' or whose work is compensable by payment of 'attorney fees,'" *Nat'l Sec. Counselors v. CIA*, 811 F.3d 22, 28 (D.C. Cir. 2016), but this statutory provision has been interpreted to divide "the attorney-fee inquiry into two prongs, which our case law has long described as fee 'eligibility' and fee 'entitlement,'" *Brayton v. Office of the U.S. Trade Representative*, 641 F.3d 521, 524 (D.C. Cir. 2011) (citing *Judicial Watch, Inc. v. U.S. Dep't of Commerce*, 470 F.3d 363, 368–69 (D.C. Cir. 2006)). Thus, the plaintiff must demonstrate both eligibility and entitlement to the award. *See McKinley v. Fed. Hous. Fin. Agency*, 739 F.3d 707, 710 (D.C. Cir. 2014); *Weisberg v. U.S. Dep't of Justice*, 745 F.2d 1476, 1495 (D.C. Cir. 1984) ("[E]ligibility alone is not enough. . . . [T]he complainant must [also] show that he or she is 'entitled' to an award."). Upon establishing both eligibility and entitlement, the plaintiff must then show the reasonableness of the fee request. *See Covington v. District of Columbia*, 57 F.3d 1101, 1107 (D.C. Cir. 1995).

To satisfy the eligibility requirement, the plaintiff must show that she "substantially prevailed" in the underlying FOIA litigation by gaining relief from either: "(I) a judicial order, or an enforceable written agreement or consent decree; or (II) a voluntary or unilateral change in position by the agency, if the complainant's claim is not insubstantial." 5 U.S.C. § 552(a)(4)(E)(ii). Under the first option, the claimant substantially prevails when "'the order changed the legal relationship between [the parties],' and [] the plaintiff 'was awarded some relief on the merits of his claim.'" *Judicial Watch, Inc. v. FBI*, 522 F.3d 364, 367 (D.C. Cir. 2008) (quoting *Davy v. CIA*, 456 F.3d 162, 165 (D.C. Cir. 2006)). Under the second option,

9

attorneys' fees may be awarded solely due to a change in an agency's position, for example, when the plaintiff's lawsuit "substantially caused the government to release the requested documents before final judgment." *Brayton*, 641 F.3d at 524–25; *see also Elec. Privacy Info. Ctr. v. U.S. Dep't of Homeland Sec.*, 811 F.Supp.2d 216, 232 (D.D.C. 2011) ("The key question under this 'catalyst theory' is whether 'the institution and prosecution of the litigation cause[d] the agency to release the documents obtained during the pendency of the litigation.'" (alteration in original) (quoting *Church of Scientology of Cal. v. Harris*, 653 F.2d 584, 587 (D.C. Cir. 1981))).[2]

If the plaintiff has substantially prevailed, the court proceeds to the entitlement prong. The D.C. Circuit "has long applied a multi-factor standard for evaluating whether a plaintiff who is eligible for attorneys' fees is also entitled to such fees." *McKinley*, 739 F.3d at 711. "Four non-exclusive factors typically govern the entitlement inquiry: '(1) the public benefit derived from the case; (2) the commercial benefit to the plaintiff; (3) the nature of the plaintiff's interest in the records; and (4) the reasonableness of the agency's withholding' of the requested documents." *Id.* (quoting *Tax Analysts v. U.S. Dep't of Justice*, 965 F.2d 1092, 1093 (D.C. Cir. 1992)); *see also Morley v. CIA*, 719 F.3d 689, 690 (D.C. Cir. 2013).[3] "No one factor is

---

[2] The catalyst theory was utilized in this Circuit until 2001, when the Supreme Court held that "the 'catalyst theory' is not a permissible basis for the award of attorney's fees." *Buckhannon Bd. & Care Home, Inc. v. W. Va. Dep't of Health & Human Res.*, 532 U.S. 598, 610 (2001). Congress responded by resurrecting the catalyst theory for FOIA cases in the Open Government Act of 2007. *See Davis v. U.S. Dep't of Justice*, 610 F.3d 750, 752 (D.C. Cir. 2010). "The purpose and effect of this law, which remains in effect today, was to change the 'eligibility' prong back to its pre-*Buckhannon* form." *Brayton*, 641 F.3d at 525. As a result, "plaintiffs can now qualify as 'substantially prevail[ing],' and thus become eligible for attorney fees, without winning court-ordered relief on the merits of their FOIA claims." *Id.* (alteration in original).

[3] In his concurring opinion in *Morley v. CIA*, then-Judge Kavanaugh urged that the D.C. Circuit "should ditch the four-factor standard," as "hav[ing] no basis in the statutory text." 719 F.3d at 690 (Kavanaugh, J., concurring). He strongly criticized the factors as "so vague and malleable that they provide very little guidance to district courts," leading "to unpredictable and inconsistent fees results from case to case and judge to judge," *id.* at 692, and "caus[ing] continuing real-world problems—among other things, drawing arbitrary and unfair distinctions among FOIA requesters and requests, and generating satellite litigation that is wasteful and unnecessary, *id.* at 693. This four-factor standard, however, remains binding on this Court.

dispositive," *Davy II*, 550 F.3d at 1159, and balancing is left to the district court's discretion, *Morley v. CIA*, 894 F.3d 389, 391 (D.C. Cir. 2018).

If the plaintiff has established eligibility and entitlement, the plaintiff must then establish the reasonableness of the calculation in her fee request. *See Covington*, 57 F.3d at 1107. The reasonableness determination involves three parts: "(1) determination of the number of hours reasonably expanded [sic] in litigation; (2) determination of a reasonable hourly rate or 'lodestar'; and (3) the use of multipliers as merited." *Save Our Cumberland Mountains, Inc. v. Hodel*, 857 F.2d 1516, 1517 (D.C. Cir. 1988). The plaintiff must submit evidence regarding "the attorneys' billing practices; the attorneys' skill, experience, and reputation; and the prevailing market rates in the relevant community." *Covington*, 57 F.3d at 1107. Provided that the plaintiff has submitted the required information, the presumption is that the number of hours billed and the hourly rates are reasonable. *Jackson v. District of Columbia*, 696 F. Supp. 2d 97, 101 (D.D.C. 2010). Reasonable hourly rates often begin by comparing counsel's requested rate to a fee matrix maintained by the Civil Division of the local United States Attorney's Office—the USAO matrix. *See Gatore v. U.S. Dep't Homeland Sec.*, 286 F. Supp. 3d 25, 32–47 (D.D.C. 2017); *Elec. Privacy Info. Ctr. v. DEA*, 266 F. Supp. 3d 162, 171 (D.D.C. 2017); *see also Salazar v. District of Columbia*, 809 F.3d 58, 62 (D.C. Cir. 2015) (explaining that a fee matrix may establish "a general guideline for awarding attorneys' fees based on experience"). The burden then shifts to the defendant to "provide specific contrary evidence tending to show that a lower rate would be appropriate." *Covington*, 57 F.3d at 1110.

## III. DISCUSSION

As noted, the defendants concede that the plaintiff is eligible for attorneys' fees, Defs.' Opp'n at 8, but object to the plaintiff's entitlement to attorneys' fees, *id.* at 8–15. The factors informing a FOIA plaintiff's entitlement to attorneys' fees are considered in order.

### A. Public Benefit

Under the first factor, "both the effect of the litigation for which fees are requested and the potential public value of the information sought" are considered. *Davy II,* 550 F.3d at 1159. Public value is judged *ex ante,* which is to say value must be assessed based on the nature of the FOIA request, rather than the actual documents received. *Morley v. CIA* ("*Morley II*"), 810 F.3d 841, 844 (D.C. Cir. 2016). *Ex ante*, the request must have "at least a modest probability of generating useful new information about a matter of public concern." *Id.* Records' public value depends on "the significance of the contribution that the released information makes to the fund of public knowledge." *McKinley*, 739 F.3d at 711. "Generally, released documents have an insufficient public benefit when they pertain to such highly particularized interactions with an agency that non-participants would have only a limited interest in the records as a means of learning what the agency was doing." *Dorsen v. SEC*, 15 F. Supp. 3d 112, 121 (D.D.C. 2014). Thus, released documents that are relevant to only a subset of the public, such as contractors or a private litigant, confer little public benefit. *See Cotton v. Heyman*, 63 F.3d 1115, 1120 (D.C. Cir. 1995); *Fenster v. Brown*, 617 F.2d 740, 744–45 (D.C. Cir. 1979). Conversely, the release of documents relevant to historically important events—a presidential assassination, for example— benefit the public. *Davy II*, 550 F.3d at 1159.

Here, the plaintiff insists that her FOIA requests conferred a public benefit because they "had 'at least a modest probability of generating useful new information about a matter of public

concern.'" Pl.'s Mot. at 10 (quoting *Morley II*, 810 F.3d at 844). To substantiate that her border stops were a matter of public concern, the plaintiff notes contemporaneous news coverage of her detentions. *Id.* at 10–11; Pl.'s Reply at 3. Beyond that, the plaintiff curated an art exhibition at the Whitney Museum of American Art utilizing some documents received through the FOIA requests. Pl.'s Mot. at 11; Pl.'s Reply at 3. Finally, the plaintiff's FOIA litigation generated its own news coverage. Pl.'s Mot. at 12; Pl.'s Reply at 3.

The defendants answer that from the outset this case has been about the plaintiff obtaining records of her own detentions. Defs.' Opp'n at 9. Thus, the defendants contend, the requested records are of "'highly particularized interactions[s]' between a private individual and a government agency that the public had only a limited interest in." *Id.* (quoting *Dorsen*, 15 F. Supp. 3d at 121).

Despite some public interest, the plaintiff's FOIA requests always have been about her access to records that would explain her own experiences, much like the plaintiff's FOIA requests at issue in *Dorsen v. SEC*, 15 F. Supp. 3d 112 (D.D.C. 2014). There, the FOIA request was "primarily relevant to Lauer in his attempt to vacate the civil judgment against him." *Id.* at 122. Thus, the disclosed information, which related to the SEC's authorization of a civil action against the requester, "had limited public benefit." *Id.* Yet, limited public benefit is not *no* public benefit, and even if the requests were individualized, "some value attaches to the disclosure of the SEC's discrete decisions by shedding light on this enforcement activity." *Id.* Balancing those competing considerations, in *Dorsen* the first factor was neutral. *Id.*

As in *Dorsen*, certainly some value attaches to information illuminative of a U.S. agency's treatment of a U.S. citizen. Here, however, the public benefit is stronger given both the plaintiff's notoriety and that the FOIA requests might reasonably been viewed as likely to shed

13

light on regulation of air travel, a topic of broader public interest than SEC enforcement actions. In particular, *ex ante*, the plaintiff's FOIA requests could have been expected to illuminate why someone is designated for "Secondary Security Screening Selection," whether the plaintiff's persistent detentions were related to suspicions that she had advance knowledge of a 2004 attack in Iraq that led to the death of an American soldier, or whether the regular stops were connected to the plaintiff's professional work. *See, e.g.*, Pl.'s Mot, Ex. C, Rachel Bunn, *Oscar-nominated Filmmaker Detained at U.S. Border Sparks Debate Over Searches of Electronic Devices*, REPS. COMM. FOR FREEDOM OF THE PRESS, Apr. 12, 2012 at 1, ECF No. 45-3 (contextualizing the plaintiff's border detentions as "renewing the legal debate over electronic device searches at U.S. borders and their implications for newsgathering"); *see also id.*, Ex. D, Peter Maass, *How Laura Poitras Helped Snowden Spill His Secrets*, N.Y. TIMES MAG., Aug. 13, 2013 ("Maass Article") at 6–8, ECF No. 45-4 (hypothesizing that allegations of plaintiff's knowledge of the 2004 ambush "may be related to [her] many detentions and searches" and noting that the Secondary Security list has "been criticized by civil rights groups for being too broad and arbitrary and for violating the right of Americans who are on them"). All three of those possibilities are of public concern.

Accordingly, this factor favors an award of attorneys' fees.

**B.     Commercial Benefit and Nature of Interest**

The second factor—the request's commercial benefit to the plaintiff—and the third factor—the plaintiff's interest in the records—often have been combined "into a single factor assessing whether a plaintiff 'has sufficient private incentive to seek disclosure' of the documents without expecting to be compensated for it." *McKinley*, 739 F.3d at 711 (quoting *Davy II*, 550 F.3d at 1160). "When a litigant seeks disclosure for a commercial benefit or other

14

personal reasons, an award of fees is usually inappropriate." *Cotton*, 63 F.3d at 1120; *see also Fenster*, 617 F.2d at 744 ("[T]he private self-interest motive of, and . . . pecuniary benefit to, the complainant (is) sufficient to insure the vindication of the rights given in the FOIA." (quoting S. Rep. No. 854, 93d Cong., 2d Sess. 19 (1974)).

As to her personal interest in the records, the plaintiff insists that she "is a professional journalist and filmmaker who sought the released records for the purpose of public dissemination" and that "[p]ursuit of information through FOIA for journalistic purposes is not deemed to be for 'commercial benefit.'" Pl.'s Mot. at 13 (citing *Davy II*, 550 F.3d at 1162); *see also Tax Analysts*, 965 F.2d at 1096 ("We have said (quoting a Senate Report on FOIA) that 'news interests should not be considered commercial interests,' and that 'a court would generally award fees if the complainant's interest in the information was . . . journalistic.'" (quoting *Fenster,* 617 F.2d at 742 n. 4)). While the defendants agree that "FOIA requests for journalistic purposes are typically not deemed to be for commercial benefit," the defendants dispute that the plaintiff's requests were made for any journalistic purpose. Defs.' Opp'n at 12.

Importantly, the D.C. Circuit has disclaimed any automatic rule that a news organization can have no self-interested reason for making a FOIA request. *Tax Analysts*, 965 F.3d at 1096; *see also Barnard v. Dep't of Homeland Sec.*, 656 F. Supp. 2d 91, 99–100 (D.D.C. 2009) ("Upon consideration of the second and third factors, the undersigned finds that because Plaintiff's interest in the records was personal, rather than scholarly or journalistic, 'an award of fees is usually inappropriate.'" (quoting *Cotton*, 63 F.3d at 1120)). Journalists, like anyone else, can act with self-interest. Indeed, here, irrespective of her profession, the plaintiff's FOIA requests patently were self-interested.

15

The best evidence of the plaintiff's motivation is her own filings. The opening paragraph in the plaintiff's memorandum in support of her second cross-motion for summary judgment explains, "[t]his case arises out of a U.S. citizen's desire to understand why she was stopped, detained, and questioned at the U.S. border by her own government for every international flight she took entering her own country for *six years*." Pl.'s Second Mem. at 1 (emphasis in original). Although the memorandum goes on to describe the plaintiff's profession and history of covering controversial subjects, "like the U.S. military occupation of Iraq, mass spying, and Guantanamo Bay," *id.*, that information is presented to imply why the plaintiff may have been subjected to stops, not why she was making her FOIA requests. As for the impetus of the FOIA request, the plaintiff notes that "[s]he was never provided any rationale" for the detentions. *Id.*; *see also* Pl.'s First Mem. at 1 ("Plaintiff, who has no criminal record and was never provided with any rationale for her treatment, sought information concerning the government's actions through the Freedom of Information Act . . . ."); Pl.'s First. Cross-Mot. Summ. J, Decl. of Laura Poitras ¶ 55, ECF No. 18-2 ("Prior to my receipt of responsive documents in the course of this FOIA litigation, I was never provided with any indication of why I had been subjected to heightened security screenings and airport detentions on a routine basis for a period of 6 years . . .'").

Further, when the plaintiff spoke publicly about this case, she couched the FOIA requests as an effort to learn why she had been stopped every time she flew. *See* Maass Article at 8 ("Poitras has never received any explanation for why she was put on a watch list. 'It's infuriating that I have to speculate why,' she said."); Pl.'s Mot., Ex. H, *Government Documents Show FBI Cleared Filmmaker Laura Poitras After Six-Year Fishing Expedition*, ELEC. FRONTIER FOUND., Dec. 6, 2017 at 3, ECF No. 45-8 ("Poitras filed her FOIA lawsuit in 2015 to find out not only

16

why her detentions started in the first place, but also why they abruptly stopped in June 2012, coincidentally (or not) just two months after her detentions made national news.").

The plaintiff now back pedals to contend that the requests were made for information of public interest and, since she was the only requester who could access the information, her request must not have been self-motivated. Pl.'s Reply at 5–6. Certainly, the plaintiff could have made the requests to satiate a public appetite for information about her border detentions. As the record lays bare, that did not happen.

Through her FOIA requests, the plaintiff discovered why she had been stopped at the border for six years. From the beginning, that was the motivation behind the her FOIA requests. Nothing is wrong with self-interested FOIA requests, they just are less likely to result in an award of attorneys' fees. Consequently, this factor counsels against attorneys' fees.

### C. The Reasonableness of the Defendants' Withholdings

The final factor "'considers whether the agency's opposition to disclosure had a reasonable basis in law' and 'whether the agency had not been recalcitrant in its opposition to a valid claim or otherwise engaged in obdurate behavior.'" *McKinley*, 739 F.3d at 712 (quoting *Davy II*, 550 F.3d at 1162). The relevant agency opposition is not limited to an agency's litigation posture, but rather factors "whether the agency has shown that it had any colorable or reasonable basis for not disclosing the material until after [the plaintiff] filed suit." *Davy II*, 550 F.3d at 1163. The purpose of the final factor is "to disincentivize requesters from complaining about reasonable withholdings while incentivizing the government to promptly turn over— before litigation is required—any documents that it ought not withhold. That purpose will be ill-served if the government can prevail on this factor by saying nothing and forcing the requester to sue . . . ." *Id.* at 1166.

As to this factor, the plaintiff faces an uphill battle. The defendants' withholdings were not only reasonable, but ultimately were upheld. *Poitras II*, 303 F. Supp. 3d at 164 (D.D.C. 2018). Nevertheless, the plaintiff argues that the defendants' pre-litigation conduct was unreasonable, underscoring that she did not receive any records responsive to her FOIA requests until bringing this lawsuit, which followed the FOIA requests by nearly 18 months. Pl.'s Mot. at 14; *see also* 5 U.S.C. § 552(a)(6)(A)(i) (requiring that "[e]ach agency, upon any request for records made under paragraph (1), (2), or (3) of this subsection, shall determine within 20 days . . . after the receipt of any such request whether to comply with such request" and notify the requester of that determination).

Yet, an agency's failure to respond to a FOIA request within the statutory timeline is not automatically unreasonable. Indeed, in every case in which the plaintiff has prevailed in some respect, and thus is eligible for an award of attorneys' fee, the defendants will have fallen short of their statutory duties somehow. *Elec. Privacy Information Ctr. v. U.S. Dep't Homeland Sec.*, 999 F. Supp. 2d 61, 69 (D.D.C. 2013). Thus, the defendants' departure from the statutory obligation must truly have been unreasonable. *Id.* Here, that is not the case.

To start, USCIS told the plaintiff within six days of the plaintiff's request that it had no responsive records and confirmed that fact two months later. USCIS Decl. ¶¶ 7–8. ICE never received the plaintiff's request because she sent it to the wrong address. ICE Decl. ¶¶ 5–11. Thus, neither USCIS nor ICE even departed from FOIA's obligations. ODNI told the plaintiff just a month after she submitted her request that the agency did not have responsive information. ODNI Decl. ¶ 21. DHS notified the plaintiff within two months that the request had been referred to CBP and TSA. DHS Decl. ¶¶ 10–11. Although both of these responses fell outside the 20-day window, neither missed by too much.

Of the three agencies that ultimately had responsive records, TSA twice, including once within two weeks of receiving the plaintiff's request, asked for additional information to help locate responsive records. TSA Decl. ¶¶ 7, 10. The plaintiff did not provide the information that TSA requested. *Id.* ¶¶ 9, 11. When TSA eventually received a copy of the plaintiff's complaint, the agency had enough information to search for, and produce, responsive records. *Id.* ¶¶ 13, 27. The FBI acknowledged the plaintiff's request on February 19, 2014 and advised her that the FBI was searching for records. First FBI Decl. ¶ 7. Referrals were sent out to other components on February 2, 2015, *id.* ¶¶ 96–109, before the plaintiff brought this action. Production of FBI records began shortly after the plaintiff initiated her complaint and was thought to be complete as of March 4, 2016. *Id.* ¶¶ 12–16. CBP's response is less impressive. While the agency, "[u]pon receiving the request" began evaluating where to search for responsive records, CBP Decl. ¶ 5, CBP did not communicate with the plaintiff about its receipt of her request or offer any contemporaneous account of its effort to respond, *see generally id.* Nor has CBP provided any details during this FOIA litigation about its search that explain the delay. Of the defendants, CBP's withholdings come closest to unreasonable. For the remainder, the withholdings were perfectly reasonable.

In addition, the plaintiff insists that the FBI's withholding, until September 2017, of six pages of records related to the conclusion of its investigation lacked a reasonable basis in the law. Pl.'s Mot. at 15; Pl.'s Reply at 7–8. The plaintiff is right insofar as the defendants do not attempt to offer any legal justification for that delayed production. Rather, the defendants explain that the delayed release of that handful of records was inadvertent, *see* Fourth FBI Decl. ¶ 4, an explanation that the plaintiff gives no reason to doubt.

Contrary to the plaintiff's argument, *see* Pl.'s Mot. at 15; Pl.'s Reply at 9, the delayed production of six pages does not resemble the facts in *Negley v. FBI*, in which the FBI had "repeatedly 'found' responsive documents long after it should have." 818 F. Supp. 2d 69, 77 (D.D.C. 2011). There, the FBI had "stonewalled" and "delayed" its response to the plaintiff's FOIA request for nearly ten years. *Id.* Here, the FBI discovered these documents in preparation for its opposition to Plaintiff's motion for summary judgment. A single instance of oversight, quickly corrected, is not "obdurate behavior." The FBI was not stonewalling, delaying, or repeatedly finding responsive documents.

Thus, the final factor moderately favors the defendants.

*   *   *

In sum, the first factor slightly favors the award of attorneys' fees. The second and third factors, however, counsel against the award of fees, a conclusion that the fourth factor tends to support. On balance, then, the plaintiff has not demonstrated an entitlement to an attorneys' fees award.[4]

## IV. CONCLUSION

For the foregoing reasons, the Plaintiff's Motion for an Award of Attorneys' Fees and Costs, ECF No. 45, is DENIED. An appropriate Order accompanies this Memorandum Opinion.

**SO ORDERED**.

Date: April 11, 2019

_____
BERYL A. HOWELL
Chief Judge

---

[4] The defendants argue that even if the plaintiff is entitled to attorneys' fees, the amount of fees she seeks, $63,627, *see* Pl.'s Reply at 11, is unreasonable, *see* Defs.' Opp'n at 15–18. That argument need not be considered because the plaintiff is not entitled to any fee award.